# EXHIBIT 3



# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

October 13, 2022

Ms. Stephanie Pollack
Deputy Administrator
Federal Highway Administration
Docket Management Facility
U.S. Department of Transportation
[Submitted electronically via www.regulations.gov]

RE:    Notice of Proposed Rulemaking
       Docket No. FHWA-2021-0004; RIN 2125-AF99
       National Performance Management Measures; Assessing Performance
       of National Highway System, Greenhouse Gas Emissions Measure

Dear Ms. Pollack:

As the chief legal officer of the State of Texas, I am writing to urge withdrawal of the proposed "National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure" (the "GHG Measure"), either in whole or as it relates to Texas. This proposed rulemaking constitutes federal agency overreach because, as provided below, Congress has not directed or authorized the Federal Highway Administration ("FHWA") to regulate greenhouse gases. Moreover, the Office of the Attorney General of Texas fully supports and incorporates here the Texas Department of Transportation's ("TxDOT") comments, which identify a litany of additional issues the FHWA failed to consider prior to proposing the GHG Measure.

The FHWA seeks to resurrect the greenhouse gas measure it concluded in 2018 was inappropriate under the Moving Ahead for Progress in the 21st Century Act ("MAP-21") and takes this version of the proposed rule even further by mandating that state agencies identify declining $CO_2$ targets equal to net-zero emissions by 2050. The FHWA includes this additional requirement without identifying sufficient statutory authority because none exists. The FHWA thus ignores the cooperative federalism embodied in MAP-21, usurping the States' primary role in setting performance measure targets. And this measure is even more aggressive than a similar greenhouse gas measure that failed to pass

Congress. The FHWA may not avoid the intent of Congress, formed through compromise, and undertake by rulemaking what Congress declined to do by law. The FHWA must respect the primary role of States in carrying out the Federal-Aid Highway Program and withdraw this proposed GHG Measure.

## *Background*

23 U.S.C. § 150(c)(3)(ii) directs the Secretary of Transportation to establish measures *for States to use* to assess:

- the condition of pavements on the Interstate system;
- the condition of pavements on the National Highway System (excluding the Interstate);
- the condition of bridges on the National Highway System;
- the performance of the Interstate System; and
- the performance of the National Highway System (excluding the Interstate System).

Notably, section 150(c)(3)(ii) provides that the measures the FHWA establishes are "*for States to use*" in administering the National Highway Performance Program ("NHPP").[1] The NHPP is State-focused; and, as the FHWA itself admitted, "State DOTs and MPOs have the authority to establish their targets at their discretion. The MAP-21 does not provide FHWA the authority to approve or reject State DOT or MPO established targets."[2] The proposed rulemaking does not even attempt to justify FHWA's reversal.

Section 150 also specifically limits FHWA's authority to establish performance measures. 23 U.S.C. § 150(c)(2)(C) provides that, when promulgating performance measures, the FHWA "shall…limit performance measures only to those described in this subsection." FHWA may not establish any measure it likes simply because it finds it expedient.

Additionally, in 2021, Congress passed the bipartisan Infrastructure Investment and Jobs Act[3] ("IIJA"). The initial house bill contained a section

---

[1] 23 U.S.C. § 150(c)(3)(ii) (emphasis added).

[2] National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 82 Fed. Reg. 5922 (Jan. 18, 2017) ("2017 GHG Measure").

[3] Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat 429 (2021).

establishing "in consultation with the Administrator of the Environmental Protection Agency, measures for States to use to assess: (A) carbon dioxide ($CO_2$) emissions per capita on public roads; (B) carbon dioxide emissions using different parameters than described in subparagraph (A) that the Secretary determines to be appropriate; and (C) any other greenhouse gas emissions on public roads that the Secretary determines to be appropriate," and provided that States could not establish a "regressive target" for the greenhouse gas measure above. But these sections appear nowhere in the enacted bill, disappearing in the engrossed Senate amendment. This means Congress declined to pass a substantially identical greenhouse gas measure to the one FHWA now seeks to promulgate by rule.

In 2017, the FHWA promulgated a final rule, 82 FR 5970-01 (the "2017 Rule"), which established a measure of the percent change in $CO_2$ emissions from the reference year 2017, generated by on-road mobile sources on the NHS (the 2017 Rule).[4] Although the State of Texas asserts this prior rule overstepped the bounds of the FHWA's authority, the measure only required State Departments of Transportation ("State DOTs") and Metropolitan Planning Organizations ("MPOs") to measure annual tons of $CO_2$ from all on-road mobile sources on the NHS and set their own targets. It did not purport to require States to set declining targets in accordance with a FHWA timeline derived solely from an executive order.

Like the proposed GHG Measure, the 2017 Rule relied on a strained reading of section 150(c)(3)(A)(ii)(IV)–(V) by interpreting "performance" of the Interstate and National Highway Systems to include the general effect on climate change of emissions produced while driving on the NHS. This interpretation inappropriately refers to the general goals for the Federal-Aid Highway Program set out in a different subsection, 23 U.S.C. § 150(b).

In 2018, the FHWA reversed course and repealed the portion of the 2017 Rule establishing a $CO_2$ measure. In doing so, the FHWA consulted 23 U.S.C. § 119, the section of the statute that specifically lays out the NHPP under which FHWA sought to establish the $CO_2$ measure.

---

[4] 2017 GHG Measure.

Under section 119(d), NHPP funds may *only* be used for a project that fulfills three separate criteria. The project must be:

1. a project or part of a program of projects supporting progress toward the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System; AND
2. consistent with sections 134 and 135; AND
3. for at least one of the purposes listed in 119(d)(2)(A–S).

23 U.S.C. § 119(d) (emphasis added).

The FHWA considered the first requirement above and acknowledged that the outlined national performance goals (improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System) were "consistent with an interpretation of 'performance' that focuses on the physical condition of the system and the efficiency of transportation operations across the system."[5]

The FHWA also pointed out that Congress specifically designated a part of section 150(c) for on-road mobile source emissions, limiting the types of emissions that could be the subject of a performance measure to those listed in the Congestion Mitigation and Air Quality ("CMAQ") statute (23 U.S.C. 149(b)). In light of the fact FHWA *must* "limit performance measures only to those described in [§ 150(c)]", and the measure for on-road mobile source emissions measures described in 150(c) is limited to CMAQ program emissions, the FHWA correctly concluded that "the term 'performance' as it relates to the Interstate System and the National Highway System is better read not to encompass measures relating to $CO_2$, as previously concluded by FHWA in adopting the GHG measure in January 2017."[6]

---

[5] National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 83 Fed. Reg. 24924 (May, 31, 2018) ("2018 Rule Repeal").

[6] *Id.*

**The proposed GHG Measure violates MAP-21, was directly rejected by Congress, and exceeds the FHWA's statutory authority.**

## I.    There is no statutory authority allowing the FHWA to establish a greenhouse gas measure.

Now, four years later, the FHWA seeks to resurrect the 2017 Rule, with the added requirement that States set declining targets to align with the current administration's goals of 50 to 52 percent emissions reductions by 2030 and net-zero emissions by 2050.

In establishing this measure, the FHWA jettisons its 2018 better reasoned (and appropriate) reading of the statute and stretches the definition of "performance" beyond any intent of Congress.

As discussed above, section 119(d) limits the projects NHPP may fund to those that are "a project … supporting progress towards the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System[.]"[7] The FHWA attempts to wave away the limitations in 119(d) by falsely claiming it does not account for all factors: "Section 119(d)(1), Title 23, U.S.C., establishes eligibility criteria for using funds apportioned to a State for carrying out the NHPP, but does not set forth all relevant considerations for carrying out the program. For example, 23 U.S.C. 119(d)(2) identifies purposes for eligible projects, including development and implementation of a State DOT's asset management plan for the NHS under 23 U.S.C. 119(e) and environmental mitigation efforts related to projects funded under 23 U.S.C. 119(g)."[8]

But this reading completely ignores the actual statutory language—the statute establishes that NHPP funds may only be obligated for a project that "support[s] progress towards the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System; **and** …" is

---

[7] 23 U.S.C. § 119(d)(1).

[8] National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 87 Fed. Register 42408-09 (July 15, 2022) ("Proposed 2022 GHG Measure").

for "1 or more of the [purposes laid out in 119(d)(2)]."[9] The FHWA attempts to argue that section 119(d)(1) does not set forth all the relevant considerations for carrying out the program—despite a laundry list of purposes included in section 119(d)(2), none of which include anything to authorize the GHG Measure. Therefore, the FHWA needs authorization from a different statute.

Looking back to section 150(c)(2)(C), this statute directs the FHWA to "limit performance measures only to those described in this subsection." But the FHWA claims that "[t]he provision limits FHWA's authority to establish measures States use to assess performance only to the Interstate System and the NHS. However, the provision does not otherwise limit the meaning of 'performance.'"[10]

The FHWA's argument proves too much. Under its reading, the FHWA would be enabled to promulgate any performance measures it found convenient, as long as the FHWA could shoehorn the measure into a nebulous, all-encompassing definition of "performance." This reading resembles the one rejected by the Supreme Court in *West Virginia v. EPA*:

> All the Government can offer, however, is the Agency's authority to establish emissions caps at a level reflecting "the application of the best system of emission reduction ... adequately demonstrated." As a matter of "definitional possibilities," generation shifting can be described as a "system"—"an aggregation or assemblage of objects united by some form of regular interaction,"—capable of reducing emissions. But of course almost anything could constitute such a "system"; shorn of all context, the word is an empty vessel. Such a vague statutory grant is not close to the sort of clear authorization required by our precedents.[11]

As in *West Virginia v. EPA*, "shorn of all context" the word "performance" could conceivably include environmental performance—but without that context the word is an empty vessel. And "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices."[12]

---

[9] 23 U.S.C. 119(d)(emphasis added).
[10] Proposed 2022 GHG Measure at 42408.
[11] *W. Virginia v. Envtl. Prot. Agency*, 142 S. Ct. 2587, 2614 (2022).
[12] *Id*. (internal punctuation omitted).

Under 150(c), emissions limits are tied to the CMAQ. But $CO_2$ is neither a CMAQ emission, nor a surrogate for any CMAQ emission. And there are no nonattainment and maintenance areas for $CO_2$.

The FHWA attempts to sidestep the existence of the CMAQ program and the fact it does not include $CO_2$ as a pollutant, by claiming that "[s]ince Congress did not expressly limit emissions measures to those related to CMAQ, it is reasonable to conclude that Congress intended FHWA to retain the discretion to adopt other emissions measures, such as the GHG measure."[13] But this statement is exactly backwards when promulgating rules. Agencies are creatures of statute and have no powers outside those granted by statute. Agency power must be expressly *granted* by statute, not expressly limited.[14] And "[w]ere courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well."[15]

Perhaps recognizing that sections 150 and 119 do not support, and in fact disallow, the FHWA's measure, the FHWA takes the shotgun approach, casting about for support in numerous statutory provisions that, again, do not actually support the proposed GHG Measure:

- **23 U.S.C. 150(b)(6)**

    o 23 U.S.C. 150(b)(6) is arguably the centerpiece of the FHWA's argument for its authority. But 150(b) is a set of general goals for the highway program—it does not grant the FHWA any authority to take concrete action. Statutes involve both purposes and means. Declarations of purpose are not carte blanche authority for agencies to use any means they find helpful to achieve those purposes: like other administrative agencies, the FHWA "must abide not only by the ultimate purposes Congress has selected, but

---

[13] Proposed 2022 GHG Measure at 42410.

[14] *Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993).

[15] *Railway Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994), amended, 38 F.3d 1224 (D.C. Cir. 1994).

by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."[16]

- **23 U.S.C. § 119(e)(2)**

  - 23 U.S.C. § 119(e)(2) is a section requiring State asset management plans to contain projects supporting progress towards the general goals set out in 150(b). This section is a limitation on the State asset management plan—that the plan will not support projects working against the goals in 150(b). It is not a grant of authority to the FHWA to mandate any performance measure it thinks could support one of the goals in 150(b).

- **23 U.S.C. 101(b)(3)(G)**

  - 23 U.S.C. 101(b)(3)(G) is a general declaration by Congress that "transportation should play a significant role in promoting economic growth, improving the environment, and sustaining the quality of life[.]" This passage gives no authority to the FHWA to determine how transportation shall improve the environment.

- **23 U.S.C. 134(a)(1)**

  - 23 U.S.C. 134(a)(1) is a general declaration in the Metropolitan transportation planning section that it is in the national interest to promote various goals, including "tak[ing] into consideration resiliency needs while minimizing transportation-related fuel consumption and air pollution through metropolitan and statewide transportation planning processes identified in this chapter[.]" Again, this passage gives no means authority to the FHWA and in fact states that it is in the national interest to accomplish these goals "through metropolitan and statewide transportation planning processes identified in this chapter," not "through any means the FHWA finds appropriate."

---

[16] *Nat'l Ass'n of Broadcasters v. Fed. Communications Comm'n*, 39 F.4th 817, 820 (D.C. Cir. 2022) (internal quotation marks omitted).

State of Texas Comments on
Docket No. FHWA-2021-004
*Page 9 of 13*

- **23 U.S.C. 134(c)(1)**

  o 23 U.S.C. 134(c)(1) instructs metropolitan planning organizations to develop transportation plans and programs "through a performance-driven, outcome-based approach to planning for metropolitan areas of the state." Nowhere in this section does it grant the FHWA free-wheeling authority to mandate any measure it feels will protect the environment.

- **23 U.S.C. 134(h)**

  o 23 U.S.C. 134(h)(1) is, similarly, an instruction that MPOs should carry out a planning process for projects that will, among other things, "protect and enhance the environment, promote energy conservation, improve the quality of life, and promote consistency between transportation improvements and State and local planned growth and economic development patterns…[and] improve the resiliency and reliability of the transportation system and reduce or mitigate stormwater impacts of surface transportation." Nothing in this section is a grant of authority for the FHWA to require state DOTs to regulate GHGs and set declining targets for GHGs consistent with goals set out in executive orders.

  o 23 U.S.C. 134(h)(2) instructs MPOs to use "a performance-based approach to transportation decision making to support the national goals described in section 150(b) of this title and the general purposes described in section 5301 of title 49." Again, this instructs MPOs to conform their programs to support the national goals for the NHS—but gives the FHWA no authority to order States or MPOs to protect the environment by any means it finds convenient.

- **23 U.S.C. 135(d)(1)**

  o 23 U.S.C. 135(d)(1) is, similarly, an instruction that States should carry out a planning process for projects that will, among other things, "protect and enhance the environment, promote energy conservation, improve the quality of life, and promote consistency

between transportation improvements and State and local planned growth and economic development patterns...[and] improve the resiliency and reliability of the transportation system and reduce or mitigate stormwater impacts of surface transportation." Nothing in this section is a grant of authority for the FHWA to require state DOTs to regulate GHGs.

- **23 U.S.C. 135(d)(2)**

    o 23 U.S.C. 135(d)(2) instructs States to use "a performance-based approach to transportation decision making to support the national goals described in section 150(b) of this title and the general purposes described in section 5301 of title 49." Again, this instructs States to conform their programs to support the national goals for the NHS—but gives the FHWA no authority to order states to protect the environment by any means it finds convenient.

## II.    The FHWA does not even attempt to justify its imposition of a requirement of net-zero emissions by 2050.

The FHWA recognizes that it has no authority to "approve or reject State DOT or MPO established targets."[17] Because of this, the FHWA incredibly attempts to claim that it does not "mandate the level of the targets. Rather, State DOTs and MPOs would have flexibility to set targets that are appropriate for their communities and that work for their respective climate change and other policy priorities, *as long as the targets would reduce emissions over time.*"[18] Regarding the 2050 deadline, this benchmark is inconsistent with the FHWA's own statement recognizing its lack of authority to mandate targets. Essentially, the FHWA offers to let States choose any number of interim two- and four-year targets leading up to 2050—so long as the final target is zero—even though the FHWA has no authority to mandate any specific target at all, including net-zero by 2050.

Further, the FHWA identifies no authority allowing it to dictate State performance measure targets. And it identifies no limit on this theoretical authority. If the FHWA may require State DOTs to reduce on-road mobile

---

[17] 2017 GHG Measure at 5897.
[18] Proposed 2022 GHG Measure at 42401 (emphasis added).

emissions 50-52 percent by 2030 and net-zero by 2050, what would stop the
FHWA from decreeing that States must reduce on-road mobile emissions to
net zero the very next year—a task that would require a huge overhaul of the
American economy, the way of life of all Americans, and in any event, likely is
not possible for State DOTs to accomplish with *any* degree of effort. TxDOT's
comments provide further details demonstrating the absurdity of these targets
if the FHWA continues with this rulemaking and the impossibility for States,
especially the State of Texas, to meet these requirements.

### III.   The FHWA, MPOs, and State DOTs have no experience in environmental policymaking.

Administrative agencies are creatures of statute and have only the limited
powers granted them under statute.[19] An administrative agency has no
authority to act outside of the statute, and any action it takes outside of those
bounds is void.[20] And "[a]s a matter of statutory construction, statutes granting
power to administrative agencies are strictly construed as conferring only
those powers granted expressly or by necessary implication."[21]

Further, administrative agencies' powers are restricted to the realm of their
expertise. "When an agency has no comparative expertise in making certain
policy judgments, we have said, Congress presumably would not task it with
doing so."[22] And where agencies seek authority to promulgate regulations with
major economic and political significance, there is "reason to hesitate before
concluding that Congress meant to confer such authority."[23]

The FHWA consistently downplays the effects that will result from requiring
all transportation on the NHS to be carbon-neutral in the identified short time
period—it would significantly change the affordability, availability, and
method of travel for tens of millions of Americans and necessitate a complete
overhaul of States' transportation infrastructure. The FHWA estimates that
the regulation "would not have sufficient federalism implications to warrant
the preparation of a federalism assessment," that the GHG Measure "is not
anticipated to have a significant economic impact on a substantial number of

---

[19] *Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993).
[20] *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986).
[21] *Walker v. Luther*, 830 F.2d 1208, 1211 (2d Cir. 1987).
[22] *West Virginia v. EPA*, 142 S.Ct. at 2612–13.
[23] *Id.* at 2608.

small entities," and, most incredibly, that "[t]he proposed rule would not have an annual effect on the economy of $100 million or more. The proposed rule would not adversely affect in a material way the economy, any sector of the economy, productivity, competition, or jobs."[24] In fact, FHWA seems to estimate that the financial effect of going net-zero on the NHS to be less than $13 million.[25]

The Supreme Court has admonished against such uninformed grabs at regulatory power:

> As in *MCI,* we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion. To find that the FDA has the authority to regulate tobacco products, one must not only adopt an extremely strained understanding of "safety" as it is used throughout the Act—a concept central to the FDCA's regulatory scheme—but also ignore the plain implication of Congress' subsequent tobacco-specific legislation.[26]

As in *FDA v. Brown & Williamson*, the FHWA grabs on to an "extremely strained" understanding of "performance," and is transparently attempting to regulate what Congress did not pass in the IIJA. The fact that Congress considered, but did not pass, a greenhouse gas measure "strongly militates against a judgment that Congress intended a result that it expressly declined to enact."[27]

---

[24] Proposed 2022 GHG Measure at 42418.

[25] *Id.*

[26] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

[27] *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 199–200 (1974).

State of Texas Comments on
Docket No. FHWA-2021-004
*Page 13 of 13*

## *Conclusion*

In sum, this rulemaking is plainly beyond the scope of the FHWA's statutory authority. For these reasons, as well as the many others raised in TxDOT's comments, the FHWA must withdraw the proposed GHG Measure, either in whole or as it relates to Texas.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas