# EXHIBIT 4



OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA

October 13, 2022

Stephanie Pollack
Deputy Administrator, Federal Highway Administration
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20560

RE:   National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure
      Docket No. FHWA-2021-0004

Dear Ms. Pollack:

The states of Oklahoma, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, South Carolina, South Dakota, Texas, Utah and Virginia submit these comments in response to your invitation in the above-captioned docket. We are concerned that your proposal to amend the National Highway Performance Program (NHPP) performance management measures to add a greenhouse gas emission measure is an improper attempt to exceed statutory limits. Congress has created a program and appropriated some funding toward addressing carbon emissions on highways, and your proposal appears to second-guess Congress on how best to address carbon emissions. Your proposed rule would be unlawful, and your agency should decline to adopt it.

**COMMENT 1:**   **The proposed rule violates statutory text.**

The national highway performance measures are assigned to four categories, most of which are tied to other statutes. The first three categories authorize performance measures to carry out "section 119," "section 148," and "section 149," respectively. 23 U.S.C. § 150(c)(3)-(5). Section 119 describes a series of projects that are permissible using NHPP funding, *see id.* § 119, while section 148 addresses highway safety improvement, *see id.* § 148, and section 149 addresses the Congesting Mitigation and Air Quality (CMAQ) improvement program, *see id.* § 149. The final category of performance measures addresses "freight movement on the Interstate System," a subset of the National Highway System.

These measures are intentionally limited to certain categories. Congress asserted broad goals for "the Federal-aid highway program" as a whole. *Id.* § 150(b). Then, despite the broad goals, Congress directed that "the Secretary shall . . . limit performance measures only to those described in this subsection." *Id.* § 150(c)(2)(C).

Your proposal inappropriately seeks to evade the limiting statute. *Id.* § 150(c)(2)(C). You broadly assert that you can write any performance measure under the broad goals described in subsection 150(b) through two creative readings of subsection 150(c). In particular, you appear to assert either that

(1) subsection 150(c)'s performance measures for section 119 are not limited to section 119 or that (2) performance measures for section 119 are only limited by the broad goals described in subsection 150(b). *See* 87 Fed. Reg. 42401, 42408. Neither proposal is a plausible reading of the statute.

In elaborating on your first interpretation, you assert that the limit on performance measures in § 150(c)(2)(C) only limits your agency to anything assessing performance on the Interstate System and the NHS. *See* 87 Fed. Reg. 42401, 42408. As you know, § 150(c)(3)(A) lists several requirements "for the purpose of carrying out section 119," including "measures for States to use to assess—(IV) the performance of the Interstate System; and (V) the performance of the National Highway System (excluding the Interstate System." 23 U.S.C. § 150(c)(3)(A)(ii). As you explain, you view § 150(c)(3)(A)(ii)(IV)–(V) as only bounded by the "seven national goals" in § 150(b) and not by the reference to section 119 in that same subsection.

Your proposed reading of the statute is errant because it renders the limit in § 150(c)(2)(C) meaningless. It is a "rudimentary canon of statutory construction that [] superfluities are to be avoided." *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1274 (10th Cir. 2017) (quoting *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1130 (10th Cir. 2013)); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). A limit that only required a relationship to the National Highway System would be no limit at all because any national highway performance measure must relate to the NHS. Thus, if § 150(c) authorizes any performance measure related to the NHS, the "limit" language in § 150(c)(2)(C) would be meaningless, which is contrary to statutory canons.

You likely understand the flaw in your statutory interpretation because you do not follow this method in reading the rest of the statute. As you know, § 150(c)(5)(B) requires measurements for "on-road mobile source emissions," and carbon under your definition is an on-road mobile source emission. Nevertheless, as you admit in your proposal, performance measurements for "on-road mobile source emissions" are limited to performance measures "for the purposes of carrying out the CMAQ Program" under section 149. *See* 87 Fed. Reg. 42401, 42408. There is no statutory interpretation method that would endorse reading § 150(c)(5) as limited to section 149 but also read § 150(c)(3) as *not* limited to section 119. Your own interpretation of § 150(c)(5) indicates that you do not truly believe your unbounded interpretation of § 150(c)(3).

The correct interpretation of § 150(c)(3) is that § 150(c)(3)(A)(ii)(IV)–(V) describes the manner of recording performance measures for Section 119. The relevant subsection specifies that it is "for the purpose of carrying out section 119," 23 U.S.C. § 150(c)(3)(A), before requiring separate measurements for the Interstate System (a subset of NHS) and for the NHS (excluding the Interstate System), *id.* § 150(c)(3)(A)(ii)(IV)–(V). The most straightforward reading of this statute is that Congress wanted to know how Section 119 funds are affecting Interstate System roads separately from how Section 119 funds are affecting other NHS roads. These provisions in a subsection about Section 119 do not empower the agency beyond its Section 119 authority.

In elaborating on your second interpretation, you appear to recognize the statutory problems with your first interpretation and seek to ground your proposed rule in Section 119. *See* 87 Fed. Reg. 42401, 42408. As you explain, you believe that because (1) the states' asset management plan described in section 119(e) must support progress toward the goals in § 150(b), and because (2) one of the goals in section 119(b) is to increase resilience to mitigate the cost of damages from environmental harm, section 119 "provides additional statutory support for the GHG measure." *Id.*

You admit, as you must, that section 119(d) sets limits for the use of NHPP funds. *See id.* You acknowledge that your agency previously held under a different administration that it could not spend funds on a greenhouse gas measure because such a measure is not related to the subset of national performance goals specified in section 119(d)(1). *See id.* You appear to disagree with this view because you believe that you can ignore the list of performance goals in section 119(d)(1) if you satisfy one or more criteria in section 119(d)(2). *See id.* In particular, you observe that permissible uses of funding under Section 119(d)(2) include supporting development of a state asset management plan under section 119(e) or environmental mitigation efforts under section 119(g).

With respect, it appears you have made a substantial mistake in reading section 119(d) by missing that it includes the word "and." Section 119(d) states that funds "may be obligated only for a project on an eligible facility" that satisfies the criteria in section 119(d)(1)(A) "and" 119(d)(1)(b) "and for 1 or more of the following purposes" under 119(d)(2). *See* 23 U.S.C. § 119(d). You do not dispute, as you cannot, that section 119(d)(1)(A) limits the use of funds to projects "toward the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement," a list that noticeably omits the environmental goals. *Id.* § 119(d)(1)(A). Thus, whatever merit there is to your reading of § 119(d)(2), it is indisputable that the greenhouse gas measure cannot satisfy all three of the relevant criteria because it is not permissible under § 119(d)(1)(A).

To be sure, the express terms of section 119(d)(1)(A) apply to "funds apportioned to a State" and are not aimed directly at your agency. *See id.* § 119(d)(1)(A). Nevertheless, because the relevant performance measures must be "for the purpose of carrying out Section 119," they must be related to projects that are funded in "carrying out Section 119." *Id.* § 150(c)(3)(A). Any other reading would construe your authority over performance measures as unbounded, reducing both of your proposed statutory interpretations to the sole theory that you are unbounded by Section 119 in drafting rules for § 150(c)(3). As explained previously, that view is untenable under the text of the statute.

In short, your agency can only adopt performance measures described by Congress, and Congress did not give you unbounded authority to adopt any measure related to the NHS, nor did Congress include greenhouse gas measures in permissible projects under Section 119. Your proposed rule is not in accordance with law, and you should decline to adopt it.

**COMMENT 2:**   **The proposed rule contradicts the statutory structure.**

Even aside from the textual flaws, your proposed rule also contradicts the structure of the relevant statutes. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *W. Virginia v. Envtl. Prot. Agency*, 142 S. Ct. 2587, 2607 (2022) (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)). Your proposed rule devotes significant time to alleging issues with carbon emissions, but it fails to substantially acknowledge that Congress has already addressed carbon reduction. *See* 23 U.S.C. § 175. Congress has dedicated funding for projects that "support the reduction" of "carbon dioxide emissions from on-road highway sources of those emissions within a State." *Id.* § 175(a)(2), (c)(1).

Despite the creation of this carbon reduction program, Congress did not include the program in the described performance measures. *See id.* § 150(c). Congress was aware of the option of performance measures for emissions, as it included the requirement to assess "on-road mobile source emissions" for the CMAQ program. *Id.* § 150(c)(5). Nevertheless, Congress did not include Section 175 in the

programs subject to emissions measures. In fact, Congress left the sole quantification of carbon emissions in statute "at the discretion of the State." *Id.* § 175(d)(2)(D).

That carbon program is not the only program omitted from performance measures in § 150(c). Beyond the programs listed in that subsection, the federal government also funds the Surface Transportation Block Grant Program (section 133), Metropolitan Planning (section 134), the National Highway Freight Program (section 167), and the PROTECT program (section 176). *See id.* § 104(b). Congress did not designate any of these programs for performance measures, and the only performance measure that is not restricted to a particular program is freight movement on the Interstate System. *See id.* § 150(c). The clear inference from this structure is that Congress made a deliberate choice to set performance measures for some programs and not set performance measures for other programs.

Your proposal to include carbon measures and carbon reduction under the NHPP is an improper attempt to avoid Congress's structure for performance measures. By creating a separate program for carbon reduction, Congress indicated that carbon reduction was not part of existing highway programs, including the NHPP. Your attempt to add carbon reduction to NHPP performance measures improperly second-guesses Congress on which highway programs need performance measures.

In short, Congress funds carbon reduction as part of a highway program it chose not to measure. You cannot collapse carbon reduction into the NHPP without setting aside Congress's policy choices on what to measure and what not to measure. Accordingly, your proposed rule violates the structure of the statutes and exceeds your statutory authority.

**COMMENT 3:**       **The proposed rule violates the Appropriations Clause.**

Your proposed rule also inappropriately seeks to rebalance Congress's funding priorities. The U.S. Constitution's Appropriations Clause specifies that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. 1, § 9, cl. 7. Congress, in turn, has appropriated approximately 2.56% of state highway funds (after certain fixed distributions) to carbon reduction, and it has appropriated approximately 59.08% of the same funds to the NHPP. *See* 23 U.S.C. § 104(b)(1), (b)(7). By attempting to spend NHPP funds on carbon reduction, you are attempting to alter Congressional appropriations to reach your preferred spending on carbon reduction. You do not have the authority either to alter appropriations or to direct States to spend those funds differently than Congress appropriated. Accordingly, your proposed rule violates the Appropriations Clause.

**COMMENT 4:**       **The proposed rule fails to consider the Major Questions doctrine.**

Your tenuous textual theories also fail to consider the Major Questions doctrine. Courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *W. Virginia*, 142 S. Ct. at 2609 (internal quotation marks and citation omitted). Even if your agency has "a colorable textual basis" or a "merely plausible textual basis" for a proposed rule, it cannot enact major policy changes without demonstrating "clear congressional authorization" for the power it claims. *Id.*

The proposed rule would be a major policy decision. By its plain text, it purports to direct state departments of transportation in all 50 states to begin new regulations of greenhouse gas emissions, including both monitoring and reducing those emissions. This radical change in state highway funding would reallocate funding from other existing highway priorities to address carbon emissions to the detriment of other policy goals in highway funding. Your extensive analysis about the alleged need for "Confronting the Climate Crisis," 87 Fed. Reg. 42401, 42405-42407, confirms that your proposed rule would be a major policy change to existing rules.

The proposed rule also lacks clear congressional authorization. As stated above, we believe your rule lacks any textual basis. *See supra* Comment 1. Because you appear to disagree, though, you must explain how your tenuous textual theories amount to clear Congressional authorization. We view it as highly unlikely that any court would agree that a statutory interpretation that disregards limits in the statute qualifies as clear congressional authorization.

In short, if you disagree with our first comment and believe you have a textual basis for your rule, you should still decline to adopt the rule because you have not identified any clear congressional authorization for the major policy change you propose.

**COMMENT 5:**     **The analysis of the proposed rule should not rely on the values of the social cost of CO2 published by the Interagency Working Group on Social Cost of Greenhouse Gases.**

The Interagency Working Group's "interim" social costs of greenhouse gases ("Interim Estimates") are not a reliable measure of costs and benefits. Using them to calculate your break-even estimates is improper because they almost certainly overstate the benefits, meaning that the reductions required to equal estimated compliance costs are far higher than what you predict in your notice.

Your agency should not use the Interim Estimates because they cannot withstand any serious scrutiny. The IAM-based calculation of so-called "social costs" of greenhouse gases involves wildly speculative guesswork that purports to project the course of all human history for 300 years into the future— including future migration, technological developments, conflicts, adaptation patterns, and mitigation measures. The 2021 Technical Support Document (2021 TSD), announcing the Interim Estimates, admits that the methodology does "not reflect the tremendous increase in the scientific and economic understanding of climate-related damages that has occurred in the past decade." *Louisiana* v. *Biden*, No. 21-1074, Doc. 55-27, at 22 (W.D. La. July 27, 2021). It also concedes that the important choice of discount rate is a naked policy decision that "raises highly contested and exceedingly difficult questions of science, economics, ethics, and law." *Id.* at 17. The discount rate plays an outsized role because the Interagency Working Group's time horizon for *global* damages is the year 2300. The Interagency Working Group had to change one of the three IAMs because its default time horizon was the year 2200—"too short a time horizon because it could miss a significant fraction of damages under certain assumptions." *Louisiana* v. *Biden*, No. 21-1074, Doc. 55-6, at 25 (2010 TSD) (W.D. La. July 27, 2021). The Interagency Working Group also had to speculate "GDP, population, and greenhouse gas emission trajectories after 2100, the last year for which these data are available from the" input models. *Id.*

Even without the benefit of statisticians and data scientists, these facts raise serious questions about the validity and reliability of the methodology that created the Interim Estimates. Other agencies have previously refused to credit these estimates, and you fail to explain why you disagree with their view

on the Interim Estimates. *E.g.*, *EarthReports, Inc.* v. *Fed. Energy Regul. Comm'n*, 828 F.3d 949, 956 (D.C. Cir. 2016) (noting social cost of carbon methodology unfit for use in FERC proceedings). If you continue relying on the Interim Estimates for your regulatory impact analysis, you should address the deficiencies raised in this comment and should address your reasons for departing from FERC's view on the reliability of the Interim Estimates.

We recognize that you stated that "[t]he break-even estimates are not intended [to] justify the proposed rule," 87 Fed. Reg. 42401, 42417. Nevertheless, your extensive regulatory impact analysis belies that suggestion, especially since you requested comment on your analysis. If you believe the Interim Estimates accurately represent your views to the extent feasible, then you should address our concerns with the Interim Estimates in any decision to use them.

**COMMENT 6:**     **You cannot lawfully use a backdated effective date.**

As written, your rule requires that States comply with the GHG performance measure on October 1, 2022. 87 Fed. Reg. 42401, 42412. That date may be a typographical error, as it seems unlikely you intended an effective date before you have even finished accepting comments on the proposed rule. Nevertheless, we do want to remind you that any proposed effective date must be at least 30 days after publication of any rule. *See* 5 U.S.C. § 553(d). Thus, if you disagree with our comments and proceed with adopting the rule anyway, we request that you adopt a lawful effective date in any final rule.

* * *

We appreciate the opportunity to comment on your proposed rule, and we hope that you will decline to adopt it.

Sincerely,

JOHN M. O'CONNOR
*Oklahoma Attorney General*

STEVE MARSHALL
*Alabama Attorney General*

TREG TAYLOR
*Alaska Attorney General*

LESLIE RUTLEDGE
*Arkansas Attorney General*

ASHLEY MOODY
*Florida Attorney General*

CHRIS CARR
*Georgia Attorney General*

TODD ROKITA
*Indiana Attorney General*

DEREK SCHMIDT
*Kansas Attorney General*

DANIEL CAMERON
*Kentucky Attorney General*

JEFF LANDRY
*Louisiana Attorney General*

LYNN FITCH
*Mississippi Attorney General*

AUSTIN KNUDSEN
*Montana Attorney General*

DOUGLAS J. PETERSON
*Nebraska Attorney General*

ALAN WILSON
*South Carolina Attorney General*

MARK VARGO
*South Dakota Attorney General*

KEN PAXTON
*Texas Attorney General*

SEAN REYES
*Utah Attorney General*

JASON MIYARES
*Virginia Attorney General*

CC:    Secretary Pete Buttigieg