## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS AND TEXAS DEPARTMENT OF TRANSPORTATION, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | |
| U.S. DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, PETE BUTTIGIEG, in his official capacity as SECRETARY OF TRANSPORTATION, and SHAILEN BHATT, in his official capacity as ADMINISTRATOR OF THE FEDERAL HIGHWAY ADMINISTRATION, | § § § § § § § § § § § § | Civil Action No. 5:23-cv-304 |
| *Defendants*. | § § | |

## <u>TEXAS'S MOTION FOR PRELIMINARY INJUNCTION ENJOINING THE EFFECTIVENESS, IMPLEMENTATION, AND ENFORCEMENT OF THE 2023 GREENHOUSE GAS RULE</u>

Plaintiffs the State of Texas (State) and the Texas Department of Transportation (TxDOT) (together, Texas) move for a Preliminary Injunction enjoining the effectiveness, implementation, and enforcement of the final rule entitled *National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure* (Final Rule), promulgated by the

Federal Highway Administration (FHWA) and the U.S. Department of Transportation (DOT) (together, Federal Agencies). Fed. R. Civ. P. 65, N.D. Tex. LR-7.1. The Final Rule requires TxDOT (among others) to establish a method of measurement and reporting for greenhouse gas (GHG) emissions associated with transportation (GHG Measure), to establish declining carbon dioxide ($CO_2$) targets for the GHG Measure, and report $CO_2$ reductions as a performance measure. The Final Rule also requires TxDOT to document actions it will take to achieve its declining targets. But the Final Rule impermissibly exceeds the Federal Agencies' statutory authority; is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law; and violates the Spending Clause of the United States Constitution. In light of the rapidly approaching initial reporting deadline of February 1, 2024, Texas asks the Court for an injunction to support the public interest and prevent irreparable harm to Texas's sovereignty and the incurrence of unrecoverable costs to comply with a rule that is unlikely to survive judicial scrutiny.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ v

BACKGROUND ........................................................................................... 1

    A.    The Federal Agencies' authority to establish performance measures. ............................................................................................ 1

    B.    The Federal Agencies' use of performance measures to regulate GHG emissions. ................................................................ 2

          1.    The Federal Agencies' first attempt to require a GHG measure. ............................................................................... 2

          2.    The Federal Agencies realized they overstepped in 2017 and repealed the GHG measure in 2018. ............................... 3

          3.    The Federal Agencies resurrect the GHG measure in 2022 based on executive policy changes and not as a result of a new directive by Congress. ............................... 4

    C.    State DOTs like TxDOT must quickly act to comply with the Final Rule. ........................................................................... 6

NATURE AND STAGE OF THE PROCEEDINGS ........................................ 7

ARGUMENT ................................................................................................ 8

    A.    Texas is likely to succeed on the merits. ....................................... 8

          1.    The Final Rule exceeds the Federal Agencies' statutory authority, in violation of the Administrative Procedure Act. .......................................................... 9

          2.    The Final Rule is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act. ...................... 13

          3.    The Final Rule violates the Spending Clause of the United States Constitution. .............................................. 15

    B.    Texas will suffer imminent and irreparable harms absent an injunction. ..................................................................................... 17

1.    The Final Rule imposes nonrecoverable compliance costs. ................................................................... 18

2.    Texans will suffer from the transformative changes that would need to happen to achieve a declining target. ............................................................................... 19

3.    The Final Rule harms Texas's sovereignty by forcing Texas to identify a declining target. ................................... 20

C.    The equities and public interest weigh in favor of an injunction. ........................................................................ 21

CONCLUSION ............................................................................... 22

CERTIFICATE OF CONFERENCE ............................................. 24

CERTIFICATE OF SERVICE ....................................................... 24

INDEX TO APPENDIX .................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Arlington Cent. Sch. Bd. of Educ. v. Murphy,*
    548 U.S. 291 (2006) ................................................................. 13

*Canal Auth. of State of Fla. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) .......................................................... 7

*Commonwealth of Kentucky, et al v. Federal Highway Administration, et al.,* Civil Action
    No. 5:23-cv-162 (W.D. Ky. Dec. 21, 2023) ......................................... 7

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
    710 F.3d 579 (5th Cir. 2013) ...................................................... 7, 15

*Dayton Bd. of Educ. v. Brinkman,*
    439 U.S. 1358 (1978) ................................................................. 19

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................. 11

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) .............................................................. 8, 10

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ........................................................ 19

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) ....................................................... 19

*Louisiana v. Biden,*
    55 F.4th 1017 (5th Cir. 2022) ...................................................... 15

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
    60 F.4th 956 (5th Cir. 2023) ....................................................... 12

*Michigan v. EPA,*
    576 U.S. 743 (2015) ................................................................. 12

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................. 11

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................. 18

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) ................................................................. 13

*Robinson v. Ardoin,*
  37 F.4th 208 (5th Cir. 2022) ................................................ 18

*Sepulvado v. Jindal,*
  729 F.3d 413 (5th Cir. 2013) ................................................. 7

*Tex. Educ. Agency v. U.S. Dep't of Educ.,*
  992 F.3d 350 (5th Cir. 2021) .........................................13, 14

*Texas v. Biden,*
  10 F.4th 538 (5th Cir. 2021) ................................................ 19

*Texas v. U.S. Env't Prot. Agency,*
  662 F.Supp.3d 739 (S.D. Tex. Mar. 19, 2023) ..................... 18

*Texas v. United States Env't Prot. Agency,*
  829 F.3d 405 (5th Cir. 2016) ........................... 15, 16, 17, 18

*Texas v. United States,*
  40 F.4th 205 (5th Cir. 2022) ................................................ 19

*Util. Air Regulatory Group v. EPA,*
  573 U.S. 302 (2014) .........................................................8, 10

*VanDerStok v. Garland,*
  No. 4:22-CV-00691-O, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022)............... 15

*W. Va. v. EPA,*
  142 S. Ct. 2587 (2022) ....................................................8, 10

*Wages & White Lion Invs., L.L.C. v. FDA,*
  16 F.4th 1130 (5th Cir. 2021) .............................................. 15

*Winter v. Natural Res. Def. Council,*
  555 U.S. 7 (2008) .................................................................. 7

## Constitutional Provisions & Statutes

U.S. Const. art. I, § 8, cl. 1 ..................................................... 13

5 U.S.C. § 706(2)(A) ................................................................ 11

5 U.S.C. § 706(2)(C) .................................................................. 8

5 U.S.C. § 2608 ............................................................................................................. 8

23 U.S.C. § 104(b).......................................................................................................... 14

23 U.S.C. § 119 ............................................................................................................... 2

23 U.S.C § 119 (b) .......................................................................................................... 1

23 U.S.C. § 119(d).....................................................................................................9, 14

23 U.S.C. § 119(d)(1)(A) ................................................................................................ 9

23 U.S.C. § 119(d)(2)(M)................................................................................................ 9

23 U.S.C. § 134 .........................................................................................................9, 14

23 U.S.C. § 135 ...........................................................................................................9,14

23 U.S.C. § 149 ............................................................................................................. 11

23 U.S.C. § 150 ............................................................................................................. 19

23 U.S.C. § 150(b)......................................................................................................... 10

23 U.S.C. § 150(b)(6) ................................................................................................9, 10

23 U.S.C. § 150(c) .........................................................................................1, 2, 4, 9, 10

23 U.S.C. § 150(c)(1) ...................................................................................................... 1

23 U.S.C. § 150(c)(2)(C) ................................................................................................. 8

23 U.S.C. § 150(c)(3) ...................................................................................................... 8

23 U.S.C. § 150(c)(3)(A)..............................................................................................1, 8

23 U.S.C. § 150(c)(3)(A)(ii)(IV) ...............................................................................1, 14

23 U.S.C. § 150(c)(3)(A)(ii)(V) ..................................................................................... 1

23 U.S.C. § 150(c)(5) ................................................................................................... 11

23 U.S.C. § 150(d).......................................................................................................... 18

23 U.S.C. § 150(d)(1) ...................................................................................................... 1

23 U.S.C. § 150(e)(3) ...................................................................................................... 2

## Rules & Regulations

Executive Order 13,990: Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7037 (Jan. 25, 2021); .................................................................................................................1

Executive Order 14,008: Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619 (Feb. 1, 2021) ........................................................................1

Fed. R. Civ. P. 5(b)(2) ........................................................................................21

82 Fed. Reg. 5970 ..............................................................................................2

82 Fed. Reg. 5972 ..............................................................................................2

82 Fed. Reg. 5994 ..............................................................................................2

82 Fed. Reg. 5995 ..............................................................................................2

82 Fed. Reg. 5996 ..............................................................................................2

83 Fed. Reg. 24,923 ...........................................................................................3

83 Fed. Reg. 24,924 ...........................................................................................3

83 Fed. Reg. 24,925 ...........................................................................................3

87 Fed. Reg. 42,407 ...........................................................................................4

87 Fed. Reg. 42,410 ...........................................................................................4

87 Fed. Reg. 42,411 ...........................................................................................4

87 Fed. Reg. 42,412 ...........................................................................................4

88 Fed. Reg. 85,364 ............................................................................... 6, 11, 13

88 Fed. Reg. 85,365 ..........................................................................................14

88 Fed. Reg. 85,367 ............................................................................................9

88 Fed. Reg. 85,368 ..........................................................................................11

88 Fed. Reg. 85,371 ....................................................................................6, 22

88 Fed. Reg. 85,372 ............................................................................................6

88 Fed. Reg. 85,378 ..........................................................................................14

88 Fed. Reg. 85,380 ..........................................................................................13

88 Fed. Reg. 85,388 ................................................................................................. 6, 14

88 Fed. Reg. 85,389 ..................................................................................................... 7

## BACKGROUND

### A.  The Federal Agencies' authority to establish performance measures.

Following Congress's passage of the Moving Ahead for Progress in the 21st Century Act (MAP-21) and the Fixing America's Surface Transportation Act (FAST Act), the DOT is required to establish measures for states to use to assess, among other things, "the performance of the Interstate System;" and "the performance of the National Highway System (excluding the Interstate System)." 23 U.S.C. § 150(c)(3)(A)(ii)(IV) and (V). Such measures are used by States in administering the National Highway Performance Program (NHPP)—a program that provides federal funding to specific projects that support the National Highway System. *Id.* §§ 150(c)(3)(A), 119(b) & (d). The measures and standards must be crafted through a rulemaking, in consultation with state departments of transportation (State DOTs) and municipal planning organizations (MPOs), that provides an opportunity to comment, considers any comments submitted, and is limited to the performance measures described in 23 U.S.C. § 150(c). *Id.* § 150(c)(1)–(2).

Within one year of the promulgation of federal performance measures, State DOTs must set performance targets that reflect such measures. *Id.* § 150(d)(1). Additionally, State DOTs must biennially report on, among other issues, their progress in achieving the performance targets established in respond to the federal performance measures. *Id.* § 150(e)(3).

1

**B. The Federal Agencies' use of performance measures to regulate GHG emissions.**

**1. The Federal Agencies' first attempt to require a GHG measure.**

On January 18, 2017, the Federal Agencies issued a final rule entitled *National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program* (2017 Rule). The 2017 Rule was published in the Federal Register at 82 Fed. Reg. 5970 and was issued to implement performance management requirements that had been established by MAP-21 and the FAST Act. 2017 Rule, 82 Fed. Reg. 5972.

Specifically, the 2017 Rule, in part, established requirements to report the percent change in $CO_2$ generated by vehicles on the National Highway System. *Id.* at 5974. State DOTs and MPOs with National Highway System mileage within their respective jurisdiction would "be required to establish targets and report on progress," which the FHWA would then analyze to determine whether there had been "significant progress" in achieving the respective targets. *Id.* The Federal Agencies primarily relied upon 23 U.S.C. §§ 119 and 150(c) as authority to promulgate the 2017 Rule but also cited a plethora of other statutes and FHWA actions that allegedly supported the Federal Agencies' rulemaking. *Id.* at 5994–96. On top of this, the Federal Agencies interpreted "'performance' of the Interstate

and non-Interstate [National Highway System] . . . to include environmental performance." *Id.* at 5995.

### 2. The Federal Agencies realized they overstepped in 2017 and repealed the GHG measure in 2018.

On May 31, 2018, following another rulemaking process, the Federal Agencies issued a final rulemaking entitled *National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion and Mitigation and Air Quality Improvement Program* (2018 Rule). The 2018 Rule was published in the Federal Register at 83 Fed. Reg. 24,920 and repealed the GHG measure imposed by the 2017 Rule for three stated reasons. First, the Federal Agencies had re-examined their statutory authority and determined that their "prior interpretation was based on a strained reading of the statutory language in section 150 and [the reading was] one that did not fully consider the limitations imposed by the statute itself and other relevant considerations." *Id.* at 24,923. Second, the Federal Agencies determined that "the GHG measure impose[d] unnecessary regulatory burdens on State DOTs and MPOs with no predictable benefits." *Id.* at 24,924. Finally, the Federal Agencies determined that the 2017 Rule's GHG measure was duplicative of regulatory actions and responses taken by other federal agencies, State DOTs, and MPOs. *Id.* at 24,925.

3.    **The Federal Agencies resurrect the GHG measure in 2022 based on executive policy changes and not as a result of a new directive by Congress.**

After two climate-related executive orders were issued by the Biden Administration,[1] the Federal Agencies issued a notice of proposed rulemaking entitled *National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure* (Proposed Rule) on July 15, 2022. The Proposed Rule was published at 87 Fed. Reg. 42,401 and was an attempt to resurrect the 2017 Rule's GHG measure by establishing "a method for the measure and reporting of GHG emissions associated with transportation." Proposed Rule, 87 Fed. Reg. 42,402. The Proposed Rule, as with the 2017 Rule, required State DOTs and MPOs to "establish declining targets that reduce $CO_2$ emissions generated by on-road mobile sources relative to a reference year defined as calendar year 2021" and to "biennially report on their progress in meeting the targets" so that the Federal Agencies could "assess significant progress toward achieving the targets." *Id.* at 42,401–02. Unlike the 2017 Rule, however, the Proposed Rule proposed to give State DOTs and MPOs flexibility to establish their own targets but required the targets meet the Biden Administration's arbitrary emission goals for net-zero emissions by 2050 established by executive order. *Id.* at 42,412. The Federal Agencies again cited

---

[1] *Executive Order 13,990: Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7037 (Jan. 25, 2021); *Executive Order 14,008: Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619 (Feb. 1, 2021).

to 23 U.S.C. § 150(c) (and its strained reading of "performance") to support its alleged authority, *id.* at 42,407, and justified changing course a second time since 2017 by needing to implement executive policy based on a broader statutory interpretation. *Id.* at 42,410–12.

Both the State and TxDOT responded to the Proposed Rule voicing opposition to, and deficiencies with, the rulemaking. The State commented that the Federal Agencies lacked the authority to issue the Proposed Rule's GHG measure, that there was no justification for a 2050 net-zero emissions goal as imposed by the executive orders, and that the Federal Agencies, State DOTs, and MPOs lack experience in environmental policymaking. *See generally* Dkt. 1-3.

TxDOT's comment also identified several deficiencies with the Proposed Rule, including the lack of administrative authority, vagueness, impossibility, and unforeseen and unequal impacts to Texas. *See generally* Dkt. 1-6. In addition to these comments, the State joined comment letters submitted by the States of Kentucky and Oklahoma which both similarly contained comments regarding the Federal Agencies' authority and identified violations of the Administrative Procedure Act. *See generally* Dkt. 1-4 & 1-5.

Summarily dismissing Texas's (and others') concerns, the Federal Agencies issued the Final Rule, which was published on December 7, 2023. In doing so, the Federal Agencies announced that the "GHG measure established in this rule is the

same as the measure proposed in the NPRM," doubling down on its wrongly asserted authority to impermissibly regulate $CO_2$ emissions. Final Rule, 88 Fed. Reg. 85,364. And, although the Federal Agencies removed the arbitrary requirements that emissions targets align with executive policy and claimed that "State DOTs and MPOs have the flexibility to set targets that work for their respective climate change policy and other policy priorities, so long as they are declining," *id.*, the Federal Agencies show their hand in admitting that the Final Rule is "essential" in meeting the Biden Administration's goal of achieving net-zero emissions economy-wide by 2050. *Id.* at 85,371.

## C.   State DOTs like TxDOT must quickly act to comply with the Final Rule.

The Final Rule requires State DOTs, like TxDOT, to establish initial declining $CO_2$ targets and report them to the Federal Agencies no later than February 1, 2024. *Id.* at 85,372. In other words, although the Federal Agencies' alleged authority has been on the books for nearly 12 years, the Federal Agencies have given State DOTs less than two months to establish declining targets and report them to the Federal Agencies. By the Federal Agencies' own admission in the Regulatory Impact Assessment (or RIA), the level of effort for setting the initial target that is due on February 1 will be approximately twice that of subsequent reporting periods, *id.* at 85,388 will take each State DOT 208 hours to develop and will cost an estimated

$636,708 cumulatively. Appx. 027-028. This initial cost is dwarfed in comparison to the estimated $2.7 million cost cumulatively for State DOTs and MPOs to meet the biennial reporting requirements, *see* Appx. 030, and a total cost estimated at $12.7 million for the first ten years of implementation. Appx. 036; 88 Fed. Reg. 85,389. More concerning, the Regulatory Impact Analysis only accounts for the basic administrative costs associated with administering the Final Rule and fails to account for any costs associated with activities that State DOTs may take in attempting to achieve a declining target.

## NATURE AND STAGE OF THE PROCEEDINGS

On December 7, 2023, the Federal Agencies published the Final Rule establishing the GHG Measure over the stated concerns of Texas and others. The Final Rule unlawfully implements the GHG Measure as a performance measure for Interstate System and National Highway System. On December 19, 2023, Texas filed a complaint in this Court, alleging that the Rule violates the Administrative Procedure Act; exceeded the Federal Agencies' authority; and impermissibly restricts the use of federal funding in violation of the Spending Clause of the United States Constitution. *See generally* Dkt. 1. Two days later, a coalition of states led by Kentucky filed suit to challenge the Final Rule. *See Commonwealth of Kentucky, et al v. Federal Highway Administration, et al.*, Civil Action No. 5:23-cv-162 (W.D. Ky. Dec. 21, 2023).

This Kentucky coalition has likewise sought immediate court intervention by requesting a preliminary injunction to enjoin the Final Rule.

## ARGUMENT

Preliminary injunctions, stays, and their modification are within the discretion of the district court. That discretion must be exercised by conducting the traditional four-pronged injunctive analysis of: (1) substantial likelihood that plaintiff will succeed on the merits; (2) substantial threat that the plaintiff will suffer irreparable injury without injunctive relief; (3) the harm to the plaintiff is outweighed by the injunction's harm to the defendant; and (4) the injunction will not disserve the public interest. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). Texas satisfies each of these requirements.

## A.    Texas is likely to succeed on the merits.

 "To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Courts look to standards provided by the substantive law to assess the likelihood of success on the merits. *Sepulvado v. Jindal*, 729 F.3d 413, 418 (5th Cir. 2013). Applying these standards, Texas can demonstrate a substantial likelihood of success on its claims

that the Final Rule violates the Administrative Procedure Act and the Spending

Clause of the U.S. Constitution.

### 1.    The Final Rule exceeds the Federal Agencies' statutory authority, in violation of the Administrative Procedure Act.

Under the Administrative Procedure Act, a final agency action may be held

unlawful and set aside if it is "in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). "Agencies have only

those powers given to them by Congress, and enabling legislation is generally not an

open book to which the agency may add pages and change the plot line." *W. Va. v.

EPA*, 142 S. Ct. 2587, 2609 (2022) (cleaned up). An agency's claim of authority

through the rulemaking process must be clearly supported by statute before

providing "'unheralded' regulatory power over a 'significant portion of the American

economy.'" *Id.* at 2608 (citing *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324

(2014)). Courts "expect Congress to speak clearly if it wishes to assign to an agency

decisions of vast 'economic and political significance.'" *Util. Air Regulatory Group*,

573 U.S. at 324 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160

(2000)).

The Federal Agencies rely upon 23 U.S.C. §150(c)(3) as the principle statutory

authority to promulgate the Final Rule. 88 Fed. Reg. 85,367. Notably, this subsection

provides that the Federal Agencies shall establish a limited number of performance

9

measures for the NHPP "for the purpose of carrying out section 119." 23 U.S.C. § 150(c)(2)(C) and (3)(A). Section 119 establishes the NHPP and identifies the criteria for funding under the program.

Specifically, section 119 provides that to be eligible for NHPP funding, a project must be: (1) part of a program that supports "progress toward the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System;" (2) consistent with 23 U.S.C. §§ 134 and 135; and (3) for one or more of the purposes specified by the statute. *Id.* § 119(d). Nothing in section 119, however, can be tied to curbing GHG emissions.

The national performance goals identified by 23 U.S.C. § 119(d)(1)(A) are focused on the "physical condition of the system and the efficiency of transportation operations across the system" and do not identify environmental performance. 2018 Rule, 83 Fed. Reg. 24,924. Additionally, the only environmental purposes associated to NHPP funding relate to environmental restoration and pollution abatement used to address water pollution or degradation caused by a transportation facility (rather than on-road mobile sources), control of noxious weeds and the establishment of native species, and environmental mitigation efforts related to natural habitats and wetlands mitigation efforts. 23 U.S.C. § 119(d)(2)(M)–(O).

10

The Federal Agencies also base their authority to promulgate the Final Rule on a strained reading of the term "performance" as used in 23 U.S.C. § 150(c). Specifically, the Federal Agencies acknowledge that "performance" is not defined by statute and "interpret[] 'performance' of the Interstate System and non-Interstate [National Highway System] . . . to include the system's environmental performance" in an effort to support the environmental sustainability goal identified by 23 U.S.C. § 150(b)(6). Final Rule, 88 Fed. Reg. 85,364. But the Federal Agencies' authority to establish performance measures is limited to the list contained in subsection (c). 23 U.S.C § 150(c)(2)(C). The Federal Agencies understood these limitations in 2018, which warranted repealing the previous GHG measure. 83 Fed. Reg. 24,920. Again, absent from this list is any language that authorizes a performance measure based on $CO_2$ or GHG emissions—a fact even the Federal Agencies recognize: "nothing in the statute specifically requires FHWA to adopt a GHG emissions measure." 88 Fed. Reg. 85,368.

Furthermore, to the extent that the Federal Agencies could rely on the national goals identified in a different subsection, 23 U.S.C. § 150(b), the goals only reference "Environmental sustainability – To enhance the performance of the transportation system while protecting and enhancing the natural environment," *id.* § 150(b)(6). This does not provide the clarity that is required to govern "decisions of vast 'economic and political significance.'" *Util. Air Regulatory Group,* 573 U.S. at 324

(cleaned up). There is no question that decisions affecting the transportation sector have immeasurable economic and/or political significance.

For example, Texas, the second largest economy in the U.S. and experiencing continued robust growth, heavily relies on the distribution of freight to, from, and within the state. Appx. 003. Therefore, any decision that affects Texas's transportation sector as a result of the Final Rule needs to be accompanied by clear statutory authority, which the Federal Agencies lack. Accordingly, the Court should "'hesitate before concluding that Congress' meant to confer such authority" as the Federal Agencies grant themselves in the Final Rule. *W. Va.*, 142 S. Ct. at 2608 (quoting *Brown & Williamson*, 529 U.S. at 159).

Moreover, to the extent Congress has authorized 23 U.S.C. § 150(c) to permit a performance measure related to on-road mobile source emissions, it already did so through the limited authority under the Congestion Mitigation and Air Quality (CMAQ) Program. 23 U.S.C. § 150(c)(5). The Federal Agencies may establish measures to carry out the CMAQ Program; however, Congress explicitly limited this program to only concern ozone, carbon monoxide, or particulate matter, not $CO_2$ or other GHGs. *See* 23 U.S.C. § 149.

For these reasons, Texas has a substantial likelihood of succeeding on the merits because the Federal Agencies exceeded their statutory authority when promulgating the Final Rule, in violation of the Administrative Procedure Act.

2.    **The Final Rule is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act.**

Under the Administrative Procedure Act, a final agency action may be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (the Administrative Procedure Act "permits… the setting aside of agency action that is arbitrary or capricious.") (cleaned up). This means an agency cannot rely on "factors which Congress has not intended it to consider" and the agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Furthermore, an agency rule is arbitrary and capricious if the agency "entirely fail[s] to consider an important aspect of the problem." *Id.* "This includes… considering the costs and benefits associated with the regulation." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (citing *Michigan v. EPA*, 576 U.S. 743, 751 (2015)).

The Final Rule requires State DOTs and MPOs "to establish declining targets for reducing $CO_2$ emissions generated by on-road mobile sources." 88 Fed. Reg. 85,364. The Federal Agencies claim that the Final Rule is no longer tied to the Biden Administration's long-term emissions reductions goals. 88 Fed. Reg. 85,380. And although the Final Rule does not specify to what degree the targets must decline, the

Federal Agencies still insist the GHG Measure "supports the U.S. target of reducing GHG emissions 50-52 percent below 2005 levels in 2030, on course to reaching net-zero emissions economywide no later than 2050." *Id.* at 85,365. But Congress has not authorized the Federal Agencies to consider *any* reductions in GHG emissions or climate change to support promulgating the Final Rule as a performance measure, let alone to require declining targets to dramatically reduce and ultimately eliminate emissions economy-wide by 2050.

The Federal Agencies also failed to properly estimate the costs associated with the Final Rule. The Regulatory Impact Analysis only evaluates the costs from the perspective of performance reporting and not from the costs for action necessary to achieve any declining target. *See* Appx. Document 2. When TxDOT raised this issue in its comment, *see* Dkt. 1-6 at 11-13, the Federal Agencies summarily dismissed the concerns and "determined the RIA cost estimates should be primarily unchanged" because the Federal Agencies are not requiring specific declining targets or mandating penalties for failing to meet the target. 88 Fed. Reg. 85,388. But the Federal Agencies' response ignores the fact that, if the Federal Agencies determine that significant progress is not made in achieving the established targets, then the Final Rule requires State DOTs to document actions they will take to achieve the reductions. 88 Fed. Reg. 85,378. The Federal Agencies cannot claim the Final Rule, for cost purposes, is merely a paperwork exercise while also requiring State DOTs

to identify actions to achieve the declining targets without an expectation for the actions to be taken. As such, target achievement is inherently baked into the Final Rule, and the Federal Agencies were required to consider the costs that will be incurred in meeting the targets. By failing to do so, the Federal Agencies failed to consider an important aspect of the problem and the Final Rule is arbitrary and capricious.

### 3. The Final Rule violates the Spending Clause of the United States Constitution.

The Spending Clause of the United States Constitution provides that Congress has the power "provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Federal Agencies may not condition federal funding because the Spending Clause "empowers Congress, not the Executive, to spend for the general welfare." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021). "[W]hen Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out unambiguously." *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (cleaned up). "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

Acting pursuant to its enumerated powers, Congress has apportioned federal funds amongst the States, including Texas, as part of the NHPP. 23 U.S.C. § 104(b). As mentioned above, to be eligible for NHPP funding, projects must be: (1) part of a program that supports "progress toward the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System;" (2) consistent with 23 U.S.C. §§ 134 and 135; and (3) for one or more of the purposes specified by the statute. *Id.* § 119(d). Congress has authorized the Federal Agencies to, "for the purpose of carrying out section 119," establish measures for States to use to assess the performance of the Interstate System and the National Highway System. *Id.* § 150(c)(3)(A)(ii)(IV)–(V).

Just as nothing in the statute provides the Federal Agencies the authority to regulate $CO_2$ emissions by requiring declining targets, nothing unambiguously establishes reductions in GHG emissions as a condition for NHPP funding. Allowing the Federal Agencies to establish the GHG Measure would, in effect, restrict the ways that Texas may use NHPP funds in violation of the Spending Clause and "would grant the Executive a power of the purse and be inconsistent with the Constitution's meticulous separation of powers." *Tex. Educ. Agency*, 992 F.3d at 362.

**B.    Texas will suffer imminent and irreparable harms absent an injunction.**

With the looming initial reporting deadline of February 1, 2024, Texas seeks protection from the irreparable harm that the Final Rule will impose without court intervention. A showing of irreparable harm requires a demonstration of "harm for which there is no adequate remedy at law" that is more than speculative. *Daniels Health*, 710 F.3d at 585. Furthermore, "it is not so much the magnitude but the irreparability that counts." *Louisiana v. Biden*, 55 F.4th 1017, 1034–35 (5th Cir. 2022) (quoting *Texas v. United States Envtl. Prot. Agency*, 829 F.3d 405, 433–34 (5th Cir. 2016)).

Regarding the costs of compliance with the Final Rule, these are nonrecoverable and generally satisfy the irreparable harm prong because the Federal Agencies enjoy sovereign immunity from monetary damages. *VanDerStok v. Garland*, No. 4:22-CV-00691-O, 2022 WL 4809376, at *3 (N.D. Tex. Oct. 1, 2022)(citing *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)); *see also Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) ("complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs"). Texas will suffer irreparable harms in at least three ways: (1) administrative costs incurred by TxDOT in complying with the Final Rule; (2) staggering costs to Texans for any actions taken to achieve a declining target; and (3) diminished state sovereignty resulting from the Federal Agencies'

17

commandeering of TxDOT to implement the Final Rule that exceeds state and federal statutory authority.

### 1.    The Final Rule imposes nonrecoverable compliance costs.

As articulated by the Fifth Circuit, "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Louisiana v. Biden*, 55 F.4th at 1034 (finding the diversion of state resources "necessary to identify covered employees and manage their vaccination status" was an irreparable harm); *Texas*, 829 F.3d at 433 (confirming the Public Utility Commission's expenditure of state resources to enforce compliance with a voided federal implementation plan was an irreparable harm).

The Federal Agencies' own calculations provided in the RIA demonstrate that TxDOT will have nonrecoverable compliance costs in administering the Final Rule. Appx. 003; *see generally* Appx. Document 2. The Regulatory Impact Analysis provides the compliance costs to: (1) establish and adjust GHG targets; (2) report on GHG targets and progress toward them; (3) develop and report plans to achieve significant progress toward GHG targets; (4) calculate annual total tailpipe $CO_2$ emissions on the National Highway System metric; and (5) calculate the percent change in tailpipe $CO_2$ emissions on the National Highway System compared to the reference year level. Appx. 028-036. This data demonstrates that TxDOT is expected to incur

approximately \$154,462 in compliance costs over a 10-year period.[2] *Id.* Also, TxDOT's compliance costs are compounded because it will have to divert resources from other activities in order to comply with the Final Rule. Appx. 003. The Federal Agencies should not be allowed to impose *any* of these costs to comply with an unlawful regulation.

### 2. Texans will suffer from the transformative changes that would need to happen to achieve a declining target.

Beyond TxDOT's compliance costs, the Federal Agencies failed to consider the harms Texans will incur as a result of any actions taken to meet the declining $CO_2$ emissions targets. As explained in TxDOT's comment to the Proposed Rule and its declaration, it would be infeasible to implement any actions to achieve a declining target without transformative effects to Texas, and likely the United States. *See* Dkt 1-6, and Appx. 003-04. Texas continues to grow both in population and economic activity. Appx. 003. Texas is the second largest economy in the U.S. and would rank ninth in the world if Texas was its own nation. *Id.* Texas is home to

---

[2] This figure assumes that the Agencies would determine that TxDOT failed to make significant process for the GHG Measure and, as a result, TxDOT would be required to develop a plan for actions to achieve the GHG reduction target and to report those actions to the Agencies.

several key ports and airports that are needed to respond to the market demand of increasing freight distribution. *Id.*

For example, long-haul freight relying on the Interstate and National Highway System is expected to increase by 40% by 2040. *Id.* Annually, trucks carry 1.5 billion tons of freight worth $1.2 trillion to, from, and within Texas. *Id.* By 2050, TxDOT expects trucks to carry 3.7 billion tons of freight worth $3.7 trillion, and Texas will continue to rely on and enhance its vast highway network to accommodate this increase. Appx. 003-04. Actions necessary to achieve any declining $CO_2$ target required by the Final Rule for on-road mobile sources will directly affect Texas's freight distribution, which would likely result in immeasurable costs borne by all Texans—costs they should not incur as a result of an unlawful rule. *Id.*

### 3. The Final Rule harms Texas's sovereignty by forcing Texas to identify a declining target.

The Final Rule also imposes irreparable harm to Texas's sovereignty by disregarding the federalism principles set out in the statute. "[T]he Fifth Circuit has held that the 'institutional injury' to a state 'from the inversion [of federalism] principles enshrined in' legislation 'may constitute irreparable injury.'" *Texas v. U.S. Envtl. Prot. Agency*, 662 F.Supp.3d 739, 757 (S.D. Tex. Mar. 19, 2023) (quoting *Texas*, 829 F.3d at 434). Congress was clear that the *States* establish the targets for the performance measure, not the Federal Agencies. 23 U.S.C. § 150(d). The Final Rule

takes this responsibility away from Texas to choose its own performance target by requiring a *declining* performance target for the GHG Measure to be consistent with executive policy.

### C.    The equities and public interest weigh in favor of an injunction.

Once a party demonstrates a substantial likelihood of success on the merits and irreparable injury, the Court must assess the harm to the opposing party and weigh the public interests and "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The equities favor [an injunction] if it would benefit the [movants] more than it would harm the nonmovants." *Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022). When considering an injunction, "preserving the status quo 'is an important' equitable consideration." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (quoting *Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358, 1359 (1978)). Furthermore, there is public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (cleaned up). And there is no public "interest in the perpetuation of unlawful agency action." *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

The balance of equities and public interest strongly favor issuing a preliminary injunction in this case to maintain the status quo. Plaintiffs will suffer unrecoverable

costs and irreparable harm if required to comply with the Final Rule as discussed above.

In contrast, the Federal Agencies have no legitimate public interest in the unlawful Final Rule. The statute that the Federal Agencies rely upon for authority, 23 U.S.C. § 150, was enacted nearly 12 years ago, and the Federal Agencies only now seek to re-implement the GHG Measure. The Federal Agencies will not be harmed from any additional delay by Texas not identifying a declining target by the deadline because the target is for TxDOT to use in its decision-making, not the Federal Agencies. Further, the Federal Agencies claim the GHG measure is "essential not only to improve transportation sector performance and work toward achieving net-zero emissions economy-wide by 2050, but also to demonstrate Federal leadership in the assessment and disclosure of climate pollution from the transportation sector." 88 Fed. Reg. 85,371. Undoubtedly, these alleged benefits (*if* they are ever realized) will take years, if not decades, to materialize and do not justify the instant and ongoing costs imposed on Texas by the Final Rule that is unlikely to pass judicial review.

## CONCLUSION

Plaintiffs respectfully request that the Court issue a preliminary injunction enjoining the effectiveness, implementation, and enforcement of the Final Rule as to Plaintiffs.

Dated: January 17, 2024

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ Logan Harrell*
LOGAN HARRELL
Assistant Attorney General
State Bar No. 24106054
Logan.Harrell@oag.texas.gov

WESLEY S. WILLIAMS
Assistant Attorney General
State Bar No. 24108009
Wesley.Williams@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
ENVIRONMENTAL PROTECTION DIVISION
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

**COUNSEL FOR THE STATE OF TEXAS AND
THE TEXAS DEPARTMENT OF
TRANSPORTATION**

23

## CERTIFICATE OF CONFERENCE

On January 17, 2024, Logan Harrell, counsel for the Plaintiffs, conferred with Michael Clendenen, counsel for the Defendants, regarding this motion. This motion is opposed, and the parties disagree at this time on whether a preliminary injunction is appropriate for this matter.

/s/ *Logan Harrell*
LOGAN HARRELL
Assistant Attorney General

## CERTIFICATE OF SERVICE

On January 17, 2024, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Logan Harrell*
LOGAN HARRELL
Assistant Attorney General

24

## INDEX TO APPENDIX

Appx. pp. 1-4      Declaration of Brandye Hendrickson

Appx. pp. 5-47     Summary Report, Economic Assessment: National Performance
                   Management Measure; Assessing Performance of the National
                   Highway System, Greenhouse Gas Emissions Measure