# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS AND TEXAS DEPARTMENT OF TRANSPORTATION | § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | |
| U.S. DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, PETE BUTTIGIEG, in his official capacity as SECRETARY OF TRANSPORTATION, and SHAILEN BHATT, in his official capacity as ADMINISTRATOR OF THE FEDERAL HIGHWAY ADMINISTRATION, | § § § § § § § § § § § § § | Civil Action No. 5:23-cv-00304-H |
| *Defendants.* | § | |

---

## TEXAS'S BRIEF IN SUPPORT OF SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDING ........................................................... 1

BACKGROUND ................................................................................................... 2

    A.    The Federal Agencies' authority to establish performance measures ............ 2

    B.   The GHG Measures under the Obama and Trump Administrations. ............ 3

        1.    The Obama Administration first implements the GHG Measure as a performance measure. ................................................................................. 3

        2.    The Trump Administration re-evaluates its statutory authority, reverses course, and rescinds the GHG Measure. ................................................. 4

    C.   The Present Rulemaking Reinstates the GHG Measure. ................................. 5

        1.    The Federal Agencies resurrect the GHG measure in 2022 based on executive policy changes rather than new directives from Congress .................. 5

        2.    Texas submits comments criticizing the Proposed Rule and highlight its defects ..................................................................................................... 7

        3.    The Federal Agencies largely ignore comments, issue the Final Rule, and establish the GHG Measure. ...................................................................... 9

STANDARD OF REVIEW ..................................................................................... 12

SUMMARY OF ARGUMENT ................................................................................ 13

ARGUMENT ......................................................................................................... 14

    A.    The Final Rule must be vacated because it was promulgated in excess of statutory authority in violation of the APA and the major questions doctrine ....14

        1.    No statutory provision provides clear congressional authorization to establish the GHG Measure. ................................................................. 14

        2.    Despite the Federal Agencies' claims to the contrary, the major questions doctrine applies to the Final Rule. ...................................................... 17

    B.   The Final Rule must be vacated because it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA. ...................................................................................................... 18

        1.    The Final Rule is arbitrary and capricious because it is based upon factors that Congress has not intended the Federal Agencies to consider. .................. 19

2.    The Final Rule is arbitrary and capricious because it fails to consider the costs that TxDOT and other State DOTs will incur in order to achieve compliance. ...........................................................................................21

C.    The Final Rule must be vacated because it violates the Spending Clause of the United States Constitution. ....................................................................22

CONCLUSION AND PRAYER .................................................................................25

## TABLE OF AUTHORITIES

### Cases

*Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ..........................24

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).......................................19

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)..........................15

*Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012)............................22

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023)......20

*Michigan v. EPA*, 576 U.S. 743, 751 (2015) ....................................................................20

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ...............................................................................................................20

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022) ..........................19

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ...............................25

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021) .........24, 27

*Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) .......................................15

*West Virginia v. EPA*, 597 U.S. 697, 142 S. Ct. 2587 (2022) ..................................11, 14

### Constitutional Provisions & Statutes

23 U.S.C. § 104(b)..............................................................................................................23

23 U.S.C. § 119(b) & (d) .....................................................................................................3

23 U.S.C. § 119(d)...............................................................................................................23

23 U.S.C. § 150(c)(1)-(2) ......................................................................................................3

23 U.S.C. § 150(c)(2)(C) ..................................................................................16

23 U.S.C. § 150(c)(3)(A) ...................................................................................3

23 U.S.C. § 150(c)(3)(A)(ii)(IV)-(V).............................................................3, 24

23 U.S.C. § 150(c)(5) .......................................................................................16

23 U.S.C. § 150(d)(1) .........................................................................................3

23 U.S.C. § 150(e)(3) ..........................................................................................3

23 U.S.C. §§ 150(c)(5), 149(b) ........................................................................20

5 U.S.C. § 706(2)(A) .........................................................................................18

5 U.S.C. § 706(2)(A)-(C) ..................................................................................13

5 U.S.C. § 706(2)(C) .........................................................................................14

Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706...............................2

INVEST in America Act, H.R. 3684, 117th Cong., § 1403 (2021) ..................15

U.S. Const. art. I, § 8, cl. 1 ..............................................................................23

## Rules & Regulations

82 Fed. Reg. 5970 ..........................................................................................3, 4

83 Fed. Reg. 24,920 ............................................................................4, 5, 14, 16

87 Fed. Reg. 42,401 ........................................................................................6, 7

88 Fed. Reg. 85,364 ......................................1, 9, 10, 11, 12, 15, 17, 19, 20, 22, 24

## Executive Orders

E.O. 13,990 (Jan. 20, 2021) .............................................................................5

E.O. 14,008 (Jan. 27, 2021) .............................................................................6

## NATURE AND STAGE OF PROCEEDING

Plaintiffs, the State of Texas (State) and the Texas Department of Transportation (TxDOT) (together, Texas) challenge the legality of the final administrative rule entitled *National Performance Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure* (Final Rule) promulgated by Defendants the Federal Highway Administration (FHWA) and the U.S. Department of Transportation (DOT) (together, Federal Agencies). On December 7, 2023, the Federal Agencies published the Final Rule in the Federal Register at 88 Fed. Reg. 85,364. The Final Rule requires TxDOT (among others) to establish a method of measurement and reporting for greenhouse gas (GHG) emissions associated with transportation (GHG Measure), to establish declining carbon dioxide ($CO_2$) targets for the GHG Measure, and to report $CO_2$ reductions as a performance measure. The Final Rule also requires TxDOT to document actions it will take to achieve its declining targets. But the Final Rule impermissibly exceeds the Federal Agencies statutory authority; is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law; and violates the Spending Clause of the United States Constitution.

The Final Rule, effective January 8, 2024, established an initial reporting deadline of February 1, 2024, causing Texas to file a Motion for Preliminary Injunction on January 17, 2024. Dkt. No. 9. The Federal Agencies subsequently

1

agreed to extend the reporting deadline to March 29, 2024, to allow the Court to fully resolve this case on the merits through cross motions for summary judgment. Dkt. No. 13. Accordingly, Texas withdrew its Motion for Preliminary Injunction on February 6, 2024. Dkt. No. 16. The Court granted the withdrawal on February 8, 2024. Dkt. No. 17

Texas now moves for summary judgment asking the Court to vacate the Final Rule. Summary judgment is the appropriate mechanism for deciding cases challenging a regulation under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. The parties agree that this litigation may be fully resolved on summary judgment briefing. Dkt. No. 11 at 2. The case turns on the legal issues of whether the Final Rule falls outside the Federal Agencies' statutory authority, whether the Final Rule is arbitrary and capricious, and whether the Final Rule violates the Constitution.

## BACKGROUND

**A.    The Federal Agencies' authority to establish performance measures.**

Following Congress's passage of the Moving Ahead for Progress in the 21st Century Act (MAP-21) and the Fixing America's Surface Transportation Act (FAST Act), the DOT is required to establish measures for the States to use to assess, among other things, "the performance of the Interstate System;" and "the performance of the National Highway System (excluding the Interstate System)." 23 U.S.C.

§ 150(c)(3)(A)(ii)(IV)-(V). Such measures are used by the States in administering the National Highway Performance Program (NHPP)—a program that provides federal funding to specific projects that support the National Highway System. *Id.* §§ 150(c)(3)(A), 119(b) & (d). The measures and standards must be crafted through a rulemaking, in consultation with state departments of transportation (State DOTs) and municipal planning organizations (MPOs), that provides an opportunity to comment, considers any comments submitted, and is limited to the performance measures listed in 23 U.S.C. § 150(c). *Id.* § 150(c)(1)-(2).

Within one year of the promulgation of federal performance measures, State DOTs must set performance targets that reflect such measures. *Id.* § 150(d)(1). Additionally, State DOTs must biennially report on, among other issues, their progress in achieving the performance targets established in response to the federal performance measures. *Id.* § 150(e)(3).

## B.    The GHG Measures under the Obama and Trump Administrations.

### 1.    The Obama Administration first implements the GHG Measure as a performance measure.

On January 18, 2017, the Federal Agencies issued a final rule entitled *National Performance Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program* (2017 Rule). The 2017 Rule was published in the Federal Register at 82 Fed. Reg. 5970 and was issued to implement performance management requirements that

3

had been established by MAP-21 and the FAST Act. 2017 Rule. Dkt. No. 15-3 at FHWA001152.

Specifically, the 2017 Rule, in part, established requirements to report the percent change in $CO_2$ generated by vehicles on the National Highway System. *Id.* at FHWA001154. State DOTs and MPOs with National Highway System mileage within their respective jurisdictions would have "be[en] required to establish targets and report on progress," which the FHWA would then analyze to determine whether there had been "significant progress" in achieving the State DOTs' and MPOs' respective targets. *Id.* The Federal Agencies primarily relied upon 23 U.S.C. §§ 119 and 150(c) as authority to promulgate the 2017 Rule, but also cited other statutes and FHWA actions that allegedly supported the Federal Agencies' rulemaking. *Id.* at FHWA001174–76. On top of this, the Federal Agencies interpreted "'performance' of the Interstate and non-Interstate [National Highway System] . . . to include environmental performance." *Id.* at FHWA001175.

### 2. The Trump Administration re-evaluates its statutory authority, reverses course, and rescinds the GHG Measure.

On May 31, 2018, following another rulemaking process, the Federal Agencies issued a final rule entitled *National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion and Mitigation and Air Quality Improvement Program* (2018 Rule). The 2018 Rule was published in the Federal Register at 83 Fed. Reg. 24,920 and repealed the

2017 Rule's GHG measure for three stated reasons. First, the Federal Agencies had re-examined their statutory authority and determined that their "prior interpretation was based on a strained reading of the statutory language in section 150 and [the reading was] one that did not fully consider the limitations imposed by the statute itself and other relevant considerations." Dkt. No. 15-2 at FHWA001136. Second, the Federal Agencies determined that "the GHG measure impose[d] unnecessary regulatory burdens on State DOTs and MPOs with no predictable benefits." *Id.* at FHWA001137. Finally, the Federal Agencies determined that the 2017 Rule's GHG measure was duplicative of regulatory actions and responses taken by other federal agencies, State DOTs, and MPOs. *Id.* at FWHA001138.

## C.    The Present Rulemaking Reinstates the GHG Measure.

### 1.    The Federal Agencies resurrect the GHG measure in 2022 based on executive policy changes rather than new directives from Congress.

Since his first day in office, President Biden has made a number of executive orders or announcements indicating his Administration's goal of drastically reducing GHG emissions. On January 20, 2021, President Biden issued an executive order directing all agencies to review and address all actions taken by the Trump Administration that conflict with his stated environmental objectives. Dkt. No. 15-2 at FHWA001007, § 1. Subsequently, on January 27, 2021, President Biden issued another executive order establishing a government-wide approach to "achieve net-

zero emissions, economy-wide, by no later than 2050." *Id.* at FHWA001017, § 201. Further, on April 22, 2021, President Biden announced "a new target for the United States to achieve a 50-52 percent reduction from 2005 levels in economy-wide net greenhouse gas pollution in 2030." *Id.* at FHWA001061. These actions and statements, taken together, demonstrate the Biden Administration's aggressive all-of-government approach to reduce GHG emissions.

Following this direction, the Federal Agencies published a notice of proposed rulemaking (NPRM) on July 15, 2022, entitled *National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure* (Proposed Rule). *See id.* at FHWA000032–53. The Proposed Rule was an attempt to resurrect the 2017 Rule's GHG measure by establishing "a method for the measure and reporting of [GHG] emissions associated with transportation." *Id.* at FHWA000032. Much like the 2017 Rule, the Federal Agencies proposed to require State DOTs and MPOs to "establish declining targets that reduce $CO_2$ emissions generated by on-road mobile sources relative to a reference year . . ." and to "biennially report on their progress in meeting the targets" so that the Federal Agencies could "assess significant progress toward achieving the targets." *Id.* The Federal Agencies claimed that the Proposed Rule would allow State DOTs and MPOs the flexibility to establish their own targets as long as the met the Biden

Administration's arbitrary emission goals set for 2030 and 2050. *Id.* at FHWA000043.

The Federal Agencies claimed that 23 U.S.C. § 150(c)(3)'s requirement to establish performance measures to assess the performance of the Interstate System and the National Highway System and provided the authority to promulgate the Proposed Rule. In doing so, the Federal Agencies again relied upon the strained interpretation of "performance" and cited to numerous statutes for support. Specifically, the Federal Agencies asserted that a patchwork of language pulled from various statutes including 23 U.S.C. §§ 101, 119, 134, and 135 supported the Federal Agencies' interpretation of "performance." *Id.* at FHWA000040. Furthermore, the Federal Agencies claimed that it was appropriate to re-establish the GHG measure "[b]ecause reducing GHG emissions is clearly established as a national priority and national goal in section 1 of E.O. 13990 and E.O. 14008." *Id.* at FHWA000037.

### 2. Texas submits comments criticizing the Proposed Rule and highlight its defects.

In a comment letter dated October 12, 2022, TxDOT asserted that the Proposed Rule constituted "impermissible overreach" because Congress has never granted the Federal Agencies the authority to establish a $CO_2$ performance measure for the National Highway System. Dkt. No. 15-20 at FHWA004206. Specifically, TxDOT rebutted the Federal Agencies' interpretation of "performance" and claimed that nothing in the legislative history of MAP-21 nor anything in subsequent

legislation provided the clear authority that Supreme Court precedent requires. *Id.* at FHWA004206–08. TxDOT expressed its concern that achieving the 2030 and 2050 emission goals as set by President Biden, or even year-after-year declining targets, would be impossible to accomplish without transformative changes within the transportation sector, many of which would require action by entities outside of TxDOT's control. *Id.* at FHWA004209–15.

Additionally, TxDOT critiqued the Federal Agencies' economic analysis. TxDOT claimed that the Federal Agencies failed to account for the costs that would be incurred in taking the action necessary to meet the declining emissions targets and that the Federal Agencies, at a minimum should consider costs associated with a shift to public transit, issues related to increased electrification of the national fleet of vehicles, personal choices that would impact travel, federal funding issues, land use and freight movement changes, and the differences in needs between rural and urban areas. *Id.* at FHWA004215–16. TxDOT also disagreed that the Proposed Rule was non-significant and asserted that the Proposed Rule would amount to an unfunded mandate. *Id.* at FHWA004218–19.

On October 13, 2022, the State submitted a comment letter echoing many of the issues raised in TxDOT's letter.[1] The State reiterated TxDOT's arguments that

---

[1] In addition to its own comment letter, the State joined separate comment letters submitted by the Commonwealth of Kentucky and the State of Oklahoma, both of which similarly addressed the

the Federal Agencies lacked the statutory authority needed to implement the GHG Measure, *see id.* at FHWA004183–88, and added that Congress had declined to establish such authority when enacting the Infrastructure Investment and Jobs Act (IIJA), Pub. L. No. 117-58, 135 Stat. 429 (2021). *Id.* at FHWA004180–81. The State also asserted that the Federal Agencies did not identify an authority "allowing [them] to dictate State performance measures targets" and argued that if the Federal Agencies were allowed to make such approvals, nothing would stop the Federal Agencies from requiring stricter requirements in the future. *Id.* at FHWA004188–89. The State also argued that the GHG Measure fell outside of the scope of authority of the Federal Agencies because neither the Federal Agencies, State DOTs, nor MPOs have experience in environmental policy making. *Id.* at FHWA004189–90.

### 3.    The Federal Agencies largely ignore comments, issue the Final Rule, and establish the GHG Measure.

The Federal Agencies summarily dismissed Texas's (and others') concerns and issued the Final Rule on December 7, 2023. Although "[t]he GHG measure established in [the Final Rule] is the same as the measure proposed in the NPRM," Dkt. No. 15-2 at FHWA000001, the Federal Agencies made several changes between the Proposed Rule and the Final Rule. *See id.* at FHWA000008–10. Notably, the Federal Agencies removed the requirement that emission targets established by State

---

Federal Agencies' authority to establish the GHG Measure and their violations of the APA. *See generally* Dkt. No. 15-20 at FHWA004159–72.

DOTs and MPOs must meet any net-zero goals established by the Biden Administration. *See id.* at FHWA000009 ("[T]argets must be declining for reducing tailpipe $CO_2$ emissions on the National Highway System, but they are not required to demonstrate reductions toward net-zero targets.").

But conflicting statements within the Final Rule demonstrate how the Final Rule is intrinsically linked to larger emissions objectives, such as those established by executive order. For example, the Federal Agencies provide that although "State DOTs and MPOs have the flexibility to set targets that work for their respective climate change policies and other policy priorities," the targets must be declining in order to "help the United States… confront the increasingly urgent climate crisis." *Id.* at FHWA000001. Furthermore, the Federal Agencies admit that "[t]he GHG measure aligns with Executive Orders . . . and supports the U.S. target of reducing GHG emissions 50-52 percent below 2005 levels in 2030, on course to reaching net-zero emissions economywide no later than 2050." *Id.* at FHWA000002; *see also id.* at FHWA000008 ("As a matter of transportation policy, FHWA considers the GHG measure essential not only to improve our transportations sector performance and work toward achieving net-zero emissions economy-wide by 2050, but also to demonstrate Federal leadership in the assessment and disclosure of climate pollution from the transportation sector.").

In support of the Final Rule, the Federal Agencies double down on their claim that 23 U.S.C. § 150(c), and their interpretation of "performance," provide the requisite statutory authority to issue the GHG Measure. Specifically, the Federal Agencies again claim that the language of several other statutes, 23 U.S.C. §§ 101, 119, 134, and 135, taken together with the national goals enumerated at § 150(b) give credence to their strained reading of § 150(c)(3). *Id.* at FHWA000004–05. In response to comments regarding the authority to establish the GHG Measure, the Federal Agencies merely affirm their position that they maintain the requisite authority and claim that the commenters have mischaracterized the rulemaking. *Id.* at FHWA000011. Additionally, the Federal Agencies push back against the idea that the Final Rule is inconsistent with recent Supreme Court precedent (specifically, *West Virginia v. EPA*, 597 U.S. 697, 142 S. Ct. 2587 (2022)) because "[i]t does not involve a novel interpretation of longstanding FHWA authority, nor does it represent an unheralded assertion of regulatory authority with the significant economic and political impacts that implicates a major questions case . . . ." *Id.* at FHWA000012.

Accordingly, under the Final Rule, State DOTs are required to establish their initial declining targets for the GHG Measure and report them to the Federal Agencies by no later than February 1, 2024 (now extended to March 29, 2024). *Id.* at FHWA000009; Dkt. No. 13. In their initial submissions, State DOTs shall also include "the basis for the target, a discussion of how the target relates to other long-

11

term performance expectations, and the metric information . . ." Dkt. No. 15-2, at FHWA000009.

Starting in 2026, State DOTs shall begin biennial reporting of the GHG Measure as part of the Full Performance Period Progress Report and Baseline Performance Period Report. *Id.* The FHWA will review these reports and "determine whether a State DOT has made significant progress toward the achievement" of the initial declining target for the GHG Measure. *Id.* If a State DOT does not make significant progress, FHWA requires the State DOT to provide "data-supported explanations" and document the actions it will take "to achieve said progress in the future" towards the declining target. *Id.* at FHWA000015, FHWA000021–22.

## STANDARD OF REVIEW

The Court must hold unlawful and set aside the Final Rule if it finds any aspects are:

(A)    Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)    Contrary to constitutional right, power, privilege, or immunity; or

(C)    In excess of statutory jurisdiction, authority, or limitations or short of statutory right.

5 U.S.C. § 706(2)(A)-(C).

12

## SUMMARY OF ARGUMENT

Despite the lack of clear statutory authority, the Federal Agencies seek to impose the unlawful GHG Measure in the Final Rule upon Texas. The Federal Agencies fall well short of demonstrating that Congress expressly provided them with the power to regulate tailpipe $CO_2$ emissions by establishing the GHG Measure as part of the federally funded National Highway Performance Program. Instead, the Federal Agencies rely on their interpretation of several statutes in order to enact the GHG Measure when it is clear that the Final Rule is directed by the Biden Administration's executive policies on climate change, not the language provided by Congress. Texas cannot abide by this federal overreach. Moreover, the actions TxDOT must take to achieve these declining targets would have transformative effects on how Texans use the Interstate System and National Highway System. The Federal Agencies did not take these additional costs into account before issuing the Final Rule. This is not simply a paperwork exercise as the Federal Agencies claim. The Court should vacate the Final Rule because it exceeds the Federal Agencies statutory authority, is arbitrary and capricious, and violates the U.S. Constitution.

## ARGUMENT

**A.    The Final Rule must be vacated because it was promulgated in excess of statutory authority in violation of the APA and the major questions doctrine.**

Under the APA, final agency action shall be held unlawful and set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *W. Va. v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up). An agency's claim of authority through the rulemaking process must be clearly supported by statute before providing "'unheralded' regulatory power over a 'significant portion of the American economy.'" *Id.* at 722 (citing *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). Courts "expect Congress to speak clearly if it wishes to assign to an agency decision of vast 'economic and political significance.'" *Util. Air Regulatory Group*, 573 U.S. at 324 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)).

**1.    No statutory provision provides clear congressional authorization to establish the GHG Measure.**

Past rulemaking succinctly identifies the fundamental flaw with the Final Rule: there is no "statutory provision that specifically directs or requires [the Federal Agencies] to adopt a GHG measure." Dkt. No. 15-2 at FHWA001136. Congress has not changed the text of section 150 since the 2018 Rule was finalized. And the text

14

does not grant the Federal Agencies the requisite authority to establish the GHG Measure. This fact is not for a lack of consideration. When Congress passed the IIJA in 2021, the initial House bill contained an amendment to section 150(c) that would have authorized the Federal Agencies to establish "measures for the States to use to assess (A) carbon dioxide emissions per capita on public roads; (B) carbon dioxide emissions using different parameters than described in subparagraph (A) that the Secretary determines to be appropriate; and (C) any other greenhouse gas emissions on public roads that the Secretary determines to be appropriate." Dkt. No. 15-20 at FHWA004181; *see also* INVEST in America Act, H.R. 3684, 117th Cong., § 1403 (2021) (as introduced in the House). This authorization, however, is notably absent from the final version that became law. This legislative history demonstrates that not only did Congress consider expressly granting the authority to establish the GHG Measure to the Federal Agencies, but it also consciously decided against such grant of regulatory power.

Recognizing that they lack clear statutory authority, the Federal Agencies attempt to use a strained reading of "performance," as it is used in section 150(c) to claim authority to establish the GHG Measure. In doing so, the Federal Agencies point to five separate statutes that the Federal Agencies claim support their position. Dkt. No. 15-2 at FHWA000004–05. But as Texas has already indicated to the Federal Agencies, the referenced statutes do not provide the authority that the Federal

15

Agencies claim. *See* Dkt. No. 15-20 at FHWA004185–88, FHWA004206–08. For example, sections 101(b)(3)(G), 134(a)(1), and 150(b)(6) are general declarations that identify general purposes rather than grant authority. The remaining statutory provisions, such as sections 119(e)(2), 134(c)(1) and (h), and 135(d), contain limitations and directives for State DOTs and MPOs to follow rather than explicit instructions for the Federal Agencies. As such, these oft cited provisions fall short of any grant of authority related to the GHG Measure. The Federal Agencies themselves correctly recognized these limitations as described in the 2018 Rule. Dkt. No. 15-2 at FHWA001136.

Even if such statutes provided credence to the Federal Agencies' interpretation of "performance," reliance upon the statutes for the establishment of the GHG Measure would be contrary to clear statutory language. The Federal Agencies are instructed to limit performance measures to only those described in subsection (c). 23 U.S.C. § 150(c)(2)(C). Subsection (c) limits emissions-related performance measures to those for ozone, carbon monoxide, and particulate matter through the Congestion Mitigation and Air Quality Program (CMAQ Program). *Id.* § 150(c)(5). Nothing within the confines of subsection (c) speaks to performance measures focused on $CO_2$ emissions associated with the Interstate System or National Highway System.

16

2.    **Despite the Federal Agencies' claims to the contrary, the major questions doctrine applies to the Final Rule.**

In responding to comments, the Federal Agencies erroneously assert that recent Supreme Court precedent surrounding the major questions doctrine should not apply to the Final Rule. Dkt. No. 15-2 at FHWA000012. The Federal Agencies suggest that the Final Rule is not significant to implicate the major questions doctrine because, in part, the Final Rule "has minimal costs for State DOTs and MPOs." *Id.* Further, the Federal Agencies claim that they do in fact have clear congressional authorization to establish performance measures and as such, the major questions doctrine cannot apply. *Id.*

As discussed more thoroughly below, the Federal Agencies' economic analysis for the Final Rule is fundamentally flawed because it does not account for the full costs that State DOTs and MPOs will incur in complying with the Final Rule. Instead, the Federal Agencies only look to the costs associated with the establishment and reporting of performance goals to claim that the Final Rule's economic impact will amount to $12.7 million. Dkt. No. 15-2 at FHWA000002. But this figure severely underestimates the costs of compliance as well as the impacts it will have on transit in Texas and across the Nation. As such, the Federal Agencies cannot hide behind their own flawed Regulatory Impact Analysis (RIA) to claim that the Final Rule will not have significant economic impacts that are required under *West Virginia.*

17

Additionally, as established above, the Federal Agencies do not have the clear congressional authority that they claim. Texas does not dispute that section 150(c) authorizes the Federal Agencies to establish performance measures—that is clear from the plain language of the statute. However, nothing in section 150(c) authorizes performance standards related to $CO_2$ emissions from tailpipes such as the GHG Measure. And, even if the Federal Agencies' jumbling of various provisions of law supported their interpretation of "performance" to include environmental performance, such interpretation is a far cry from the clear authorization that the Supreme Court has required.

Agencies are creatures of statute that possess only the authority that Congress has provided. *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022). As such, the Federal Agencies are required to be able to identify the authority granted to them to establish the GHG Measure. They cannot for the Final Rule. As such, the Final Rule must be vacated because it exceeds the Federal Agencies' authority.

**B.   The Final Rule must be vacated because it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA.**

Under the APA, a final agency action may be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (the APA "permits… the setting aside of agency action that is arbitrary

or capricious.") (cleaned up). This means an agency cannot rely on "factors which Congress has not intended it to consider" and the agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Furthermore, an agency rule is arbitrary and capricious if the agency "entirely fail[s] to consider an important aspect of the problem." *Id.* "This includes . . . considering the costs and benefits associated with the regulation." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (citing *Michigan v. EPA*, 576 U.S. 743, 751 (2015)).

### 1. The Final Rule is arbitrary and capricious because it is based upon factors that Congress has not intended the Federal Agencies to consider.

Despite the Federal Agencies' claims to the contrary, the Final Rule is intrinsically tied to President Biden's all-encompassing environmental agenda. This is made clear from the Federal Agencies' own statements made when they published the Final Rule. The Proposed Rule was prompted by, and crafted to, "align with the Administration's target of net-zero emissions, economy-wide, by 2050, [in] accordance with the national policy established under section 1 of E.O. 13990, . . . section 201 of E.O. 14008, . . . and at the Leaders Summit on Climate." Dkt. No. 15-2 at FHWA000003. The Federal Agencies believe that "the establishment of declining targets is vital given the urgency of the climate crisis," and view the GHG Measure as "action to address the largest source of U.S. $CO_2$ emissions." *Id.* at

FHWA000006–7. Furthermore, the Federal Agencies extensively detail the importance of the Final Rule to the Biden Administration's overarching climate priorities:

> By establishing a consistent method for estimating GHG emissions and reporting on trends, the GHG measure aligns with E.O. 13990, E.O. 14008, and supports a U.S. target of reducing GHG emissions economy-wide 50 to 52 percent below 2005 by 2030, on a course toward reaching net-zero emissions economywide by no later than 2050.

*Id.* at FHWA000008.

In the same vein that Congress has not authorized the Federal Agencies to establish the GHG Measure, Congress has not indicated an intent for the Federal Agencies to consider such economy-wide emission reduction goals when establishing performance measures for the Interstate System or National Highway System. Congress permitted the Federal Agencies to examine emissions reductions within the limited scope of establishing performance measures for the CMAQ Program that concerns only three pollutants—none of which are $CO_2$. *See* 23 U.S.C. §§ 150(c)(5), 149(b). And the absence of $CO_2$ is telling when Congress knows how to provide specific directives for the NHPP.

Moreover, Congress initially entertained allowing the Federal Agencies to consider $CO_2$ emissions when establishing performance measures but declined to enact such language. This silence should be interpreted to limit rather than expand

the Federal Agencies' ability to consider President Biden's arbitrary environmental directives. *See Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012) ("Absent compelling evidence, we will not attribute to the Congress the intent to create such an absurd overabundance of regulation."). There is nothing in statute or the administrative record to demonstrate that Congress has intended for the Federal Agencies to consider climate change goals when establishing performance measures under section 150(c)(3). As such, the Final Rule is arbitrary and capricious, in violation of the APA, and must be vacated.

### 2. The Final Rule is arbitrary and capricious because it fails to consider the costs that TxDOT and other State DOTs will incur in order to achieve compliance.

The Federal Agencies also failed to consider the full costs associated with the Final Rule. The RIA only evaluates the costs to entities "that would need to set targets for the GHG measure, report on those targets, report on actions to be taken by those States that do not meet their targets for the GHG measure, prepare the GHG performance metric, and calculate the GHG performance measure." Dkt. No. 15-2 at FHWA000061. The Federal Agencies did not, however, account for the costs that State DOTs (like TxDOT) and MPOs will incur in taking actions to meet the declining targets. As a result, the Federal Agencies' claim that the Final Rule will cost only $12.7 million fails to remain in reality.

When TxDOT raised this issue in its comment letter, *see* Dkt. No. 15-20 at FHWA004215–17, the Federal Agencies dismissed the concerns and "determined the RIA cost estimates should be primarily unchanged" because the Federal Agencies are not requiring specific declining targets, nor are they mandating penalties for failure to meet such targets. Dkt. No. 15-2 at FHWA000025. But the Federal Agencies' response ignores the fact that State DOTs will need to take some action beyond the calculations and reporting when complying with the Final Rule. If a State DOT does not make significant progress, FHWA requires the State DOT to provide "data-supported explanations" and document the actions it will take "to achieve said progress in the future" towards the declining target. *Id.* at FHWA000015, FHWA000021–22.

The Federal Agencies cannot claim that the Final Rule is merely a paperwork exercise for cost purposes while also requiring State DOTs to identify actions to achieve declining targets without an expectation that such actions are taken. As such, target achievement is baked into the Final Rule, and the Federal Agencies were required to consider the associated costs. Such error requires vacatur.

## C.    The Final Rule must be vacated because it violates the Spending Clause of the United States Constitution.

The Spending Clause of the Constitution provides that Congress has the power to "provide for the common Defense and general Welfare of the United

States." U.S. Const. art. I, § 8, cl. 1. The Federal Agencies may not condition federal funding because the Spending Clause "empowers Congress, not the executive, to spend for the general welfare." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021). "[W]hen Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out unambiguously." *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (cleaned up). The key inquiry is whether the language in the statute provides "clear notice" of the obligations linked to the federal funding. *Id.* "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

Acting pursuant to its enumerated powers, Congress has apportioned federal funds amongst the States, including Texas, as part of the NHPP. 23 U.S.C. § 104(b). To be eligible for NHPP funding, projects must be: (1) part of a program that supports "progress toward the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System;" (2) consistent with 23 U.S.C. §§ 134 and 135; and (3) for one or more of the purposes specified by the statute. *Id.* § 119(d). ) Congress has authorized the Federal Agencies to, "for the purpose of carrying out section 119," establish measures for States to use to assess

the performance of the Interstate System and the National Highway System. *Id.* § 150(c)(3)(A)(ii)(IV)-(V).

As explained in TxDOT's comment to the Proposed Rule, it would have to spend NHPP federal funds—and likely require significantly more funding from Congress—to implement new strategies and take actions necessary to accomplish even year-after-year declining targets as prescribed by the Final Rule. Dkt. 15-20 at FHWA004211, FHWA004218. Congress did not intend for NHPP funds to be used for this purpose. The Federal Agencies claim that the IIJA provided federal funding of more than $27 billion for the Carbon Reduction Program to help State DOTs achieve their GHG reduction targets. Dkt. No. 15-2 at FHWA000014. However, that funding was intended for several new programs aimed at GHG emissions found in a completely different statute—23 U.S.C. § 175—not the one the Federal Agencies currently claim entitles them to require the GHG Measure as a performance measure for the Interstate System and National Highway System. Dkt. 15-20 at FHWA004207–08.

Just as nothing in statute provides the Federal Agencies the authority to regulate $CO_2$ emissions by requiring declining targets, nothing unambiguously establishes reductions in GHG emissions as a condition for NHPP funding. Congress was clear on conditioning other federal funding intended to be used for GHG emissions as part of the Carbon Reduction Program, but Congress has not

24

provided clear notice to Texas (or the states) that NHPP federal funds are conditioned upon implementing the GHG Measure as required in the Final Rule. Allowing the Federal Agencies to establish the GHG Measure based on a strained reading of the statute would, in effect, restrict the ways that Texas may use NHPP funds in violation of the Spending Clause and "would grant the Executive a power of the purse and be inconsistent with the Constitution's meticulous separation of powers." *Tex. Educ. Agency*, 992 F.3d at 362. This cannot be allowed and the Final Rule should be vacated.

## CONCLUSION AND PRAYER

There are many reasons to vacate the Final Rule. Specifically, the Final Rule cannot be supported by the plain language enacted by Congress, is arbitrary and capricious, and violates the Constitution. Texas prays for vacatur now.

Dated:   February 9, 2024                Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ Logan Harrell*
LOGAN HARRELL
Assistant Attorney General
State Bar No. 24106054
Logan.Harrell@oag.texas.gov

WESLEY S. WILLIAMS
Assistant Attorney General
State Bar No. 24108009
Wesley.Williams@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
ENVIRONMENTAL PROTECTION DIVISION
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

**COUNSEL FOR THE STATE OF TEXAS AND
THE TEXAS DEPARTMENT OF
TRANSPORTATION**