# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

STATE OF TEXAS, *et al.*,

        Plaintiffs,

    v.

U.S. DEPARTMENT OF
TRANSPORTATION, *et al.*,

        Defendants.

Case No. 5:23-cv-00304-H

## DEFENDANTS' COMBINED BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

STANDARD OF REVIEW ..................................................................................... 7

ARGUMENT ........................................................................................................... 8

I.      The Final Rule Is an Appropriate Exercise of the Agency's Statutory
        Authority. ................................................................................................... 8

II.     The Final Rule Is Not Arbitrary and Capricious. ................................... 15

        A.      FHWA Did Not Consider Any Impermissible Factors ............... 15

        B.      FHWA Considered the Costs to States ........................................ 17

III.    The Final Rule Does Not Violate the Spending Clause. ......................... 18

IV.     Any Relief Should Be Limited to the State of Texas. ............................. 20

CONCLUSION ...................................................................................................... 22

## TABLE OF AUTHORITIES

**CASES**

*Abbott Lab'ys v. Gardner,*
    387 U.S. 136 (1967) .................................................................................... 22

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
    452 U.S. 490 (1981) .................................................................................... 17

*Arlington Cent. School Dist. Bd. of Educ. v. Murphy,*
    548 U.S. 291 (2006) .................................................................................... 19

*Blue Ocean Inst. v. Gutierrez,*
    585 F. Supp. 2d 36 (D.D.C. 2008) ............................................................... 7

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ...................................................................... 22

*Camp v. Pitts,*
    411 U.S. 138 (1973) ...................................................................................... 7

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
    596 U.S. 212 (2022) .................................................................................... 19

*Cunningham v. Cornell Univ.,*
    86 F.4th 961 (2d Cir. 2023) .......................................................................... 9

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) ........................................................................... 16, 18

*Dep't of Homeland Sec. v. New York,*
    140 S. Ct. 599 (2020) ................................................................................. 21

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .............................................................................. 15, 18

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ...................................................................................... 8

*Gill v. Whitford,*
    585 U.S. 48 (2018) ...................................................................................... 20

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
    968 F.3d 454 (5th Cir. 2020) ........................................................................ 7

*Hosseini v. Nelson,*
  911 F.3d 366 (6th Cir. 2018) ........................................................................ 15

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  140 S. Ct. 2367 (2020) ............................................................................ 8, 15

*Louisiana v. Becerra,*
  20 F.4th 260 (5th Cir. 2021) ........................................................................ 21

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) .................................................................................... 21

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
  602 F.3d 687 (5th Cir. 2010) .......................................................................... 7

*N.C. Fisheries Ass'n v. Gutierrez,*
  518 F. Supp. 2d 62 (D.D.C. 2007) ................................................................ 18

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
  538 U.S. 109 (2018) ...................................................................................... 8

*Nat'l Fed'n of Indep. Business v. Sebelius,*
  567 U.S. 519 (2012) .................................................................................... 19

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) ........................................................................................ 19

*Pension Ben. Guar. Corp. v. LTV Corp.,*
  496 U.S. 633 (1990) .................................................................................... 12

*Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms, & Explosives,*
  No. 3:21-CV-0116-B, 2023 WL 4304760 (N.D. Tex. June 30, 2023) ................. 21

*Sierra Club v. U.S. Dep't of Interior,*
  990 F.3d 909 (5th Cir. 2021) .......................................................................... 7

*Texas v. EPA,*
  389 F. Supp. 3d 497 (S.D. Tex. 2019) .............................................................. 7

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ................................................................................ 21, 22

*United States v. Johnson,*
  632 F.3d 912 (5th Cir. 2011) .......................................................................... 7

*United States v. Schopp,*
    938 F.3d 1053 (9th Cir. 2019) ........................................................... 9

*United States v. Texas,*
    599 U.S. 670 (2023)........................................................................ 22

*United States v. Wallington,*
    889 F.2d 573 (5th Cir. 1989) ........................................................... 9

*United States v. Wise,*
    370 U.S. 405 (1962) ................................................................. 12, 13

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014)........................................................... 13, 14, 15

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) ......................................................... 20

*W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24, S. Atl. & Gulf Coast Dist. of the ILA, AFL-CIO,*
    751 F.2d 721 (5th Cir. 1985) ......................................................... 22

*W. Virginia v. EPA,*
    597 U.S. 697 (2022)........................................................... 13, 14, 15

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982)........................................................................ 22

*Whole Woman's Health v. Smith,*
    896 F.3d 362 (5th Cir. 2018) *as revised* (July 17, 2018)....................... 20

## STATUTES

5 U.S.C. § 706 ...................................................................... 7, 22

23 U.S.C. § 101 ........................................................................ 10

23 U.S.C. § 119 .................................................................... 9, 10

23 U.S.C. § 134 .................................................................... 1, 10

23 U.S.C. § 135 ........................................................................ 11

23 U.S.C. § 150 ................................................................. *passim*

42 U.S.C. § 1320f-3 ................................................................. 17

Infrastructure Investment and Jobs Act,
    Pub. L. No. 11758, 135 Stat. 429 (2021) ............................................................... 12

**RULES**

Fed. R. Civ. P. 56..................................................................................................................7

**REGULATIONS**

23 C.F.R. § 470.107 ............................................................................................................. 1

23 C.F.R. § 490.101 ........................................................................................................... 16

23 C.F.R. § 490.105 ........................................................................................................... 16

23 C.F.R. § 490.109 ............................................................................................................. 6

23 C.F.R. § 490.507 ............................................................................................................. 6

National Performance Management Measures; Assessing Performance of the
    National Highway System, Freight Movement on the Interstate System, and
    Congestion Mitigation and Air Quality Improvement Program,
    82 Fed. Reg. 5,970 (Jan. 18, 2017)................................................................................ 4

National Performance Management Measures; Assessing Performance of the
    National Highway System, Freight Movement on the Interstate System, and
    Congestion Mitigation and Air Quality Improvement Program,
    83 Fed. Reg. 24,920 (May 31, 2018) ........................................................................ 4, 5

Protecting Public Health and the Environment and Restoring Science to Tackle
    the Climate Crisis,
    Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (January 20, 2021) .......................................... 5

Tackling the Climate Crisis at Home and Abroad,
    Exec. Order No. 14,008, 86 Fed. Reg. 7,619 (Jan. 27, 2021) ................................................. 5

National Performance Management Measures; Assessing Performance of
    the National Highway System, Greenhouse Gas Emissions Measure,
    87 Fed. Reg. 42,401 (July 15, 2022) ............................................................................. 5

National Performance Management Measures; Assessing Performance of the
    National Highway System, Greenhouse Gas Emissions Measure,
    88 Fed. Reg. 85,364 (Dec. 7, 2023)................................................................... *passim*

**OTHER AUTHORITIES**

INVEST in America Act, H.R. 3684, 117th Cong., § 1403 (2021) ........................................ 12

U.S. Department of Transportation, Federal Highway Administration and Federal
  Transit Administration, *Status of the Nation's Highways, Bridges, and Transit*, 24th ed.
  (2021),
  https://www.fhwa.dot.gov/policy/24cpr/pdf/24cpr.pdf .............................................. 1

**INTRODUCTION**

After conducting notice-and-comment rulemaking and pursuant to its statutory authority, the Federal Highway Administration ("FHWA") published a Final Rule requiring states and metropolitan planning organizations ("MPOs") to measure greenhouse gas ("GHG") emissions from on-road mobile sources on the National Highway System ("NHS")[1] within their jurisdiction and to set targets for reducing these emissions. *See* National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 88 Fed. Reg. 85,364 (Dec. 7, 2023) ("Final Rule") (reproduced at Administrative Record FHWA000001). The Final Rule is intended to provide state and local decisionmakers with nationally consistent and transparent information regarding GHG emissions to use when they select projects within their jurisdictions. The Final Rule requires states[2] to submit periodic reports to FHWA, but there are no penalties if a state fails to meet its target or fails to reduce GHG emissions.

The State of Texas and the Texas Department of Transportation (collectively, "Texas") brought this lawsuit challenging the Final Rule as exceeding FHWA's statutory

---

[1] The NHS consists of interconnected urban and rural principal arterials and highways (including toll facilities) which serve major population centers, international border crossings, ports, airports, public transportation facilities, other intermodal transportation facilities and other major travel destinations; meet national defense requirements; and serve interstate and interregional travel. All routes on the Interstate System are a part of the NHS. 23 CFR § 470.107(b)(1). The NHS consists of slightly over 5 percent of highway route miles in the United States but accounts for approximately 55 percent of vehicle miles travelled. *See* U.S. Department of Transportation, Federal Highway Administration and Federal Transit Administration, *Status of the Nation's Highways, Bridges, and Transit*, 24th ed. (2021), at 1-8. https://www.fhwa.dot.gov/policy/24cpr/pdf/24cpr.pdf.

[2] Many of the Final Rule's terms apply to both states and MPOs. *See* 23 U.S.C. § 134(d) (requiring a state to designate an MPO to carry out transportation planning activities for each urbanized area with a population of more than 50,000 individuals). Because no MPO is a party to this case, this brief primarily focuses on the Final Rule's applicability to states.

1

authority; arbitrary and capricious; and unconstitutional in violation of the Spending Clause. Texas has moved for summary judgment on these grounds and seeks an order "vacating the Final Rule." Tex.'s Mot. for Summ. J. at 2, ECF No. 18. None of Texas's claims is meritorious, so the Court should deny Texas's motion for summary judgment and grant summary judgment in favor of Defendants.

First, FHWA has authority to establish measures for "performance" of the NHS, 23 U.S.C. § 150(c)(3), in furtherance of the "national goals" set forth in 23 U.S.C. § 150(b), which include "[e]nvironmental sustainability." In context, the best reading of the statute is that the term "performance" includes environmental performance, including GHG emissions, in furtherance of the goal of environmental sustainability. Thus, FHWA has clear statutory authority to issue the Final Rule.

Second, the Final Rule is not arbitrary and capricious. Contrary to Texas's claims, consideration of national policies regarding GHG emissions is permissible under 23 U.S.C. § 150. Also contrary to Texas's claims, FHWA considered the costs to the states of implementing the Final Rule, which are generally limited to the costs of establishing targets, monitoring, and reporting emissions because the Final Rule does not require states to achieve their targets or take any other specific actions with respect to ongoing or planned transportation projects within their jurisdictions.

Third, the Final Rule is not an unconstitutional condition on federal funding that was not clearly expressed by Congress. The Final Rule imposes no consequences for a state's failure to meet emissions targets, so meeting those targets is not a condition on funding at all. Texas's federal funding at risk.

For all of these reasons, judgment should be entered in Defendants' favor. Should the Court nonetheless determine that judgment should be entered for Texas, the scope of any relief awarded should give due consideration to Article III and the Administrative Procedure Act.

## BACKGROUND

The 2012 Moving Ahead for Progress in the 21st Century Act (MAP-21) and the 2015 Fixing America's Surface Transportation Act (FAST Act) enacted several changes to the Federal-aid highway program. These statutes established performance management requirements and tasked FHWA with implementing them. As Congress explained in 23 U.S.C. § 150(a), "[p]erformance management will transform the Federal-aid highway program and provide a means to the most efficient investment of Federal transportation funds by refocusing on national transportation goals, increasing the accountability and transparency of the Federal-aid highway program, and improving project decisionmaking through performance-based planning and programming."

The transportation goals of the Transportation Performance Management ("TPM") statutory framework, on which "[p]erformance management" will be "refocus[ed]," 23 U.S.C. § 150(a), are in turn set forth in 23 U.S.C. § 150(b). The statute declares that "[i]t is in the interest of the United States to focus the Federal-aid highway program on" seven "national goals," summarized as "(1) Safety," "(2) Infrastructure condition," "(3) Congestion reduction," "(4) System reliability," "(5) Freight movement and economic vitality," "(6) Environmental sustainability," and "(7) Reduced project delivery delays." *Id.* § 150(b). The statute instructs FHWA to "promulgate a rulemaking that establishes performance measures and standards" "[n]ot later than 18 months after the date of enactment of the MAP-21" and "in consultation with State departments of transportation" ("State DOTs"), "metropolitan planning organizations" ("MPOs"), "and other stakeholders." *Id.* § 150(c)(1). Such regulation should establish "measures for States to use to assess": "the condition of pavements on the Interstate system"; "the condition of pavements on the National Highway System (excluding the Interstate)"; "the condition of bridges on the National Highway System"; "the performance of the Interstate System"; "the performance of the National Highway System (excluding the Interstate System)"; "serious injuries and fatalities per vehicle mile traveled"; "the number of serious injuries

3

and fatalities"; "traffic congestion"; "on-road mobile source emissions"; and "freight movement." *Id.* § 150(c)(3)(A)(ii), (4)–(6). After promulgation of a regulation, states must "set performance targets that reflect" these measures. *Id.* § 150(d)(1). Beginning four years after enactment of the MAP-21, States are required to submit biennial reports that describe, among other things, "the condition and performance of the National Highway System in the State" and "progress in achieving performance targets." *Id.* § 150(e).

Starting in 2016, FHWA issued several performance management rules pursuant to the requirement in 23 U.S.C. § 150(c)(1). The first two rules, known as "PM1" and "PM2," focused on safety and infrastructure (bridge and pavement conditions), respectively. 88 Fed. Reg. at 85,366 (describing the regulatory history). The third rule, known as "PM3," published January 18, 2017, established several further performance measures, including on-road mobile source GHG emissions. *See id.* (discussing National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 82 Fed. Reg. 5,970 (Jan. 18, 2017)). The PM3 rule recognized that emissions of GHG, such as carbon dioxide ("$CO_2$"), build up in Earth's atmosphere and result in increased average global temperatures over time. *Id.* PM3 also noted that on-road sources account for over 80% of GHG emissions from the United States transportation sector. *Id.* FHWA thus decided to establish a GHG emissions performance measure involving the percent change in $CO_2$ emissions from the reference year 2017 generated by on-road mobile sources on the National Highway System. *Id.*

In 2017, FHWA changed course and announced that it would repeal PM3's GHG measure. *See id.* On May 31, 2018, FHWA published a new rule ("the 2018 Rule") repealing the GHG measure, citing three main reasons: (1) reconsideration of the legal authority to issue a GHG measure; (2) the cost of the GHG measure in comparison to the lack of demonstrated benefits; and (3) a potential duplication of information from other initiatives related to measuring $CO_2$ emissions. *See id.* (discussing National Performance

Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 83 Fed. Reg. 24,920 (May 31, 2018)). The repeal took effect before any of the states' deadlines for target setting or reporting. *See id.*

In 2022, FHWA issued a Notice of Proposed Rulemaking ("NPRM") to establish a new GHG measure. *See id.* (discussing National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 87 Fed. Reg. 42,401 (July 15, 2022)). The NPRM proposed to require State DOTs and MPOs that have National Highway System mileage within their geographic boundaries to establish targets for reducing tailpipe $CO_2$ emissions from on-road mobile sources that align with the goal of net-zero emissions economy-wide by 2050. *See id.*; *see also* Tackling the Climate Crisis at Home and Abroad, Exec. Order No. 14,008, § 201, 86 Fed. Reg. 7,619, 7,622 (Jan. 27, 2021) (declaring a policy to "put the United States on a path to achieve net-zero emissions, economy-wide, by no later than 2050"); Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, Exec. Order No. 13,990, § 1, 86 Fed. Reg. 7,037 (January 20, 2021) (declaring a government-wide policy "to reduce greenhouse gas emissions"). Under the rule proposed in the NPRM, states would be required to establish two- and four-year statewide emissions reduction targets, and MPOs would be required to establish four-year emissions reduction targets, with each to report on its progress meeting the targets. 88 Fed. Reg. at 85,366–67; *see id.* at 85,371 (using 2022 as the reference year). On December 7, 2023, after providing notice and soliciting, receiving, and reviewing public comments, FHWA published the Final Rule. *See id.* at 85,367.

The Final Rule finalized the NPRM with some modifications. Most notably, the Final Rule clarifies that, while states must set declining targets for GHG emissions, those targets do not need to demonstrate reductions toward net-zero emissions by 2050. *Id.* at

85,380. The Final Rule also clarifies the lack of consequences for a state's failure to meet its targets:

> There are no specific penalties for failing to achieve GHG targets. Rather, consistent with existing [National Highway Performance Program ("NHPP")] performance measures, if significant progress in not made for the target established for the GHG measure in 23 C.F.R. 490.507(b), the State DOT must document the actions it will take to achieve that target no later than in its next biennial report, but is encouraged to do so sooner. . . . The FHWA did not propose specific penalties for failure to achieve performance targets, and is not finalizing any such penalty. Failure to achieve significant progress for this measure, as defined in 23 C.F.R. 490.109, will also not trigger any penalties. State DOTs and MPOs that set a declining target but fail to achieve their targets can satisfy regulatory requirements by documenting the actions they will take to achieve that target in their next biennial report. The FHWA does not set or approve the State DOT's or MPO's targets.

*Id.* at 85,378. The goal of the Final Rule is to promote a reduction in GHG emissions by ensuring states have transparent information, rather than to mandate reductions. "The first step toward reducing GHG emissions involves inventorying and monitoring those emissions." *Id.* at 85,365. By providing updated data regarding mobile source emissions on the NHS, "the GHG measure has the potential to increase public awareness of GHG emissions trends, improve the transparency of transportation decisions, enhance decisionmaking at all levels of government, and support better informed planning choices to reduce GHG emissions or inform tradeoffs among competing policy choices." *Id.*

The Final Rule also explains FHWA's reconsideration of the rationales underlying the 2018 Rule and determination to depart from them. *Id.* at 85,369–70. The Final Rule explains that the 2018 Rule adopted a mistakenly narrow interpretation of 23 U.S.C. § 150(c) that overlooked one of that subsection's key provisions. *Id.* It also explains that the 2018 Rule misunderstood and thus overestimated the cost of a GHG measure to states and MPOs, *id.* at 85,370, and that other programs that collect data on $CO_2$ emissions do

not provide the specific information gained from the Final Rule, *i.e.*, emissions from on-road mobile sources on the NHS, *see id.* at 85,379.

The Final Rule requires states to establish initial GHG emissions targets and report them to FHWA by no later than February 1, 2024. *Id.* at 85,372. However, in this litigation and related litigation, *see Kentucky v. Fed. Highway Admin.*, No. 5:23-cv-00162-BJB (W.D. Ky.), FHWA agreed not to enforce the February 1, 2024 deadline until March 29, 2024, *see* Tex.'s Advisory to the Court, ECF No. 13.

## STANDARD OF REVIEW

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In the context of a challenge under the [Administrative Procedure Act ("APA")], '[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review.'" *Texas v. EPA*, 389 F. Supp. 3d 497, 503 (S.D. Tex. 2019) (quoting *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008)); *see, e.g., Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 459–60 (5th Cir. 2020). When reviewing agency action under the APA, a court may "set aside agency action," 5 U.S.C. § 706(2), when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)). This standard is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (quoting *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010)).

In reviewing a final agency action under the APA, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "[T]he focal point for judicial review" of an administrative agency's action "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). A court must "apply the appropriate APA standard

7

of review . . . to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (citation omitted); *see also id.* (explaining that a court's "factfinding capacity" is "typically unnecessary to judicial review" in an APA case).

ARGUMENT

## I.     The Final Rule Is an Appropriate Exercise of the Agency's Statutory Authority.

23 U.S.C. § 150(c) authorizes FHWA to issue the Final Rule. Like any other question of statutory interpretation, an analysis of an agency's statutory authority "begins with the statutory text," and, when the text is clear, it "ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 538 U.S. 109, 127 (2018) (citation omitted); *see, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020). Here, FHWA's authority to adopt the Rule flows directly from the text of the statute.

In promulgating the Final Rule, FHWA invoked 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V), which provides that FHWA regulations shall establish "measures for States to use to assess" "the performance of the Interstate System" and "the performance of the National Highway System (excluding the Interstate System)." *See* 88 Fed. Reg. at 85,367 (citing these subsections for FHWA's authority and explaining FHWA's interpretation of the statute). Although Congress charged FHWA with establishing performance measures in 23 U.S.C. § 150(c), it did not define the term "performance" as used in that subsection. Thus, FHWA and the Court must interpret this term in the context of the TPM statutory scheme.

As FHWA explained, the term "performance" is most logically defined by reference to the seven "national goals" set forth in the immediately preceding subsection. *See* 23 U.S.C. § 150(b). One of those goals is "[e]nvironmental sustainability," as to which Congress directed the TPM program "[t]o enhance the performance of the transportation

8

system while protecting and enhancing the natural environment." 23 U.S.C. § 150(b)(6).[3] Read together, subsections (b)(6) and (c)(3) make clear that Congress intended for "performance" measures to include environmental performance in furtherance of the goal of environmental sustainability. The "[e]nvironmental sustainability" goal, which focuses on the "performance of the transportation system," can only be achieved if FHWA takes reasonable steps to assist State DOTs and MPOs to measure and evaluate factors which affect the "natural environment," *id.* § 150(b)(6), including GHG emissions, on the NHS. Congress's use of the term "performance" in 23 U.S.C. § 150(c)(3) should therefore be read to enable these measures. In this regard, environmental performance, including $CO_2$ emissions, is a component of the "performance" of the NHS, and as such it is appropriate for FHWA to establish a performance measure for GHG emissions.

Moreover, FHWA's interpretation of "performance" under 23 U.S.C. § 150(c)(3) is consistent with 23 U.S.C. § 119. The purposes of the NHPP, set out in 23 U.S.C. § 119(b), include supporting "the condition and performance of the National Highway System" and supporting "activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters." Assessing environmental performance supports both the "condition" of the highway system, as well as activities to increase the system's "resiliency . . . to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters." *Id.* Notably, the damaging events Congress listed are all commonly associated with global climate change brought about by rising GHG levels in the atmosphere, *see* 88 Fed. Reg. at 85,368; accordingly,

---

[3] The subheading "[e]nvironmental sustainability" was included in the bill as enacted and should therefore be considered as part of the text of the statute. *Cf. United States v. Wallington*, 889 F.2d 573, 577 (5th Cir. 1989) (considering "heading [that] was included in the statute as it was considered and enacted"); *Cunningham v. Cornell Univ.*, 86 F.4th 961, 976 n.8 (2d Cir. 2023); *United States v. Schopp*, 938 F.3d 1053, 1061 n.3 (9th Cir. 2019).

assessment of GHG emissions on the NHS is particularly relevant to this purpose, *id.* Further, Congress connected the TPM scheme and the NHPP statute: 23 U.S.C. § 119(e)(2) directs State DOTs to develop a performance-driven asset management plan that would "support[] the progress toward the achievement of the national goals identified in section 150(b)." And 23 U.S.C. § 119(d)(2) identifies permissible purposes for eligible NHPP projects as including development and implementation of a State DOT's asset management plan under 23 U.S.C. § 119(e). Particularly when read in conjunction with section 119, sections 150(b) and 150(c)(3) make clear that FHWA has authority to establish a performance measure of GHG emissions.

As FHWA also acknowledged, *see* 88 Fed. Reg. at 85,368, this reading of the statute is also consistent with other parts of Title 23, which governs the entire highway program. Several other sections of Title 23 of the U.S. Code treat environmental performance as a component of transportation and highway performance. The policy declaration in 23 U.S.C. § 101(b)(3)(G) states that "transportation should play a significant role in promoting economic growth, improving the environment, and sustaining the quality of life." And 23 U.S.C. § 134(a)(1) states as a matter of transportation planning policy that "[i]t is in the national interest . . . to encourage and promote the safe and efficient management, operation, and development of surface transportation systems . . . while minimizing transportation-related fuel consumption and air pollution through metropolitan and statewide transportation planning processes identified in this chapter." Under 23 U.S.C. § 134(h), the scope of the metropolitan planning process is defined to require consideration of projects and strategies that will "protect and enhance the environment, promote energy conservation, improve the quality of life," and "improve the resiliency and reliability of the transportation system." *Id.* § 134(h)(1)(E), (I); *see id.* § 134(c)(1) (requiring MPOs to develop long range plans and transportation improvement programs to achieve the objectives in 23 U.S.C. § 134(a)(1) through a performance-driven, outcome-based approach to planning). The subsequent section

similarly defines the scope of the statewide planning process in reference to environmental protection. *See id.* § 135(d)(1)(E), (I). And 23 U.S.C. § 135(d)(2) requires the statewide transportation planning process to "provide for the establishment and use of a performance-based approach to transportation decisionmaking to support the national goals described in" 23 U.S.C. § 150(b), which of course includes "[e]nvironmental sustainability," *id.* § 150(b)(6). These provisions further indicate that assessing highway performance under 23 U.S.C. § 150(c)(3) properly encompasses the assessment of environmental performance, including GHG emissions and other climate-related matters, in furtherance of the goal of environmental sustainability.

Texas argues to the contrary that the Court should adopt the 2018 Rule's interpretation of FHWA's statutory authority. Texas asserts, as does the 2018 Rule, that 23 U.S.C. § 150(c)(2)(C) compels a narrow reading of the word "performance" that disregards the national goals set forth in § 150(b). *See* Tex.'s Br. in Supp. of Summ. J. ("Pls.' Br.") at 16, ECF No. 19. Section 150(c)(2)(C) provides that FHWA must "limit performance measures only to those described in this subsection," *i.e.*, in 23 U.S.C. § 150(c). In other words, FHWA cannot issue measures for considerations that are not enumerated in 23 U.S.C. § 150(c). But 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V) directs that measures be established for the "performance" of the Interstate System and the National Highway System generally. Neither 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V) themselves nor 23 U.S.C. § 150(c)(2)(C) imposes any limits or otherwise compels a particular interpretation of the word "performance." Thus, because environmental performance falls within "performance," FHWA may establish a measure for environmental performance, including GHG emissions, without offending 23 U.S.C. § 150(c)(2)(C). In light of the explicit statutory goal of "[e]nvironmental sustainability," the significant risks that climate change-driven extreme weather pose to the condition and performance of the NHS, and FHWA's unquestioned authority to establish performance measures, the Court should interpret the meaning of "performance" of the Interstate System and National

Highway System under 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V) to include environmental performance in furtherance of the goal of environmental sustainability.

Texas also advances the 2018 Rule's conclusion that no statutory provision "specifically directs or requires [FHWA] to adopt a GHG measure." Pls.' Br. at 14. But no provision of law *prohibits* FHWA from adopting a GHG measure either. 88 Fed. Reg. at 85,370. FHWA has authority under 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V) to establish measures of "performance" on the NHS. The Final Rule is an appropriate exercise of this authority.

Texas argues that subsequent legislative inaction should be deemed to confirm the 2018 Rule's interpretation of the statute. But that legislative history provides little insight into congressional intent in this instance. After FHWA issued PM3 interpretating the TPM statutory scheme to allow FHWA to establish a measure for GHG emissions, and after the 2018 Rule adopted the opposite interpretation, Congress enacted new legislation related to federal highway programs without clarifying FHWA's authorities under 23 U.S.C. § 150(c). *See* Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. No. 11758, 135 Stat. 429 (2021); *see also* INVEST in America Act, H.R. 3684, 117th Cong., § 1403 (2021) (as introduced in the House). As Texas notes, the House considered language that specifically authorized FHWA to establish a measure for GHG emissions, but this language ultimately was not adopted. *See* Pls.' Br. at 15. Texas suggests that, by declining to amend 23 U.S.C. § 150(c), Congress demonstrated its intent that FHWA not have regulatory authority to establish a GHG measure. *See id.* But the same historical record just as readily supports the inference that Congress determined that FHWA already had authority to establish a GHG measure, and that, accordingly, amending 23 U.S.C. § 150(c) was unnecessary. "Congressional inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction, 'including the inference that the existing legislation already incorporated the offered change.'" *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990) (quoting *United States v. Wise*, 370 U.S.

405, 411 (1962)); 88 Fed. Reg. at 85,376 (citing *id*.). By the time Congress was considering the IIJA, FHWA had already on separate occasions adopted both interpretations of its own authority—once saying it had authority to establish a GHG measure, and once saying it did not—and so Congress's decision not to weigh in after the fact provides little help in interpreting the statute. Indeed, Congress's refusal to step in is, if anything, an indication that Congress's intention was to afford the agency authority to make reasonable policy judgments about how best to implement the statute, even if such policy judgments have historically been in flux.

Texas also argues that Congress only permitted FHWA to examine emissions reductions within the limited scope of establishing performance measures for the Congestion Mitigation and Air Quality ("CMAQ") Program, rather than the NHPP. Pls.' Br. at 20. However, this language only indicates congressional intent that FHWA establish a performance measure for on-road mobile source emissions for the purposes of carrying out the CMAQ Program. Congress did not include any language prohibiting FHWA from establishing other measures related to emissions for the NHPP.

Finally, Texas argues that the Final Rule's interpretation of FHWA's authority violates the "major questions doctrine." Pls.' Br. at 17–18. Under the "major questions doctrine," courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *W. Virginia v. EPA*, 597 U.S. 697, 716 (2022) (citation omitted). A regulation that "order[s] the wholesale restructuring of an[ entire] industrial sector" and has "billions of dollars of impact," for example, might trigger the major questions doctrine because of the regulation's vast economic significance. *Id.* (citation omitted). So, too, might a situation in which an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'" *Id.* at 724 (second alteration in original) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). In "certain extraordinary cases," a court might require the agency to "point to 'clear congressional authorization' for the

13

power it claims" in the challenged action. *Id.* at 723 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

But the Final Rule simply is not one such "extraordinary case" to which the major questions doctrine might apply. The Final Rule does not have vast economic or political impacts. *See* 88 Fed. Reg. at 85,375. The Final Rule merely adds one additional target and reporting requirement for State DOTs and MPOs to an existing regulatory scheme using existing data sources. And although states are required to set declining targets for $CO_2$ emissions, the Rule does not dictate a rate of decline, and imposes no penalty for failure to meet the targets. *Id.* at 85,378. Nor does the Final Rule require states to change their approach to selecting projects or indeed to do anything other than monitor emissions, set targets, and submit reports. *See id.* at 85,375 ("Th[e Final Rule] does not require State DOTs and MPOs to change their approach to selecting projects."). Rather, the purpose of the Final Rule is to provide state and local decisionmakers with consistent and transparent information to inform their decisionmaking without mandating any specific approach or results. *See id.* And the agency reasonably estimated the total cost of implementing the Final Rule to be around $12.7 million over ten years total across all states and MPOs, *see id.* at 85,389, a far cry from the sort of vast economic impact present in cases in which courts have found the major questions doctrine applies.

Moreover, the Final Rule does not involve a novel interpretation of a longstanding statute. The MAP-21 and FAST Act were enacted in 2012 and 2015, respectively. The first three regulations promulgated under the TPM framework were published between 2016 and 2017, with PM3 adopting the original interpretation of the statute that FHWA now claims. FHWA did not "discover in a long-extant statute an unheralded power," *Util. Air Regul. Grp.*, 573 U.S. at 324, and thus, that basis for invoking the major questions doctrine is lacking as well.

In any event, Congress *did* speak clearly in authorizing FHWA to establish measures related to environmental performance. Under 23 U.S.C. § 150(c)(3), FHWA has

authority to establish measures for the "performance" of the NHS, in furtherance of the "goals" of the statute set forth in 23 U.S.C. § 150(b), which include "[e]nvironmental sustainability." Thus, even if this were an "extraordinary case," the straightforward reading of 23 U.S.C. § 150 to authorize FHWA to establish measures related to environmental performance would provide the requisite "clear congressional authorization." *W. Virginia*, 597 U.S. at 723 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

## II.    The Final Rule Is Not Arbitrary and Capricious.

Texas's arbitrary-and-capricious claims fare no better. Agency action must be upheld in the face of an arbitrary-and-capricious challenge so long as the agency "articulate[s] a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Little Sisters of Poor Saints Peter & Paul Home*, 140 S. Ct. at 2383 (citation omitted). A court's review is "narrow" and it "is not to substitute its judgment for that of the agency." *Hosseini v. Nelson*, 911 F.3d 366, 371 (6th Cir. 2018) (citation omitted). Under this "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Texas argues that FHWA (1) considered factors that Congress did not intend for it to consider, and (2) failed to consider certain costs to the states. Pls.' Br. at 19–22. Each argument is meritless.

### A.  FHWA Did Not Consider Any Impermissible Factors

Texas first asserts that FHWA considered "factors that Congress has not intended" the agency to consider. *Id.* at 19. Their argument appears to be twofold: first, Texas says, FHWA adopted the Final Rule in part to align with President Biden's executive orders on GHG emissions, *see id.* at 19–20; second, Texas says that Congress did not intend for FHWA to consider GHG emissions when establishing performance measures for the NHS, *see id.* at 20–21.

As to the first strain of Texas's argument, even assuming Texas is correct that the President's executive orders informed FHWA's policy judgments in promulgating the Final Rule, there is nothing unusual or unlawful about that. "[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019). And unlike in *Department of Commerce v. New York*, here there is no "significant mismatch between the decision the [agency] made and the rationale [it] provided." *Id.* at 2575. To the contrary, the rationale provided in the Final Rule amply justifies the decision made, and Texas does not contend otherwise.

Moreover, the Final Rule in fact specifically does not require states to adhere to emissions benchmarks set out in the executive orders. "Upon considering public comments," the Final Rule states, "FHWA recognizes that the reference to net-zero targets and national GHG goals in the NPRM may have caused confusion, and FHWA has removed the definition of net-zero from 23 CFR 490.101 and the requirement in 23 CFR 490.105(e)(10) that targets for the GHG measure 'demonstrate reductions toward net-zero targets.'" 88 Fed. Reg. at 85,380. "Declining targets are not required to align with the Administration's goal for the U.S. to reduce $CO_2$ emissions 50–52 percent below 2005 levels by 2030 and achieve net-zero emissions economywide by 2050, in accordance with national policy established" by the executive orders. *Id.* "Rather, FHWA believes these national goals can provide a useful roadmap for State DOTs and MPOs as they consider how their targets fit into a longer timeframe of emission reductions." *Id.*

The second strain of Texas's argument—that Congress did not "indicate[] an intent for [FHWA] to consider such economy-wide emission reduction goals when establishing performance measures for" the NHS, Pls.' Br. at 20, duplicates their statutory-authority argument. As explained above, *supra* Part I, Congress has granted FHWA statutory authority to establish a measure for GHG emissions on the NHS; thus, of course FHWA can "consider" GHG emissions on the NHS when issuing such a rule. Moreover, one of

the stated "goals" of the statute is to further "[e]nvironmental sustainability," 23 U.S.C. § 150(b)(6); in that regard, Congress clearly does intend FHWA to consider such factors. Finally, Texas points to no provision of law that prohibits FHWA from considering GHG emissions as a factor when setting performance measures. Had Congress intended to prohibit FHWA from considering GHG emissions when evaluating progress toward the goal of environmental sustainability," it readily could have said so. *C.f. Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 509 (1981) (finding arbitrary and capricious an agency's regulation that balanced costs and benefits of a rule on worker health where the statute stated that the "benefit" of worker health should be placed above any other consideration if the benefit was achievable); 42 U.S.C. § 1320f-3(e)(2)(D) (prohibiting the Centers for Medicare & Medicaid Services from considering evidence from any clinical trial that placed lower value on extending the life of elderly, disabled, and terminally ill individuals as compared to other individuals).

**B. FHWA Considered the Costs to States**

Texas next argues that FHWA acted arbitrarily and capriciously by not considering the full costs to states of implementing the Final Rule. As Texas correctly notes, the Final Rule considered the costs of setting targets, reporting on targets, reporting on actions taken by the States that do not meet their targets, and preparing and calculating the GHG performance metric. *See* Pls.' Br. at 21. The Final Rule estimated these costs to total $12.7 million. *Id.* But Texas complains that FHWA failed to "account for the costs that State DOTs (like [Texas DOT]) and MPOs will incur in taking actions to meet the declining targets." *Id.* In fact, the Final Rule addresses precisely this point: "The rule does not impose compliance costs associated with achieving declining targets since the rule does not require that emissions actually decrease or establish any penalties in the

17

event that declining targets are not achieved." 88 Fed. Reg. at 85,379.[4] Texas argues that, because the Final Rule requires states that do not achieve their targets to submit a report on what actions they will take to achieve progress in the future, that the states will incur costs when taking such actions. Pls.' Br. at 22. But this argument is baseless, for the Final Rule imposes no penalties for failing to achieve targets or for failing to take the actions expressed in a previous report. Because the Rule imposes no requirement on states to actually take the actions they say they will take, the Rule carries no associated costs beyond the cost of submitting the reports.

In any event, during the rulemaking, FHWA considered the comment Texas submitted regarding alleged costs and expressly addressed it in the Final Rule. *See* 88 Fed. Reg. at 85,379. Nothing more is required under the APA. *See Prometheus Radio Project*, 592 U.S. at 423 (stating that the agency only needs to have "reasonably considered the relevant issues and reasonably explained the decision"). That Texas disagrees with FHWA's assessment does not render the Final Rule arbitrary and capricious. "[M]ere policy disagreement is not a basis for a reviewing court to declare agency action unlawful." *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007); *see also Dep't of Com.*, 139 S. Ct. at 2571 (declaring that courts are not to "second-guess[]" an agency's "weighing of risks and benefits" associated with a rulemaking).

### III.   The Final Rule Does Not Violate the Spending Clause.

The Court should reject Texas's claim that the Final Rule violates the Spending Clause by attaching conditions on federal funding that are not clearly set out by Congress. States do not risk NHPP funding—or, indeed, face any consequences—for failing to meet the GHG targets they establish. The Final Rule is thus not a condition on funding at all,

---

[4] The Final Rule also notes that the cost of achieving declining emissions targets—which is *not* required under the Final Rule—would not actually be burdensome for transportation agencies because IIJA provides over $27 billion in federal funding to help State DOTs and MPOs achieve declining GHG targets.

and the Spending Clause is not implicated.

"Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022); *see also Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The Supreme Court's *Pennhurst* decision and its recent progeny reflect the basic proposition that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Just as with actual contractual obligations, a state must "voluntarily and knowingly accept[] the terms" attached to federal funding for those terms to be enforceable. *Id.* For that reason, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* Congress cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions." *Id.* at 25; *see also Nat'l Fed'n of Indep. Business v. Sebelius* (*NFIB*), 567 U.S. 519, 584 (2012).

Courts have applied the *Pennhurst* rule to relieve states of the obligation to comply with statutory conditions on federal funding that were not sufficiently apparent at the time the states accepted that funding. In *Pennhurst* itself, for example, the question was whether the "bill of rights" provision of a federal statute stated an enforceable condition at all, or whether it was merely "hortatory." 451 U.S. at 15–27. Construing the statute, the Court found it "clear that the provision[]" was "intended to be hortatory, not mandatory," *id.* at 24, and thus foreclosed any effort to enforce the provision against the state entity.

Texas's Spending Clause argument is premised on a misunderstanding of the Final Rule. Texas notes that Congress has apportioned federal funds to the states as part of the NHPP and set out several statutory conditions not related GHG emissions. Pls.' Br. at 23. Texas then asserts that the Final Rule would require the states "to spend NHPP federal funds . . . to implement new strategies and take actions necessary to accomplish even

19

year-after-year declining [GHG] targets." *Id.* at 24. Because no statutory authority "unambiguously establishes reductions in GHG emissions as a condition for NHPP funding," Texas says, the Final Rule is unconstitutional. *Id.*

But the Final Rule expressly states that "[t]he FHWA is neither requiring any specific targets *nor mandating any penalties for failing to achieve these targets*." 88 Fed. Reg. at 85,367 (emphasis added); *see also id.* at 85,378 ("There are no specific penalties for failing to achieve GHG targets."). The goal of the Final Rule is "to help State DOTs and MPOs consistently and transparently monitor the current performance of the [National Highway System ("NHS")], and plan transportation projects in a way that protects the long-term performance of the NHS." *Id.* at 85,367. "The rule provides State DOTs and MPOs with the tools to consider GHG emissions in making transportation decisions *and imposes no penalties on States and MPOs that do not meet their targets . . . .*" *Id.* at 85,380 (emphasis added). The Final Rule only requires that states submit periodic reports that set targets for GHG emissions and measure the progress made towards those targets.[5] A state's NHPP funding is not at risk for failure to meet its GHG targets, so there is no "condition" on funding to analyze for statutory clarity.

## IV.    Any Relief Should Be Limited to the State of Texas.

In the event that the Court finds that Texas is entitled to relief,[6] such relief should be limited to the State of Texas. Relief should be no broader than necessary to remedy any harm demonstrated by plaintiffs in a given case. *See Gill v. Whitford*, 585 U.S. 48, 73

---

[5] Texas has not argued that the reporting requirements create a Spending Clause violation, *i.e.*, that NHPP funding is unlawfully conditioned on the submitting of reports, so any such argument is waived.

[6] For the reasons explained above, none of Texas's claims has merit. However, in the event that the Court disagrees, it should confine its ruling to a non-constitutional basis, if possible. "The rule of constitutional avoidance prevents courts from issuing unnecessary and potentially overbroad . . . rulings on constitutional issues." *Whole Woman's Health v. Smith*, 896 F.3d 362, 374 (5th Cir. 2018), *as revised* (July 17, 2018); *see also Veasey v. Abbott*, 830 F.3d 216, 230 n.11 (5th Cir. 2016) (recognizing that courts should "avoid[] reaching constitutional claims unnecessarily").

(2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). "Both the Fifth Circuit and the Supreme Court have suggested that nationwide injunctions are, at best, reserved for extraordinary circumstances." *Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms, & Explosives*, No. 3:21-CV-0116-B, 2023 WL 4304760, at *3 (N.D. Tex. June 30, 2023) (citing *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (staying nationwide injunction of COVID-19 vaccination mandates as "an issue of great significance" that "will benefit from the airing of competing views in our sister circuits." (citation omitted)) and *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (questioning propriety of nationwide injunctions)); *see also Trump v. Hawaii*, 585 U.S. 667, 720 (2018) (Thomas, J., concurring) (suggesting universal injunctions are inconsistent with "limits on equity and judicial power"). As Justices Gorsuch, joined by Justice Thomas, has explained, "[b]ecause plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *Dep't of Homeland Sec*, 140 S. Ct. at 601 (Gorsuch, J., concurring). This creates risks of "conflicting nationwide injunctions," with "asymmetric" stakes where "a single successful challenge is enough to stay the challenged rule across the country." *Id.*; *see also Trump*, 585 U.S. at 713 (Thomas, J., concurring) (Universal relief "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.").

This case presents the sort of circumstances that especially militate against nationwide relief. Twenty-one other states have challenged the Final Rule in the Western District of Kentucky. *See Kentucky v. Fed. Highway Admin.*, No. 5:23-cv-00162-BJB (W.D. Ky.). Granting relief beyond the State of Texas risks conflicting rulings within certain jurisdictions and condoning the "gamesmanship and chaos" Justices Gorsuch and Thomas warned against. *Dep't of Homeland Sec.*, 140 S. Ct. at 601 (Gorsuch, J., concurring). This Court should abide the Fifth Circuit's mandate "to avoid rulings which may trench

upon the authority of sister courts." *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24, S. Atl. & Gulf Coast Dist. of the ILA, AFL-CIO*, 751 F.2d 721, 729 (5th Cir. 1985).

Nor does the fact that Texas brings an APA claim compel a nationwide remedy. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 582–84 (9th Cir. 2018) (vacating nationwide scope of injunction in facial challenge under the APA). A court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and the APA's general instruction that unlawful agency action "shall" be "set aside," 5 U.S.C. § 706(2), is insufficient to mandate such a departure. The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967). Significantly, no federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would any court do so for more than fifteen years thereafter. *See Trump*, 585 U.S. at 716 (Thomas, J., concurring). Accordingly, the Court should construe the "set aside" language in section 706(2) as applying only to plaintiffs that are before the Court. Finally, at least three Supreme Court Justices have recently indicated their understanding that the APA does not require, or perhaps even permit, universal vacatur of agency actions. *See United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment) (joined by Justices Thomas and Barrett). This Court should follow Justice Gorsuch's *Texas* concurrence and decline to enter a nationwide order of vacatur.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' cross-motion for summary judgment and deny Texas's Motion for Summary Judgment. In the event the Court grants Texas's motion for summary judgment, any relief should limited to the State of Texas.

DATED: February 20, 2024                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            JULIE STRAUS HARRIS
                                            Assistant Branch Director

                                            /s/ Michael P. Clendenen
                                            MICHAEL P. CLENDENEN
                                            Trial Attorney
                                            Civil Division, Federal Programs Branch
                                            U.S. Department of Justice
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Phone:  (202) 305-0693
                                            E-mail:  michael.p.clendenen@usdoj.gov

                                            *Counsel for Defendants*

## Certificate of Service

On February 20, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

                                            /s/ Michael P. Clendenen