UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS, et al.,
     Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, et al.,
     Defendants.

No. 5:23-CV-304-H

## <u>MEMORANDUM OPINION AND ORDER</u>

A federal administrative agency cannot act without congressional authorization. Here, the Federal Highway Administration created a rule requiring the states to measure, report, and set declining targets for the amount of carbon dioxide emitted by vehicles using the interstate and national-highway systems. For authority, the agency relied on 23 U.S.C. § 150(c)(3), which permits it to create measures to assess pavement conditions, bridge conditions, and "the performance of the Interstate System . . . [and] the National Highway System." Texas sued, alleging that the agency lacked authority to enact the rule. Given the statutory text's plain language and context, the Court agrees. The relevant definitions and related performance measures make clear that "performance of the Interstate/National Highway Systems" focuses on the infrastructure's effectiveness in facilitating travel, commerce, and national defense—not environmental outputs of vehicles using the systems. Moreover, the DOT's expansive interpretation is undermined by the fact that adopting it would render other statutory provisions superfluous. Additionally, Section 150(c)(3)'s performance measures only exist to carry out Section 119's National Highway Performance Program, which also distinguishes between the highway system's performance and environmental impact. Thus, the Court concludes that the rule was unauthorized.

1.      **Factual and Procedural Background**

      A.      **The National Highway Performance Program (NHPP) and 23 U.S.C. § 150's Performance Measures**

            i.      **The NHPP facilitates the construction, maintenance, and improvement of the nation's transportation infrastructure.**

The federal government has provided some form of highway funding to the states for more than 100 years.  These programs are "almost entirely focused on highway construction," and "[s]tate [departments of transportation (DOTs)] largely determine which projects are funded" so long as the fund-use is statutorily authorized.  Robert S. Kirk, Cong. Rsch. Serv., R47022, Federal Highway Programs: In Brief 1 (2022).  The NHPP is the largest federal-aid highway program in the country, with recent annual authorizations averaging nearly $30 billion dollars.  *Id*. at 5.  The NHPP "funds projects to achieve national performance goals consistent with state and metropolitan planning" by supporting "improvement of the condition and performance of the National Highway System, which includes Interstate System highways and bridges."  *Id.*

The NHPP's statutory authorization and funding requirements are found in 23 U.S.C. § 119.  In addition to restricting the way that funds may be used, the statute also identifies the program's four broad purposes:

    (1) to provide support for the condition and performance of the National Highway System;

    (2) to provide support for the construction of new facilities on the National Highway System;

    (3) to ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established in an asset management plan of a [s]tate for the National Highway System; and

– 2 –

(4) to provide support for activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters.

23 U.S.C. § 119(b). Conceivably, a broad range of projects could support those purposes, but the statute only funds certain "eligible projects" that are consistent with them. *See id.* § 119(d).

To be eligible for funding, projects must first "support[] progress toward the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System." *Id.* § 119(d)(1)(A). Second, projects must be consistent with the broader transportation planning process and its goals, which are codified at 23 U.S.C. §§ 134 and 135.[1] *Id.* § 119(d)(1)(B). Should a project meet those two threshold requirements, Section 119 then provides a specific list of purposes that NHPP funds may finance. *See id.* § 119(d)(2). Many of those purposes relate to building, maintaining, or improving the

---

[1] 23 U.S.C. § 134 is entitled "Metropolitan transportation planning." The goal of the statute is "to encourage and promote the safe and efficient management, operation, and development of surface transportation systems" that will "serve the mobility needs of people and freight," "foster economic growth and development," and "better connect housing and employment," while "minimizing transportation-related fuel consumption and air pollution through metropolitan and statewide transportation planning processes identified in this chapter." 23 U.S.C. § 134(a)(1). Broadly speaking, the section is devoted to laying out the planning requirements for "long-range transportation plans and transportation improvement programs through a performance-driven, outcome-based approach to planning for metropolitan areas of [a] [s]tate." *Id.* § 134(c)(1).

23 U.S.C. § 135 is entitled "Statewide and nonmetropolitan transportation planning." Section 135 explicitly incorporates the goals laid out in Section 134(a), in addition to other stated goals. *Id.* § 135(a). In general, whereas Section 134 is focused specifically on metropolitan areas, Section 135 provides for the transportation-planning process for non-metropolitan areas. *See generally id.* § 135.

In many respects, Sections 134 and 135 have similar, if not identical, language and fulfill similar purposes as to their respective targets (metropolitan areas and non-metropolitan areas). *See generally id.* §§ 134, 135. States and the designated organizations are required to complete these plans to be eligible for NHPP funds. *See id.* §§ 134(c), 135(a).

physical infrastructure of the National Highway System, the Interstate System, and other federal-aid highways, as well as the tunnels, bridges, ferries, and public bus stations that service those systems.  *See, e.g.*, *id.* § 119(d)(2)(A)–(C), (F), (G), (P).  Other purposes authorize funding for operational programs, such as training bridge and tunnel inspectors, paying for the bridge and tunnel inspections themselves, or providing for the operating costs of traffic-monitoring systems.  *See, e.g.*, *id.* § 119(d)(2)(D), (E), (J).  Some purposes authorize funding for specific environment-related projects, like mitigating water pollution or environmental degradation caused by a transportation facility, controlling noxious weeds, implementing mitigation efforts authorized by Section 119(g),[2] or making resiliency improvements along the National Highway System.[3]  *See, e.g.*, *id.* § 119(d)(2)(M)–(O), (R).  Thus, to be eligible for funding under the NHPP, a project must (1) support progress towards a specified national performance goal or goals; (2) be consistent with Sections 134 and 135; and (3) qualify as one of the explicitly enumerated purposes.  *See id.* § 119(d).

---

[2] Section 119(g) authorizes NHPP funds for "participation in natural habitat and wetlands mitigation efforts."  23 U.S.C. § 119(g)(1).  These authorized efforts include "participation in mitigation banking or other third-party mitigation arrangements," "contributions to statewide and regional efforts to conserve, restore, enhance, and create natural habitats and wetlands," and "the development of statewide and regional environmental protection plans."  *Id.*  Authorization is limited, however, to programs "relating to projects funded under [Title 23]."  *Id.*

[3] This authorization allows funds to go toward the "protective features" described in Section 119(k)(2), which include things likes "raising roadway grades," "relocating roadways" located in flood plains, and "increasing the size or number of drainage structures."  U.S.C. § 119(d)(2)(R), (k)(2).

ii.    **Section 150 authorizes the federal Department of Transportation (DOT) to promulgate performance measures to accomplish the NHPP's purpose.**

In 2012, and then again in 2015, Congress amended the NHPP to authorize the Secretary of Transportation to promulgate rules establishing "performance measures."[4]  *See id.* § 150.  These performance measures "provide a means to the most efficient investment of [f]ederal transportation funds by refocusing on national transportation goals . . . and improving project decisionmaking through performance-based planning and programming."  *Id.* § 150(a).  Section 150 then lists seven "national goals" on which "Federal-aid highway program[s]" should be focused, including safety, infrastructure condition, congestion reduction, system reliability, freight movement and economic vitality, and reduced project delivery delays.  *Id.* § 150(b).  Most relevant here is the goal of environmental sustainability: "To enhance the performance of the transportation system while protecting and enhancing the natural environment."  *Id.* § 150(b)(6).

In spite of those broad national goals, Section 150's reach is limited.  The statute provides that performance measures may only be promulgated if they are specifically authorized in Section 150(c).  *Id.* § 150(c)(2)(C).  In other words, Congress deliberately

---

[4] Section 150 was last amended in December 2015.  *See* Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1446, 129 Stat. 1312, 1437–38 (2015).  That said, Congress has considered amending Section 150 in the years since.  The parties dispute whether one prior proposed amendment is relevant to the analysis.  Specifically, an earlier House of Representatives version of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021), would have amended Section 150.  *See* INVEST in America Act, H.R. 3684, 117th Cong. § 1403 (2021) (as introduced in the House).

One such proposed amendment would have authorized federal agencies to establish "measures for the [s]tates to use to assess (A) carbon dioxide emissions per capita on public roads; (B) carbon dioxide emissions using different parameters than described in subparagraph (A) that the Secretary determines to be appropriate; and (C) any other greenhouse gas emissions on public roads that the Secretary determines to be appropriate."  *Id.*  This language was ultimately stricken from the final bill and the subsequently codified law.  *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021).

limited the types of performance measures that Section 150 authorizes the government to create. *See id.* Sections 150(c)(3)–(6) describe the authorized measures, three categories of which are specifically tied to other provisions of Title 23. Section 150(c)(3)'s measures, for instance, are "for the purpose of carrying out [S]ection 119." *Id.* § 150(c)(3). To that end, Section 150(c)(3) directs the Secretary to establish "measures for [s]tates to use to assess" pavement conditions, bridge conditions, and "the performance of the Interstate System . . . [and] the performance of the National Highway System." *Id.* § 150(c)(3)(A).

The statute mandates measures for three additional topics—highway safety, congestion mitigation and air quality, and national freight movement. *Id.* § 150(c)(4)–(6). And, regarding air quality, Congress specifically directs the Secretary to establish measures relating to "on-road mobile source emissions." *Id.* § 150(c)(5). For safety and air quality, the measures are for the purposes of carrying out 23 U.S.C. §§ 148 and 149.[5] *See id.* § 150(c)(4)–(5). Further, while not tied to another provision of Title 23, Section 150(c)(6) requires the Secretary to "establish measures for [s]tates to use to assess freight movement on the Interstate System." *Id.* § 150(c)(6). In addition to the rule-making authorization, the statute requires such measures to be promulgated in a specific manner and for states to report on their progress towards achieving such measures. *See id.* § 150(c)(1)–(2), (e).

---

[5] Section 148 codifies the Highway Safety Improvement Program—the purpose of which is to "achieve a significant reduction in traffic fatalities and serious injuries on all public roads" by authorizing funding for safety-related projects and planning. *See* 23 U.S.C. § 148. Section 149 codifies the Congestion Mitigation and Air Quality Improvement Program, which authorizes Title 23 funds for specific projects which include the regulation of on-road mobile source emissions like ozone, carbon monoxide, and particulate matter. *Id.* § 149.

B.    The History of the DOT's Greenhouse Gas (GHG) Emissions Measure

i.    The 2017 Rule

Following the codification of Section 150, the first performance-measurement rules were issued in 2016.[6]  One such rule, promulgated by the DOT's Federal Highway Administration,[7] established a performance measure related to GHG emissions.  *See National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program*, 82 Fed. Reg. 5970, 5974 (Jan. 18, 2017) (to be codified at 23 C.F.R. pt. 490) (the "2017 Rule").  In relevant part, the rule required state DOTs and metropolitan planning organizations (MPOs) to measure and track $CO_2$ emissions on system highways, "establish [declining $CO_2$ emissions targets,] and report on [their] progress" towards achieving those targets.  *Id.* at 5974, 5980–81.

For statutory support for the GHG emissions measure, the DOT relied on the general provisions of Section 150(c)(3)(A)(ii), which authorize it to establish metrics to assess the "performance" of the Interstate System and National Highway System.  *Id.* at 5994; *see also* 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V).  In finding that authority, the DOT interpreted "performance" to include "environmental performance," which it described as "an integral part of the Federal-aid Highway Program."  82 Fed. Reg. at 5995.  It claimed

---

[6] *See, e.g.*, National Performance Management Measures: Highway Safety Improvement Program, 81 Fed. Reg. 13882 (Mar. 15, 2016) (to be codified at 23 C.F.R. pt. 490); National Performance Management Measures; Assessing Pavement Condition for the National Highway Performance Program and Bridge Condition for the National Highway Performance Program, 82 Fed. Reg. 5886 (Jan. 18, 2017) (to be codified at 23 C.F.R. pt. 490).

[7] Because Section 150 requires "the Secretary" of Transportation to "promulgate . . . rulemaking[s] that establish[] performance measures and standards," 23 U.S.C. § 150(c)(1), the Court refers to the rules as DOT actions.

that its interpretation was supported by the national goal of "environmental sustainability" found in Section 150(b)(6), the transportation-planning provisions in Sections 134 and 135, and other provisions in Title 23.  *See id.*  The interrelatedness of the various provisions, the DOT argued, supported a broad interpretation of "performance," which then necessarily included "environmental performance."  *See id.* at 5995–96.  But the 2017 Rule's shelf life was short.

### ii.    The 2018 Rule's Repeal of the 2017 Rule

The agency reversed course in 2018 and concluded that Section 150 did not enable the agency to establish a GHG emissions measure.  Following a change in the presidential administration and a series of executive orders,[8] the DOT began a review of its existing regulations "to determine whether changes would be appropriate to eliminate duplicative regulations and streamline regulatory processes."  National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 83 Fed. Reg. 24920, 24922 (May 31, 2018) (codified at 23 C.F.R. pt. 490) (the "2018 Rule").  The DOT subsequently identified the 2017 Rule, and specifically the GHG emissions measure, as one such regulation.  *See id.*  As a result, the DOT began the process of the rule's repeal.  *See id.*

The 2018 Rule was simple in scope—it repealed the 2017 Rule.  *Id.* at 24920.  In doing so, it identified three problems with the 2017 Rule: (1) that the 2017 Rule exceeded the statutory authority delegated to the DOT in Section 150; (2) that the costs of the 2017

---

[8] *See, e.g.*, Exec. Order No. 13771, 82 Fed. Reg. 9339 (Jan. 30, 2017); Exec. Order No. 13777, 82 Fed. Reg. 12285 (Feb. 24, 2017).

Rule outweighed its benefits; and (3) that the 2017 Rule was duplicative of other regulatory efforts. *See id.* at 24923–26. Particularly, it stated that the 2017 Rule could point to no "statutory provision that specifically directs or requires [the DOT] to adopt a GHG measure." *Id.* at 24923. It further observed that "the national goals language" in Section 119(d)(1)(A) imposed limitations on NHPP funds. *Id.* at 24923–24. Section 119's language focuses on "physical condition[s] of the system and the efficiency of transportation operations across the system . . . [but it does not] support [the DOT's] prior, broader interpretation of 'performance' under [S]ection 150(c)(3)." *Id.* In other words, "[t]he structure of [S]ection 150 itself supports a narrower construction of the [S]ection 150 performance measures authorization than previously adopted by [the DOT]." *Id.* at 24924. And, for a few years, that was the final word on the matter.

### iii.   The 2022 Proposed Rule and the 2023 Final Rule

In 2022, after another administration change and updated agency directives,[9] the DOT once again revisited the scope of its authority under Section 150, and it began the process of promulgating a new iteration of the GHG emissions measure. National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 87 Fed. Reg. 42401, 42402–03 (proposed July 15, 2022) (to be codified at 23 C.F.R. pt. 490) (the "2022 Proposed Rule"). The 2022 Proposed Rule sought to re-establish the GHG emissions measure, and it proposed requiring states "to establish declining [$CO_2$] targets and to establish a method for the measurement and reporting of [GHG] emissions associated with transportation" on the

---

[9] *See, e.g.*, Exec. Order No. 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021); Exec. Order No. 14008, 86 Fed. Reg. 7619 (Jan. 27, 2021).

highway system.  *Id*. at 42401.  Unlike the 2017 Rule, it gave states additional flexibility to establish their own targets, but it required those targets to meet the Administration's targets of net-zero emissions by 2050.  *Id*.

Despite the 2018 Rule, the DOT asserted that it did in fact have the authority to promulgate the GHG emissions measure under Section 150(c)(3)(A)(ii)(IV)–(V).  *See id.* at 42407–10.  The agency's review contended that the 2018 Rule had "adopted a narrow interpretation of" Section 150 and that the 2022 Proposed Rule's reading was consistent with the statute.  *Id.* at 42408.  In response, Texas and the Texas Department of Transportation (TXDOT) each commented on the proposed rule's statutory authorization. *See* Dkt. Nos. 1-3 (Texas's comments on the proposed rule); 1-6 (TXDOT's comments on the proposed rule).  Each entity claimed, among other things, that the 2022 Proposed Rule would exceed the statutory authority present in Section 150.  Dkt. Nos. 1-3 at 6, 8 (arguing that the DOT's interpretation of "performance" ignores the statutory text found in Section 119 and that the national-goals language found in Section 150(b)(6) does not create rule-making authority); 1-6 at 4 (arguing the same).

The agency disagreed.  In December 2023, the DOT issued the 2023 Rule establishing the GHG measure.  National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 88 Fed. Reg. 85364 (Dec. 7, 2023) (to be codified at 23 C.F.R. pt. 490) (the "2023 Rule").  The 2023 Rule was different than the 2022 Proposed Rule in two primary ways.  First, the 2023 Rule clarified that while states must set declining targets for GHG emissions, those targets do not need to demonstrate reductions toward net-zero emissions by 2050.  *Id.* at 85380. Second, the 2023 Rule stated that there were no penalties for a state's failure to meet those

targets or even to achieve significant progress toward those targets—other than having to explain the lack of progress towards its self-established target. *Id.* at 85378. A state that "set[s] a declining target but fail[s] to achieve [that] target[] can satisfy regulatory requirements by documenting the actions [the state] will take to achieve that target" in their next report. *Id.* Aside from those differences, the crux of the 2022 Proposed Rule remained—states are required to measure and report $CO_2$ emissions generated by on-road mobile sources on the highway system and to establish declining $CO_2$ emission targets. *See id.* at 85364.

The finalized 2023 Rule reiterates that the DOT relied on 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V) for statutory authority. The 2023 Rule "reaffirms that Congress provided the [DOT] with clear authority" to promulgate the GHG emissions measure. *See id.* at 85367. That directive, the DOT argues, necessarily means that "performance" in Section 150(c)(3)(A)(ii)(IV)–(V) includes "environmental performance." *See id.* The DOT asserts that its current reading of "performance" is limited in scope to the performance only of the National Highway System and the Interstate System, but it nevertheless broadly authorizes the DOT to attack climate change. *See id.* at 85375–76, 85379. It further argues that its current reading of "performance" is consistent with other sections of Title 23, *see id.* at 85367–68, and that the 2018 Rule's statutory analysis was flawed, *id.* at 85369–70. The 2023 Rule was scheduled to take effect on January 8, 2024, with the states' targets originally due on February 1, 2024. *Id.* at 85364.

## C.    Procedural History

On December 19, 2023, Texas and TXDOT filed a complaint challenging the legality of the 2023 Rule. Dkt. No. 1. The complaint alleges that the 2023 Rule: (1) exceeds the

DOT's statutory authority; (2) is arbitrary and capricious in violation of the Administrative Procedure Act (APA); and (3) violates the Spending Clause of the U.S. Constitution. *Id.* at 17–22. The plaintiffs seek a declaration from the Court that the 2023 Rule is unlawful because it was promulgated in excess of the agency's authority and that it was arbitrary and capricious, vacatur of the 2023 Rule, and attorneys' fees. *Id.* at 22. After several weeks had passed, and in light of the looming February 1 reporting deadline, the Court ordered the plaintiffs to report on the status of this case, including whether the plaintiffs intended to request emergency relief. Dkt. No. 5.

In response to that Order, the plaintiffs informed the Court that they did intend to seek a preliminary injunction, *see* Dkt. No. 7, so the Court ordered the parties to confer and submit a proposed briefing schedule, *see* Dkt. No. 8. Shortly after the plaintiffs filed their request for an injunction (Dkt. Nos. 9–10), the parties informed the Court that they had agreed to a "45-day extension of the [2023] Rule's upcoming deadline"—effectively pushing the operative date of the 2023 Rule to March 17, 2024, *see* Dkt. No. 11. The Court issued a scheduling order adopting the parties' proposed schedule. *Id.*; Dkt. No. 12. The parties later informed the Court that the defendants had extended the 2023 Rule's delayed deadline from March 17, 2024, to March 29, 2024. Dkt. No. 13. Further, the parties notified the Court that they wished to resolve this case on the merits through cross-motions for summary judgment. *Id.* In light of that update, the Court vacated its previous scheduling order and set a schedule for the parties to complete briefing on the cross-motions for summary judgment. Dkt. No. 14.

After the plaintiffs withdrew their motion for a preliminary injunction (Dkt. Nos. 16; 17), they filed their motion for summary judgment (Dkt. No. 18). The defendants

responded with their own cross-motion for summary judgment.  Dkt. No. 24.  Briefing on the cross-motions is now complete.  The American Road and Transportation Builders Association and the Associated General Contractors of America, Inc. (together, "Amici") filed an amicus brief in support of the plaintiffs.  Dkt. No. 28.  Further, the defendants have filed a copy of the 2023 Rule's administrative record.  Dkt. No. 15.  The cross-motions for summary judgment (Dkt. Nos. 18; 24) are now ripe and before the Court.

### 2.    Standard of Review

The parties agree that summary judgment is appropriate to resolve the plaintiffs' complaint.  *See* Dkt. No. 13 at 1.  Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In the context of a challenge to an agency action under the APA, "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008).  In other words, in evaluating an APA case on summary judgment, courts apply the standard of review from the APA.  *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001). That standard requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, promulgated in excess of statutory authority. 5 U.S.C. § 706(2)(A)–(D).

### 3.    Jurisdiction

Neither party has challenged the Court's jurisdiction.  But even where Article III standing has not been challenged, a court "must—where necessary—raise it *sua sponte*." *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331–32 (5th Cir. 2002).

Federal courts have jurisdiction over cases or controversies only, and standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "[S]tanding is not dispensed in gross," so a court must conclude that standing has been established as to each claim and for each form of relief sought. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To demonstrate standing, the plaintiffs must suffer an "injury in fact" that is both "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). That injury must be "fairly traceable to the challenged action of the defendants." *Id.* (cleaned up) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). And it must be "likely"—not speculative—that the injury will be "redressed by a favorable decision." *Id.* at 561 (quoting *Simon*, 426 U.S. at 38). The "ordinary rule," however, is that a party that is the "object of the regulation may challenge it." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) (cleaned up). The Court considers each aspect of standing in turn. But in light of the lack of any challenge to the Court's jurisdiction, it does so briefly.

First, the Court finds that the plaintiffs would suffer an injury in fact if the 2023 Rule were to take effect. While such injury need not have already occurred, an injury must be "certainly impending" for a court to find that there is an injury in fact. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis omitted) (quoting *Lujan*, 504 U.S. at 565 n.2). Here, the 2023 Rule would indisputably require either Texas or TXDOT[10] to

---

[10] All that is required of the case-or-controversy requirement is that one party has standing. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006). The 2023 Rule itself does not make clear which plaintiff would bear this cost—but it is obvious that one of them would. *See* Dkt. No. 15-2 at 2.

expend compliance costs.  Dkt. No. 15-2 at 2; *see also* Dkt. Nos. 19 at 21 (noting that the 2023 Rule would require compliance costs); 25 at 24 (estimating the final cost to state DOTs).  At a minimum, the plaintiffs would be forced to spend money to "establish[] the GHG measure" and "implement[] the GHG measure for each component of the rule that may involve costs."  Dkt. No. 15-2 at 2.  This "amounts to an increased regulatory burden," which "typically satisfies the injury in fact requirement."  *Contender Farms, L.L.P.*, 779 F.3d at 266.  The Court finds that this certainly impending injury is sufficient to establish the plaintiffs' injury in fact.

Resolving the remaining two elements of standing is straightforward.  Where a plaintiff would suffer injury as the object of the challenged government action, "there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it."  *Id.* at 264 (quoting *Lujan*, 504 U.S. at 561–62).  Here, there is little doubt that the plaintiffs' imminent injuries—which they would incur should the 2023 Rule take effect—are the direct result of the DOT's enforcement of the 2023 Rule and are therefore fairly traceable to the challenged rule.  *See* Dkt. No. 15-2 at 2.  Further, the relief sought by the plaintiffs—vacatur of the rule—would redress the plaintiffs' injuries.  Without the 2023 Rule, the plaintiffs need not incur costs from establishing and implementing the GHG emissions measure.  Therefore, the Court finds that the plaintiffs have established traceability and redressability.  And finding that all three elements of standing are present, the Court concludes that the plaintiffs have standing to challenge the 2023 Rule.

4.     **Analysis**

A.     **Administrative agencies may only do what Congress authorizes them to do.**

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated [to it] by Congress." *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).  Legislative grants to agencies are policed by the APA, which requires courts to "set aside agency action found to be, among other things, 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'"  *Id.* at 187–88 (quoting 5 U.S.C. § 706(2)(C)).  The "core inquiry" in an APA case is whether the rule in question is a "lawful extension of the statute under which the agency purports to act, or whether the agency has indeed exceeded its 'statutory jurisdiction, authority, or limitations.'"  *Id.* at 188 (quoting 5 U.S.C. § 706(2)(C)).

"No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority."  *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (emphasis omitted).  Therefore, an analysis of a rule's authority must begin with the text of the authorizing statute.  *Sackett v. EPA*, 598 U.S. 651, 671 (2023).  The "ordinary meaning and structure of the law itself" guides this inquiry.  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019).  The words of an authorizing statute must be read "in their context and with a view to their place in the overall statutory scheme."  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a

whole."). After all, a word's context in a statute dictates its meaning. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 289–90 (2010) (stating that "[s]tatutory language has meaning only in context" and that a court has a "duty to construe statutes, not isolated provisions" (alteration in original) (quotations omitted)).

Additionally, statutory interpretation is not an exercise in determining "the outer limits of [a word's] definitional possibilities." *See FCC v. AT&T Inc.*, 562 U.S. 397, 407 (2011) (alteration in original) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)). Flowing from that principle, courts have generally looked with suspicion on "cryptic" delegations of authority. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Courts should generally be skeptical of agencies that seek to find "elephants in mouseholes" or otherwise seek to rely on tiny grants of authority to justify major actions. *See West Virginia v. EPA*, 597 U.S. 697, 746–47 (2022) (Gorsuch, J., concurring) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

### B.    The DOT's authorization to promulgate performance measures is expressly limited to those listed in Section 150(c).

As detailed above, Congress created the NHPP to provide support for the condition and construction of the National Highway System. 23 U.S.C. § 119(a), (b)(1)–(2). The NHPP also ensures that investments of federal highway funds "are directed to support progress toward the achievement of performance targets" established in a state's asset-management plan. *Id.* § 119(b)(3). The NHPP further provides funding to states for eligible projects. *Id.* § 119(d).

But Congress did not want to invest blindly in the highway system. As a result, Congress ordered the DOT to establish certain performance measures and targets, which "provide a means to the most efficient investment of [f]ederal transportation funds." *Id.*

§ 150(a), (c). The states, in turn, must track those measures for use in NHPP-fund investment and set targets based off those measures. *See id.* § 150(c)–(d). States must then submit reports to the DOT detailing, among other things, their progress toward achieving those targets. *Id.* § 150(e).

Critically, however, Congress did not authorize the DOT to create any performance measure it deemed appropriate. To the contrary, Congress expressly limited the permissible performance measures to only those specifically enumerated in the statute. *Id.* § 150(c)(2). The statute provides that, "[i]n carrying out paragraph (1) [establishing performance measures and standards], the Secretary shall . . . limit performance measures only to those described in this subsection[—that is, subsection 150(c)]." *Id.* § 150(c)(2)(C).

Thus, Congress provided a clearly delineated and expressly limited grant of authority to the DOT in establishing performance measures, and the Court must be faithful to that limitation. And precedent makes clear that when Congress provides an agency with a limited grant of authority, courts should be hesitant to adopt an agency's expansive interpretation of its own power. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2368–71 (2023) (interpreting a limiting provision to require a strict reading of a statute's authorization). Recognizing this limitation, the DOT cites Section 150(c)(3)(A)(ii) as authority to establish the GHG emissions measure, but Section 150(c)'s limited, precise statutory language cannot bear the weight of the DOT's proposed expansive interpretation.[11]

---

[11] Although the Court interprets Section 150's scope of authority in light of this express limitation, the Court does not rely on the major-questions doctrine. The plaintiffs invite the Court to invoke the doctrine because, in their view, the states will incur significant costs to comply with the 2023 Rule. *See* Dkt. No. 19 at 21–22; *see also West Virginia*, 597 U.S. at 716, 724–32 (discussing the major-questions doctrine). The defendants counter that the doctrine does not apply because the costs are limited to around $13 million. *See* Dkt. No. 25 at 20–21. But because the statutory language itself makes clear that the DOT lacked authorization to promulgate the 2023 Rule, the Court need not

**C.** **Section 150's text makes clear that "the performance of the Interstate System . . . [and] the National Highway System" focuses on the system's effectiveness in facilitating travel, commerce, and national defense—not the environmental performance of vehicles using that system.**

The Court's task is to determine the scope of Section 150's authorized performance measures.  In doing so, the Court's analysis begins with the statute's plain language.  "In matters of statutory interpretation, text is always the alpha."  *In re DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019); *see also United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020) ("In statutory interpretation, we have three obligations: '(1) Read the statute; (2) read the statute; (3) read the statute!'" (quoting Henry J. Friendly, *Benchmarks* 202 (1967))).  As a result, the Court must determine whether "measures for [s]tates to use to assess . . . the performance of the Interstate System . . . [and] the National Highway System" may appropriately include measures regarding GHG emissions from vehicles using the highways.  *See* 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V).  In Texas's view, "performance," by its plain language, cannot authorize the GHG emissions measure.  *See* Dkt. No. 19 at 18–22.  The DOT, in contrast, argues a more expansive reading and asserts that "performance" encompasses the highway systems' environmental performance, including the GHG emissions from vehicles using the systems.  *See* Dkt. No. 25 at 15–22.

After carefully examining the statutory language and the parties' arguments, the Court concludes that the relevant statutory provisions do not authorize the DOT's GHG emissions measure.  Four reasons support this conclusion.  First, the key terms' definitions focus on the infrastructure's effectiveness at achieving its purposes and not on the

---

resolve whether the issue presented constitutes a "major question."  If the doctrine applied, given its requirement of "clear congressional authorization," *see West Virginia*, 597 U.S. at 732, the Court's conclusion would be especially apparent.

environmental impact of vehicles using the infrastructure. Second, all of the related performance measures in Section 150(c)(3) focus on physical infrastructure, which makes it less likely that the DOT's broad interpretation is accurate. Third, the DOT's proposed interpretation would render other portions of the statute superfluous. And fourth, Section 150(b)'s list of—and language related to—the national goals of the federal-aid highway program indicate that "performance" of the system does not include environmental performance. Thus, the statutory text demonstrates that "measures . . . to assess . . . the performance of the Interstate System . . . [and] the National Highway System" do not include GHG emissions from vehicles using the systems.

> ### i. The definitions of "performance," "National Highway System," and "Interstate System" do not encompass the environmental impact of vehicles.

Section 150 does not define "performance," nor does it point to a particular provision elsewhere in the code that does. *See* 23 U.S.C. § 150. Title 23 does contain a definitions provision, but that section does not define "performance." *See* 23 U.S.C. § 101. Where Congress does not define a term within a statute, a court should "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

Heeding that advice, the Court will look to a dictionary definition of "performance" at the time of statutory enactment. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566–67 (2012) (noting that "[w]hen a term goes undefined in a statute, [a court should] give the term its ordinary meaning," which may be discerned from dictionaries in use at the time of enactment). Section 150 is a relatively recent statute—its first version became law in

2012, and it was subsequently amended in 2015.  *See* 88 Fed. Reg. at 85365 (describing the history of Section 150).[12]  At the time of the statute's enactment, the dictionary definition of "performance" was, in relevant part, "the competence or effectiveness of a person or thing in performing an action; *spec.* the capabilities, productivity, or success of a machine, product, or person when measured against a standard."[13]  *Performance*, Oxford English Dictionary, https://perma.cc/6VPX-2JLS (last visited Mar. 26, 2024).  The term focuses on an identified object's or person's capability.  *See id.*  Applying the definition to the statute at issue, Congress authorized the DOT to create a measure to assess "the [competence or effectiveness]" of the identified objects—the Interstate System and National Highway System.

Because the DOT may properly measure the competence or effectiveness of the Interstate and National Highway Systems, the Court's analysis likewise depends on the scope of the latter terms.  Thankfully, Congress provided precise definitions for "Interstate System," "National Highway System," and "Highway."  23 U.S.C. § 101(11), (12), (16).  As detailed below, the critical point is that each definition relates to transportation infrastructure and describes their purposes as facilitating travel, commerce, and national defense.  *See id.*; *see also id.* § 103(b) (defining "National Highway System"), (c) (defining "Interstate System").

Title 23's definition of "highway" includes a long list of transportation infrastructure, including:

---

[12] *See also supra* note 4.

[13] Given the relative recency of Section 150's enactment, the Court uses a modern dictionary.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 419, 423 (2012).  Further, neither party has directed the Court to a particular definition that would contradict this approach.

> (A) a road, street, and parkway;
>
> (B) a right-of-way, bridge, railroad-highway crossing, tunnel, drainage structure including public roads on dams, sign, guardrail, and protective structure, in connection with a highway; and
>
> (C) a portion of any interstate or international bridge or tunnel and the approaches thereto, . . . including such facilities as may be required by the United States Customs and Immigration Services in connection with the operation of an international bridge or tunnel.

*Id.* § 101(11).

"National Highway System" is defined as "the Federal-aid highway system described in [S]ection 103(b)." *Id.* § 101(16). In turn, Section 103(b) defines "National Highway System" as "the highway routes and connections to transportation facilities" that serve three purposes—none of which relate to environmental emissions or impact:

> (A) serve major population centers, international border crossings, ports, airports, public transportation facilities, and other intermodal transportation facilities and other major travel destinations;
>
> (B) meet national defense requirements; and
>
> (C) serve interstate and interregional travel and commerce.

*Id.* § 103(b)(1). The definition specifies that various components are included in the National Highway System, like "urban and rural principal arterial routes." *Id.* § 103(b)(2).

Unsurprisingly, "Interstate System" is likewise defined as certain transportation infrastructure and does not include environmental emissions or impact. The term "means the Dwight D. Eisenhower National System of Interstate and Defense Highways described in [S]ection 103(c)." *Id.* § 101(12). And Section 103(c) specifies that the Interstate System "consists of highways designed, located, and selected in accordance with this paragraph." *Id.* § 103(c)(1)(A). Moreover, the interstate highways must be located to fulfill three purposes:

– 22 –

(i)   to connect by routes, as direct as practicable, the principal metropolitan areas, cities, and industrial centers;

(ii)  to serve the national defense; and

(iii) to the maximum extent practicable, to connect at suitable border points with routes of continental importance in Canada and Mexico.

*Id.* § 103(c)(1)(C).

Synthesizing the various definitions brings into focus the proper scope of Section 150's congressional authorization for the DOT to create "measures . . . to assess . . . the performance of the Interstate System . . . [and] the National Highway System." The performance of these transportation systems turns on their "competence or effectiveness" at achieving the specified aims of each of these roadways. For the National Highway System's performance, the DOT may establish measures to assess the "competence or effectiveness" of "the highway routes['] and connections[']" ability to "serve major population centers," "meet national defense requirements," and "serve interstate and interregional travel and commerce." *Id.* §§ 101(16); 103(b); 150(c)(3). For the Interstate System's performance, the DOT may establish measures to assess the "competence or effectiveness" of the interstate highways' ability to directly connect "metropolitan areas, cities, and industrial centers," "serve the national defense," and "connect at suitable border points with routes of continental importance in Canada and Mexico." *Id.* §§ 101(12); 103(c); 150(c)(3).

Nothing within these definitions or the statutory goals of the National Highway System or Interstate System indicate that GHG emissions are a relevant metric. The focus is on how well the highways, routes, and connections within the systems are achieving their goals of facilitating travel, commerce, and the national defense. The statute's plain language does not include within the scope of the National Highway System or the

– 23 –

Interstate System the environmental performance or impact of the vehicles that use those

systems.  As a result, the very definitions of the relevant terms undercut the DOT's

argument and proposed expansive definition, and the statute does not authorize the GHG

emissions measure.

### ii.   Section 150(c)(3)'s remaining performance measures relate to physical infrastructure, further indicating that these measures focus on the highways' effectiveness, not the vehicles' environmental impact.

When interpreting words with disputed meanings, courts should consider words in

light of the terms surrounding them.  *See Dubin v. United States*, 599 U.S. 110, 118 (2023)

(citing *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004)).  After all, "a word is known by the company

it keeps."  *Yates v. United States*, 574 U.S. 528, 543–44 (2015) (plurality opinion).  Thus,

"[w]hen several nouns or verbs or adjectives or adverbs—any words—are associated in a

context suggesting that the words have something in common, they should be assigned a

permissible meaning that makes them similar."  Antonin Scalia & Bryan A. Garner, *Reading

Law: The Interpretation of Legal Texts* 195 (2012).  And, relevant in this case, "[t]he canon

especially holds that 'words grouped in a list should be given related meanings.'"  *Id.* at 195

& n.2 (quoting *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977)).

Here, the company "performance of the Interstate System . . . [and] the National

Highway System" keeps is uniformly focused on the physical condition of transportation

infrastructure.  The relevant subsection provides that the DOT shall establish measures to

assess:

(I)   the condition of pavements on the Interstate [S]ystem;

(II)   the condition of pavements on the National Highway System (excluding the Interstate);

(III)  the condition of bridges on the National Highway System;

(IV)  the performance of the Interstate System; and

(V)  the performance of the National Highway System (excluding the Interstate System)[.]

23 U.S.C. § 150(c)(3)(A)(ii).

The clear focus of Section 150(c)(3)(A)(ii) on the physical structures of the interstate and national-highway systems demonstrates that "performance" is also focused on those physical structures. Congress authorized the DOT to measure the system's physical infrastructure itself and how well that physical infrastructure meets its objectives. Three of the five measures relate expressly to physical conditions—the condition of interstate pavement, the condition of highway pavement, and the condition of bridges. These are tactile, material items. Given these closely associated measurements, the two immediately following measurements—interstate and national-highway performance—are likewise limited to the systems' physical infrastructure and its ability to meet its objectives.

The DOT's expansive reading of "performance" to include $CO_2$ emissions from vehicles ignores its context in this list of tactile measurements, which favors a more confined reading. Unlike interpreting the list of items in relation to one another, the DOT's proposed interpretation would "generate confusion or unpredictability," like a list of "fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise involve shades of red." *Cf. Johnson v. United States*, 576 U.S. 591, 603 (2015) (emphasis in original) (quotation omitted). Construing "performance" following the specified "condition of pavements" and "bridges" as pertaining to the performance of the physical structure maintains the unified nature of the statute. But if "performance" instead encompasses things as vast as the GHG emissions of vehicles using the interstate and national-highway systems, the provision's scope is

unfettered—it introduces navy blue into a list otherwise clearly constrained to ordinary reds. *See Johnson*, 576 U.S. at 603. Given all these considerations, the Court concludes that the measurements are associated with one another and should be interpreted harmoniously and in relation to one another. *See Yates*, 574 U.S. at 543–44 (plurality opinion).

That understanding is confirmed when examining the rest of the statute and related statutes because "condition" and "performance" are often grouped together. *See* 23 U.S.C. § 150(e)(1) (requiring that states report on "the condition and performance of the National Highway System in the [s]tate"); *id.* § 119(b)(1) (stating that a purpose of the NHPP is "to provide support for the condition and performance of the National Highway System"); *id.* § 119(e)(2) (requiring a state's asset-management plan to include strategies "leading to a program of projects that would make progress toward achievement of the [s]tate targets for asset condition and performance of the National Highway System"). This frequent pairing further demonstrates that "condition" and "performance" are related and bear on each other's meaning within Section 150. *See id.* §§ 119, 150. Because "condition" is focused on the physical attributes of the interstate and national-highway systems, the text indicates that "performance" is likewise tied to the physical infrastructure. *See id.*

Further, this interpretation avoids the contradiction with the statute's express limitation on the number of authorized performance measures that would result from the DOT's position. "The provisions of a text should be interpreted in a way that renders them compatible, not contradictory." Scalia & Garner, *supra*, at 180. Section 150 speaks in mandatory, limiting language in providing that the DOT "Secretary shall . . . limit performance measures only to those described in this subsection." 23 U.S.C. § 150(c)(2)(C). But the DOT's view would untether the limitation from the interstate and national-highway

systems' infrastructure, instead permitting the DOT to require states to measure anything that happens to use or relate in any way to those systems.  And the DOT does not dispute this expansive view.  In the 2023 Rule, the DOT notes that, while its authority to impose "performance" measures is not unlimited, the only limitation is the scope of the interstate and national-highway systems.  *See* 88 Fed. Reg. at 85367.  In other words, the only limit on permissible performance measures is that they can only apply to certain roads and things coming into contact with or relating to those roads—not that the measures themselves are limited to certain subjects.  *See id.*  Given the expansive systems at issue and the number of things and people that relate in some way to them, this is no limit at all.  The agency's interpretation would figuratively open the floodgates and effectively eliminate the strict limit that Congress placed on the agency's authority to promulgate measures.  *See* 23 U.S.C. § 150(c)(2)(C).  But once the Court interprets the relevant terms in relation to the associated list, the contradiction falls away.

### iii.    The DOT's proposed interpretation would render other portions of the statute superfluous.

Although the analysis thus far has focused on Section 150(c)(3)'s performance measures, the statute mandates measures for three additional topics—highway safety, congestion mitigation and air quality, and national freight movement.  23 U.S.C. § 150(c)(4)–(6).  And, regarding air quality, Congress specifically directs the DOT to establish measures relating to "on-road mobile source emissions."  *Id.* § 150(c)(5).  The plaintiffs argue that this provision cabins the DOT's authority to establish performance measures to ozone, carbon monoxide, and particulate matter through its tie to Section 149.  *See* Dkt. No. 19 at 20.  The defendants counter that the provision does not prohibit the DOT from otherwise adopting other measures to combat $CO_2$ emissions.  *See* Dkt. No. 25 at 20.

The statutory text and settled canons of statutory interpretation support the plaintiffs' argument.

Section 150(c)(5) provides that, "[f]or the purpose of carrying out [S]ection 149, the Secretary shall establish measures for [s]tates to use to assess . . . on-road mobile source emissions." 23 U.S.C. § 150(c)(5). Section 149 codifies the "congestion mitigation and air quality improvement program" (CMAQ), which allows states to obligate funds apportioned to it under Title 23 to certain programs that relate to road congestion and air quality. *See id.* § 149. Under Section 149, the states are authorized to regulate on-road mobile source emissions of ozone, carbon monoxide, and particulate matter. *See id.* § 149(b). That section does not authorize programs to address $CO_2$ emissions, which the parties do not dispute. *See id.*

"When presented with two plausible readings of a regulatory text, this court common-sensically . . . prefers the reading that does not render portions of that text superfluous." *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 399 (5th Cir. 2014). As Justice Scalia and Bryan Garner explain: "If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." Scalia & Garner, *supra*, at 174 (footnote omitted).

Here, the 2023 Rule seeks to have states establish targets for and measure GHG emissions generated by "on-road mobile sources." 88 Fed. Reg. at 85364. But instead of ozone, carbon monoxide, and particulate matter, it seeks to regulate $CO_2$ emissions. *See id.* In citing to Section 150(c)(3)(A)(ii)(IV)–(V), the agency claims another source of authority to regulate on-road mobile source emissions. *Compare* 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V),

*with id.* § 150(c)(5).  In effect, the DOT claims that both sections authorize the regulation of on-road mobile source emissions.  But if air quality and "on-road mobile source emissions" were contemplated by Congress when it used "performance" in Section 150(c)(3)(A)(ii), then the authorization found in Section 150(c)(5) would be superfluous.  If "performance" included the broad authority to promulgate measures related to on-road mobile source emissions, Congress would not have needed to separately authorize such measures later in the statute.[14]  *See id.* § 150(c).  The DOT's "reading is thus at odds with one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).  Congress had no need to duplicate the provision of this authority in two separate subsections, and it is especially unlikely that it created an expansive, duplicative authorization after limiting the universe of possible measures "only to those described in this subsection."  23 U.S.C. § 150(c)(2)(C).

Moreover, Section 150(c)(5)'s on-road mobile source emission standard is precisely drafted to cover only certain pollutants, and it excludes $CO_2$.  *See id.* § 149(b).  Nothing in the statute's text indicates that, despite the precision in (c)(5) and the limitation of permissible measures in (c)(2), Congress wanted the DOT to go beyond (c)(5) and create

---

[14] The Court recognizes that CMAQ might cover a "transportation project or program" that is not part of the Interstate System or National Highway System.  *See* 23 U.S.C. § 149(b).  For such a project, an on-road mobile source emissions measure might be promulgated under Section 150(c)(5) that would not fit under (c)(3).  However, given the breadth of the definitions of the Interstate System and National Highway System, *see supra* Section 4.C.i, there is undoubtedly a very large overlap between those systems and any project covered by CMAQ, rendering (c)(5) superfluous. For that reason, and for the other textual and contextual reasons detailed in this order, this aspect of CMAQ does not materially alter the Court's analysis.

additional measures for on-road source emissions based on the more general authorization related to "the performance of the Interstate System . . . [and] the National Highway System."  Additionally, the agency fails to point to how, as a matter of logic, its interpretation of "performance" could encompass on-road mobile source emissions related to $CO_2$ but not carbon monoxide.  *See generally* 88 Fed. Reg. at 85364.  Congress chose to use "on-road mobile source emissions" in one place—which authorized measures relating to ozone, carbon monoxide, and particulate matter.  *See* 23 U.S.C. § 150(c)(5).  The Court will not interpret (c)(3) in a way that renders (c)(5) superfluous.[15]

And to the extent the DOT asserts that, despite the duplication in (c)(3) and (c)(5), Congress could nevertheless detail the air-quality program specified in subsection (c)(5), that assertion runs roughshod into the negative-implication canon.  That canon teaches that "[t]he expression of one thing implies the exclusion of others."  Scalia & Garner, *supra*, at 107.  Congress specifically addressed an air-quality program and on-road mobile source emissions in (c)(5), and no party argues that this subsection can authorize the GHG

---

[15] Relatedly, the plaintiffs argue that legislative history provides support for their position that Congress deliberately chose to exclude performance measures related to $CO_2$ emissions.  *See* Dkt. No. 19 at 18–19.  Because of the limited analytical benefit derived from legislative history, the Court finds that argument unconvincing.  After all,

> Apart from th[e] political problem [that the legislature makes law only by voting on proposed statutes] and a torrent of practical problems . . . the use of legislative history poses a major theoretical problem: It assumes that what [a court is] looking for is the intent of the legislature rather than the meaning of the statutory text.  That puts things backwards.  To be "a government of laws, not of men" is to be governed by what the laws *say*, and not by what the people who drafted the laws intended.

Scalia & Garner, *supra*, at 375 (emphasis in original).  As stated more succinctly by Justice Holmes: "We do not inquire what the legislature meant; we ask only what the statute means."  Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899) (quoted with approval in *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 397 (1951) (Jackson, J., concurring)).

emissions measure.  *See generally* Dkt. Nos. 19; 25.  The implication is clear.  Congress's choice to address emissions in (c)(5), and to do so in a way that cannot authorize the 2023 Rule, implies the exclusion of other on-road mobile source emission measurements, including GHG emissions.  *See Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023) ("'[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same [a]ct,' [courts] generally take the choice to be deliberate." (quoting *Badgerow v. Walters*, 596 U.S. 1, 11 (2022))); *see also* Dkt. No. 28 at 10–11.

    In an attempt to establish otherwise, the defendants confuse the source of an agency's power to act.  They assert that the 2023 Rule is justified despite Section 150(c)(5)'s specific mention of on-road emissions because "Congress did not include any language prohibiting [the DOT] from establishing other measures related to emissions for the NHPP."  Dkt. No. 25 at 20.  This gets things backwards.  An agency must have statutory authorization to enact a rule; the absence of a statutory prohibition does not indicate that such authority has been given.  *See City of Arlington*, 569 U.S. at 297; *see also VanDerStok*, 86 F.4th at 187.  Thus, the lack of a statutory prohibition provides no support for the defendants' position.

> ### iv.   Section 150(b)'s list of national goals indicates that "performance" of the interstate and national-highway systems does not include environmental performance.

    The DOT relies heavily on the national goals articulated in Section 150(b) to justify its interpretation of "performance"—particularly the goal of environmental sustainability.  *See* Dkt. No. 25 at 15–19.  The plain language of the provision and the statutory structure, however, undermine the agency's interpretation.  While environmental sustainability is undoubtedly a statutory goal, it does not follow that, as a result, measuring the interstate

and national-highway systems' "performance" includes the GHG emissions measure.  To the contrary, environment-related measures are included in Section 150(c)(5), and environmental sustainability is also addressed in various other sections of the Title 23.  Thus, the DOT cannot properly use the broad national goal mentioned in Section 150(b) to shoehorn the GHG emissions measure into Section 150(c)'s limited, specific list of performance measures that the states must track and report.

Turning to the goals themselves, the Court recognizes that the NHPP aims to "provide a means to the most efficient investment of [f]ederal transportation funds by refocusing [the program] on national transportation goals."  23 U.S.C. § 150(a).  These goals include (1) safety; (2) infrastructure condition; (3) congestion reduction; (4) system reliability; (5) freight movement and economic vitality; (6) environmental sustainability; and (7) reduced project delivery delays.  *Id.* § 150(b).  Critically here, the environmental-sustainability goal is "[t]o enhance the performance of the transportation system while protecting and enhancing the natural environment."  *Id.* § 150(b)(6).

Contrary to the DOT's contention, the environmental-sustainability goal does not authorize the 2023 Rule for three reasons.  First, and most simply, neither GHG emissions nor environmental sustainability more broadly is included as one of the categories of performance measures in Section 150(c)(3).  Those five measures focus on the condition of pavements, the condition of bridges, and the competence or effectiveness of the interstate and national-highway systems.  *Id.* § 150(c)(3)(A)(ii)(I)–(V).  In contrast, the environment-related goal relates to the measures detailed in (c)(5)'s air-quality program.  Similarly, other national goals have related and easily identified measures.  The safety goal corresponds to (c)(4)'s "[h]ighway safety improvement program."  The infrastructure-condition and system-

reliability goals correspond to (c)(3)'s infrastructure and efficiency-related measures. Congestion reduction corresponds to (c)(5)'s "[c]ongestion mitigation" program.  The freight-movement goal corresponds to (c)(6)'s "[n]ational freight movement" measures.

But not every goal appears to have a corresponding measure.  Specifically, the goal of reducing project-delivery delays seeks to reduce costs of federal highway projects by "eliminating delays in the project development and delivery process, including reducing regulatory burdens and improving agencies' work practices."  *Id.* § 150(b)(7).  Despite this goal, none of the specified performance measures in subsection (c) address costs or project delays, which indicates that the states do not necessarily need to measure and report on every aspect of the national goals.  Because the environmental-sustainability goal is not included in (c)(3)'s authorized measures, that provision cannot authorize the GHG emissions measure.

Second, the language of the environmental-sustainability goal itself undermines the DOT's position that it may be measured as an aspect of "the performance of the Interstate System . . . [and] the National Highway System."  Again, the national goal is to "enhance the performance of the transportation system while protecting and enhancing the natural environment."  *Id.* § 150(b)(6).  Pared down, the goal is to do one thing (enhance system performance) while also doing another thing (enhance the environment).  By separating the two aspirations with the conjunction "while," the statutory language distinguishes "the performance of the transportation system" from "protecting and enhancing the natural environment."  *See id.*  Given that the Court must "give effect to every word that Congress used in the statute," *Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985), the Court concludes that, within the context of Section 150, the "performance of the transportation system" is distinct

from "protecting and enhancing the natural environment." *See* 23 U.S.C. § 150(b). To include "protecting and enhancing the natural environment" in the definition of "the performance of the transportation system"—and by extension, the performance of the Interstate System and the National Highway System—would render portions of the environmental-sustainability goal's provision redundant. *See id.* If the DOT's interpretation were correct, the national goal could be restated as "to protect and enhance the natural environment while protecting and enhancing the natural environment." Adopting such a nonsensical interpretation would create a redundancy in the statute—something precedent cautions the Court against. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is, however, a cardinal principle of statutory construction that [a court] must 'give effect, if possible, to every clause and word of a statute.'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))). Nor can the Court assume that "performance" as used in Section 150(b)(6) is different than "performance" as used within Section 150(c)(3)(A)(ii) absent some evidence in the text supporting different readings. *See Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) (concluding that a court cannot unreasonably give a word a different meaning across the same section of a statute).

Third, the environmental-sustainability goal is more obviously and naturally accounted for in other portions of the statute. As discussed elsewhere in this Order, other portions of the statutory scheme shed light on how programs authorized under Section 119, Section 150, and elsewhere in Title 23 further environmental sustainability. *See supra* Section 4.C.iii; *infra* Section 4.D. For instance, Section 119 allows funding for specific projects that support the goal of protecting and enhancing the natural environment. *See, e.g.*, 23 U.S.C. § 119(d)(2)(M) (authorizing funding for projects that accomplish

"[e]nvironmental restoration and pollution abatement in accordance with [S]ection 328"). And within Section 150 itself, subsection (c)(5) allows the defendants to promulgate performance measures related to traffic congestion and non-$CO_2$ types of on-road mobile source emissions. *See id.* §§ 149(b), 150(c)(5). Each of those sections supports the national goal of environmental sustainability.

Given that (1) environmental measures are not included in Section 150(c)(3)'s performance measures; (2) the language of the environment-sustainability goal contrasts system performance with environmental enhancement; and (3) environmental sustainability is expressly accounted for in other portions of Title 23, (c)(3)'s infrastructure-specific measures do not include measures of environmental performance.

### D. Section 150's statutory context demonstrates that "performance" of the interstate and national-highway systems is not broadly defined to include the GHG emissions from cars using the system.

In light of the above analysis, the plain language of Section 150 alone demonstrates that the 2023 Rule exceeded the DOT's authority. If any doubt remains, however, the broader statutory context proves the same. "Context is a primary determinant of meaning." Scalia & Garner, *supra*, at 167; *see also Graham Cnty. Soil & Water Conservation Dist.*, 559 U.S. at 289–90. Because a statute "typically contains many interrelated parts that make up the whole," "[t]he entirety of the document thus provides the context for each of its parts." Scalia & Garner, *supra*, at 167.

Here, the context reveals that Section 150—and the performance measures at issue— are connected to Section 119. Congress instructed in Section 150 that (c)(3)'s performance measures exist expressly "for the purpose of carrying out [S]ection 119." 23 U.S.C. § 150(c)(3)(A). Thus, Section 119 and its purposes aid the Court in determining the scope of

Section 150's permissible performance measures, and they provide further support for the Court's conclusion.

> ### i.    Section 119(b)'s purposes distinguish between the highway system's performance and the system's resilience to avoid environmental disasters.

Section 119 requires the DOT to implement the NHPP and enumerates four purposes for that program.  23 U.S.C. § 119(b).  Specifically, the statute provides that "[t]he purposes of the national highway performance program" are:

> (1) to provide support for the condition and performance of the National Highway System;
>
> (2) to provide support for the construction of new facilities on the National Highway System;
>
> (3) to ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established in an asset management plan of a [s]tate for the National Highway System; and
>
> (4) to provide support for activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters.

*Id.*

Two aspects of these purposes aid the Court.  First, the statute lists "performance of the National Highway System" as a separate purpose from "mitigat[ing] the cost of damages from" natural disasters.  *Cf. id.* § 119(b)(1), (b)(4).  As distinct purposes using different terminology, the Court construes them as having independent meaning.  *See Williams*, 529 U.S. at 404.  If the "performance" of the system included its resiliency to mitigate the cost from environmental impacts, then (b)(4) would be redundant.  Once again, the Court will not interpret "performance" in a way that renders other portions of the statute superfluous.  *Exelon Wind 1, L.L.C.*, 766 F.3d at 399.  This is yet another indicator that the

"performance" of the highway system means the efficiency of the infrastructure itself and not its "environmental performance."

Second, the statutory purpose related to natural disasters demonstrates that Section 119's environmental focus is increasing the system's "resiliency . . . to mitigate the cost of damages" resulting from potential disasters—not the potential underlying cause of those disasters. 23 U.S.C. § 119(b)(4). Congress seeks to support activities that make the National Highway System able to withstand or recover quickly from things like sea-level rise, extreme weather, flooding, and wildfires. *See id.* That is, the purpose is not about mitigating the causes of the damage to the system, but about mitigating the damage to the system. *See id.* Further, when damage does occur, the provision is directed at ensuring that the system may survive that damage. *See id.* But environmental inputs, like vehicle emissions, are omitted from the list, and it is unclear how measuring GHG emissions could make the system itself more resilient to natural disasters when they occur. Thus, Section 119(b)(4) is yet another indicator that GHG emissions are not properly included in Section 150(c)(3)'s scope.

> **ii.    In defining eligible projects, Section 119(d)(1)(A)'s list of "performance goals" focuses on the infrastructure's capabilities; it does not mention environmental sustainability.**

As detailed in Part 1, to be eligible for NHPP funding, a project must meet certain criteria. *Id.* § 119(d). First, funds "may be obligated only for a project on an eligible facility that" supports progress in achieving the national performance goals for improving "infrastructure condition, safety, congestion reduction, system reliability, or freight movement." *Id.* § 119(d)(1)(A). Second, the project must be "consistent with [S]ections 134

– 37 –

and 135."[16]  *Id.* § 119(d)(1)(B).  Third, the project must be for one or more defined purposes. *Id.* § 119(d)(2).

It is telling that, in defining which projects are eligible for funding, Section 119's "national performance goals" do not mention environmental sustainability.  Each of the goals—infrastructure condition, safety, reducing congestion, system reliability, and freight movement—focuses on the system's infrastructure and efficiency.  These goals, which Section 150(c)(3) exists to carry out, are consistent with the Court's interpretation of "performance of the Interstate System . . . [and] the National Highway System" as focusing on the system's physical condition and efficiency.  And they undermine the DOT's more expansive interpretation to include "environmental performance."

---

[16] The Court notes that Sections 134 and 135 each contain provisions that require a state to assess the environmental impact of its transportation planning.  *See, e.g.*, 23 U.S.C. § 134(a) (noting that "[i]t is in the national interest" to "minimiz[e] transportation-related fuel consumption and air pollution"); *id.* § 135(d)(1)(E) (noting that an aspect of a state's plan should include "consideration and implementation of projects" that "protect and enhance the environment").  While this language requires states to consider the environmental impact of transportation decisions in their planning processes, that consideration is wholly divorced from whether Section 150(c) authorizes a GHG emissions measure.  The performance goals in Section 119(d)(1)(A) exclude environmental sustainability—so NHPP funding is not conditioned on a project accomplishing progress toward that goal.  And projects may of course be consistent with the planning requirements of Sections 134 and 135 without achieving progress towards an environmental-sustainability national goal.  Finally, to assert that the language in Sections 134 and 135 indicates that "performance" includes "environmental performance" ignores the more relevant statutory language present in both Section 150 and Section 119.  Finding authority to promulgate the GHG emissions measure in Sections 134 and 135—two sections removed from Section 150—would be the sort of "cryptic" authority that the Supreme Court has viewed with suspicion.  *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 160. The defendants' references to 23 U.S.C. § 101(b)(3)(G) for authorization fall into the same category. *See* Dkt. No. 25 at 17; *see also* 23 U.S.C. § 101(b)(3)(G) (providing in a declaration of policy that "transportation should play a significant role in promoting economic growth, improving the environment, and sustaining the quality of life").

### iii.    Section 119(d)(2)'s list of eligible project purposes specifies multiple environmental purposes; none include GHG emission reduction.

Assuming that a project can meet the threshold eligibility requirements found in Section 119(d)(1), Section 119(d)(2) enumerates a variety of purposes for which funds may be directed.  It includes 19 separate purposes for which funds may be authorized.  Nine are explicitly tied to the construction or maintenance of infrastructure on the National Highway System, Interstate System, and related facilities.  *See id.* § 119(d)(2)(A)–(C), (F)–(H), (L), (P), (Q).  Two more relate to the inspection of and the training of inspectors for the National Highway System's infrastructure.  *See id.* § 119(d)(2)(D)–(E).  Several more purposes relate to safety and operations.  *See id.* § 119(d)(2)(I)–(K), (S).  Most relevant here, four of the permissible purposes relate to the environment.  *See id.* § 119(d)(2)(M)–(O), (R).

Like all the provisions found in Section 119(d)(2), those environmental provisions only authorize funds for specific, narrow activities.  Section 119(d)(2)(M) provides that funds may be used towards "[e]nvironmental restoration and pollution abatement in accordance with [S]ection 328."  *Id.* § 119(d)(2)(M).  Section 328 provides for specific projects related solely to "minimiz[ing] or mitigat[ing] the impacts of any transportation project" funded by the NHPP.  *See id.* § 328(a).  Further, projects funded under subsection (M) are only allowed "to address water pollution or environmental degradation caused wholly or partially by a transportation facility."  *Id.*  Section 119(d)(2)(N) provides that funds may be used towards the "[c]ontrol of noxious weeds and aquatic noxious weeds and establishment of native species in accordance with [S]ection 329."  *Id.* § 119(d)(2)(N).  Section 329, in turn, deals with protecting plant systems specifically "related to transportation projects funded under this title."  *Id.* § 329(a).  It further lists discrete activities related to that goal that may be addressed through NHPP funding, such as the establishment

of plants for the abatement of water runoff and the control or elimination of plants that impede or impair a transportation system. *See id.* § 329(a)–(b). Section 119(d)(2)(O) provides that funds may go towards "[e]nvironmental mitigation efforts related to projects funded under this [S]ection, as described in [Section 119(g)]." *Id.* § 119(d)(2)(O). Section 119(g) allows funds for a variety of mitigation efforts, such as participating in mitigation banking or contributions to statewide and regional efforts to conserve natural habitats and wetlands. *See generally id.* § 119(g)(1)–(2). Section 119(d)(2)(R) permits funds to go towards "[r]esiliency improvements on the National Highway System, including protective features described in [Section 119(k)(2)]." *Id.* § 119(d)(2)(R). Section 119(k)(2) lists protective features for which NHPP funds may be used, including things like "raising roadway grades," "stabilizing slide areas," and "increasing the size or number of drainage structures." *Id.* § 119(k)(2).

What these environmentally related purposes all have in common is a strict limitation on how NHPP funds may be used. Section 119(d)(2)(M) is strictly limited to accomplishing the terms of Section 328. *See id.* §§ 119(d)(2)(M), 328. Section 119(d)(2)(N) is likewise controlled by Section 329. *See id.* §§ 119(d)(2)(N), 329. Section 119(d)(2)(O) is tied to the mitigation efforts described in Section 119(g)—which, while broad in nature, are limited to reactive purposes, as demonstrated by the term "mitigation." *See id.* § 119(d)(2)(O), (g)(1)–(2). Section 119(d)(2)(R) is limited to "resiliency" improvements, which are tied to constructive or reconstructive efforts to protect infrastructure. *See id.* § 119(d)(2)(R), (k)(2). Thus, the funds could not properly apply towards the reduction of GHG emissions.

Further, the explicit enumeration of these provisions evince that Congress specifically excluded other environmental purposes. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017). Importantly, none of the provisions touch a subject even remotely related to $CO_2$ emissions by vehicles on the Interstate System or National Highway System. They are each more limited in scope to particular aspects of environmental impacts of the interstate and national-highway systems. The specific inclusion of these authorized environmental purposes—and the omission of anything related to GHG emissions—further weigh against adopting the DOT's broad interpretation of "performance."

\* \* \*

In sum, the statutory text indicates at every turn that measuring the "performance of the Interstate System . . . [and] the National Highway System" does not authorize measures of environmental performance. The definitions of "performance," "National Highway System," and "Interstate System" instruct that it is the roadways' efficiency and reliability in facilitating travel, commerce, and the national defense that may be measured. The associated measures in Section 150(c)(3) support this conclusion by focusing on the systems' physical infrastructure. The DOT's position, in contrast, would render other portions of the statute superfluous, and the national goal on which the DOT relies so heavily provides more support for the plaintiffs' position. Likewise, the statutory context consistently instructs the Court to reject the DOT's expansive interpretation. Thus, the Court concludes that the DOT's GHG emission measure is unauthorized by the statute.[17]

---

[17] In light of this conclusion, the Court need not, and does not, reach the plaintiffs' remaining claims that the 2023 Rule is arbitrary and capricious under the APA and also violates the Constitution's Spending Clause.

5.      **Remedy**

Having concluded that the DOT promulgated the GHG emissions measure in excess of its statutory authority, the Court now turns to the proper remedy.  The plaintiffs ask the Court to vacate the 2023 Rule.  Dkt. No. 1 at 22.  They defer to the Court as to whether the remedy should be party-specific.  Dkt. No. 30 at 14.  The defendants argue that any relief should be limited to the State of Texas.  Dkt. No. 25 at 27.  For the reasons described below and in light of binding precedent, the Court remands the rule with vacatur, a remedy that inherently sweeps broader than the parties.

A.      **The Rule is vacated and remanded.**

Under the APA, a court shall hold unlawful and set aside agency action that is in excess of the statutory authority.  5 U.S.C. § 706(2).  Section 706(2) goes "beyond the mere non-enforcement remedies available to courts" and "empowers courts to set aside—*i.e.*, formally nullify and revoke—an unlawful agency action."  *Data Mktg. P'ship v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (cleaned up) (quotation omitted).  The 2023 Rule is such an agency action.  *See* 5 U.S.C. § 551(13).

When awarding relief under Section 706(2), the Court may fashion the remedy in one of two ways: remand the rule with vacatur or remand the rule without vacatur.  *See Texas v. United States*, 50 F.4th 498, 529–30 (5th Cir. 2022).  The default rule is to vacate and remand the rule.  *See Data Mktg. P'Ship*, 45 F.4th at 859.  Remand without vacatur is an exceptional remedy that is appropriate where "there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so."  *See Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod.*

*Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021)); *see Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019).

When deciding whether vacatur is appropriate, a court should consider two factors. First, the court should evaluate "the seriousness of the deficiencies of the action" or "how likely it is the agency will be able to justify its decision on remand." *Texas*, 50 F.4th at 529 (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). Second, the court should assess "the disruptive consequences of vacatur." *Id.* (quoting *United Steel*, 925 F.3d at 1287). "A strong showing of one factor may obviate the need to find a similar showing of the other." *Am. Bankers Ass'n*, 934 F.3d at 674.

Here, the 2023 Rule was promulgated in excess of the agency's statutory authority and is therefore substantially deficient. *See supra* Section 4. Further, the defendants have not explained how they would substantiate the 2023 Rule if given the opportunity to do so. Without any such explanation, and in light of the 2023 Rule's deficiencies, the Court finds it unlikely that the defendants will be able to justify their decision on remand. *See Texas*, 10 F.4th at 560.

Further, there are no disruptive consequences that would support remand without vacatur. As a preliminary matter, the defendants do not raise any arguments on this front, other than noting that setting the rule aside would affect other court decisions currently pending around the country. *See* Dkt. No. 25 at 27–29. But that argument is more relevant to the scope of relief, discussed below. The Court notes that the 2023 Rule's effective date has been delayed several times, and the first reporting deadline is not until March 29, 2024. *See* Dkt. No. 13 at 1. Thus, the Court cannot identify a disruptive effect that would be caused by vacating the Rule. After all, the 2023 Rule is not functionally effective at this

moment, and its predecessor has not been in effect since the 2018 repeal.  Having

considered both the applicable factors, the Court concludes that remanding the Rule with

vacatur is appropriate.

> **B.    Fifth Circuit precedent provides that setting aside an unlawful agency action under the APA nullifies and voids that action; thus, the Court does not limit the vacatur to the plaintiffs.**

Having determined what relief is appropriate, the Court now considers the scope of

relief.  The defendants urge the Court to limit relief to the plaintiffs in this case.  *See* Dkt.

No. 25 at 27–29.  For support, they cite a host of authority regarding the propriety of

nationwide injunctions, *see id.* at 27–28, before addressing the scope of relief under the APA,

*see id.* at 28–29.  Here, the plaintiffs have requested vacatur, not an injunction, so the

injunction-related case law misses the mark.

While injunctions can be narrowly tailored to the parties, vacatur "formally nullifies

and revokes an unlawful agency action."  *Data Mktg. P'ship*, 45 F.4th at 859 (cleaned up)

(quotation omitted); *see also Vacate*, Black's Law Dictionary (11th ed. 2019) ("To nullify or

cancel; make void; invalidate."); John Harrison, *Vacatur of Rules under the Administrative

Procedure Act*, 40 Yale J. on Reg. Bull. 119, 120 (2023) ("[V]acatur is inherently universal.").

In other words, "[u]nlike an injunction, which merely blocks enforcement, vacatur unwinds

the challenged agency action."  *Data Mktg. P'ship*, 45 F.4th at 859 (quoting *Driftless Area

Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021)).  Vacatur therefore "erase[s]

[the agency action] from the books."  *See United States v. Texas*, 143 S. Ct. 1964, 1981 (2023)

(Gorsuch, J., concurring in the judgment).  And, if erased from the books, this relief cannot

logically be limited to the plaintiffs—if the rule no longer exists, it does not exist at all.  *See

Data Mktg. P'ship*, 45 F.4th at 859; *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir.

1989).  While this sweeping result has led some jurists to criticize the grant of such relief, *see, e.g.*, *Texas*, 143 S. Ct. at 1980–86 (Gorsuch, J., concurring in the judgment), this Court is bound by Fifth Circuit precedent that has continually maintained that vacatur is "the appropriate remedy" by "default."  *Data Mktg. P'ship*, 45 F.4th at 859; *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc), *cert. granted*, 144 S. Ct. 374 (2023).

To be sure, vacatur's status as the default rule does not mean the Court is without discretion to choose "a more limited remedy" if appropriate.  *See Cargill*, 57 F.4th at 472.  But a more limited remedy is not party-specific vacatur.  It is instead some other kind of remedy—"injunctive, declaratory, or otherwise."  *See id.*  The present predicament is that there is no other clear, more limited remedy requested by the plaintiffs that the Court could grant here that would redress the plaintiffs' injury.  *See* Dkt. No. 18 at 2.  While the plaintiffs previously sought injunctive relief, they withdrew that request before the defendants had an opportunity to respond.  Dkt. Nos. 9; 16.  Of course, the Court has discretion in fashioning relief, even if not requested by a party, Fed. R. Civ. P. 54(c), but that relief must have been "tested adversarially, tried by consent, or at least developed with meaningful notice to the defendant[s]."  *Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 340 (5th Cir. 2015); *Deanda v. Becerra*, --- F.4th ----, No. 23-10159, 2024 WL 1059721, at *13 (5th Cir. Mar. 12, 2024).  Several federal appellate courts have found it improper to use Rule 54(c) to grant injunctive relief even when actually requested in the complaint if the plaintiff fails to pursue an injunction throughout litigation.  *See id.* at 341 (collecting cases).  If those discretion-based injunctions were improper, it would seem odd that a sua sponte injunction where none is requested would be a valid use of Rule 54(c).  Even if the Court could issue a sua sponte party-specific injunction here, it would have to act without the benefit of developed

briefing on all four elements, in spite of the plaintiffs' prior abandonment of their request for such relief, and importantly, without the defendants having clear notice of such a possibility. And, despite its scope, vacatur is often considered "a less drastic remedy" than an injunction, so courts typically vacate rather than enjoin. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

      As for the request for a declaratory judgment, Dkt. No. 18 at 2, given the time-sensitive nature of the plaintiffs' impending obligations under the Rule, adequate relief requires an affirmative blockade of the agency's action, not merely a defensive tool. Moreover, courts in this circuit generally consider a declaratory judgment only after addressing vacatur. *E.g.*, *D&B Boat Rentals, Inc. v. United States*, 508 F. Supp. 3d 87, 101 (E.D. La. 2020); *Texas v. United States*, 606 F. Supp. 3d 437, 501–02 (S.D. Tex. 2022), *rev'd on other grounds*, 143 S. Ct. 1964 (2023). This ordering makes sense given that the APA directs that a "reviewing court *shall* . . . hold unlawful and set aside agency action"—which, again, generally means vacate—while declaratory relief is instead equitable and discretionary. *See* 5 U.S.C. § 706 (emphasis added); *Data Mktg. P'ship*, 45 F.4th at 859; *Rowan Cos. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989). And the defendants do not argue that the Court should grant a declaratory judgment in lieu of vacatur. Dkt. No. 25 at 27–29. As a result, based on the present record before the Court, there is no other more limited relief available that would address the plaintiffs' injuries that has been properly noticed to the defendants. So, although courts can, in certain circumstances, choose a more limited approach than vacatur, *Cargill*, 57 F.4th at 472, the Court concludes that doing so here would be inappropriate.

Accordingly, the Court concludes that the proper remedy here is vacatur, and, by necessary implication, that means relief not limited to the plaintiffs.  A remedy must be tailored to redress the plaintiffs' particular injury.  *Id.*  But the Court is not free to ignore the Fifth Circuit's precedent instructing that the precise remedy for the plaintiffs' APA claim is vacatur, particularly when, as here, no other suitable remedy is before the Court.[18]  *See Data Mktg. P'ship*, 45 F.4th at 859–60 (holding that the set-aside vacatur under Section 706(2) nullifies and revokes unlawful agency action).  The Fifth Circuit has repeatedly granted vacatur without limiting such relief to the parties.  *See, e.g.*, *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 623 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023); *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019); *Texas*, 50 F.4th at 529–30.  To the extent courts tailor vacatur, those limits address the scope of the agency action that is vacated, nullifying only those portions that are invalid.  *See Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 944–45 (N.D. Tex. 2019).  Unsurprisingly, because party-specific vacatur

---

[18] As the Court has already noted, members of the Supreme Court have questioned the validity of non-party-specific relief such as vacatur.  *See Texas*, 143 S. Ct. at 1980–86 (Gorsuch, J., concurring in judgment).  And there is ongoing scholarly debate on the subject, with some arguing that vacatur under the APA is universal and others claiming that any relief should be limited in scope to only the plaintiffs. *Compare* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2020), *with* John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. on Reg. Bull. 37 (2020), *and* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017). However, because the Court cannot ignore existing Fifth Circuit precedent on vacatur absent a Supreme Court decision overruling it, the Court follows existing precedent in vacating the Rule without limitation to the plaintiffs.

The Court recognizes the weighty concerns raised by the defendants as to why relief not limited to the parties should be disfavored.  For one, there is ongoing litigation in another district where 21 states have challenged the same rule, creating the possibility of conflicting rulings.  *See Kentucky v. Fed. Highway Admin.*, No. 5:23-cv-162-BJB (W.D. Ky. filed Dec. 21, 2023).  Moreover, vacatur runs contrary to the ordinary principle that relief is limited to what is necessary to redress the plaintiff's demonstrated harm.  *See Gill v. Whitford*, 585 U.S. 48, 73 (2018).  The Court does not grant this relief lightly.  But based on its understanding of precedent and the unique procedural posture at hand, the Court sees no viable or appropriate alternative.

runs contrary to the very nature of the relief, the defendants have cited no examples to the contrary.  *See* Dkt. No. 25 at 27–29.  To vacate is to void.  And the Court must do so here.

## 6.   Conclusion

"When a regulation attempts to override statutory text, the regulation loses every time—regulations can't punch holes in the rules Congress has laid down."  *Djie v. Garland*, 39 F.4th 280, 285 (5th Cir. 2022).  That is what occurred here—the DOT's 2023 Rule attempts to override Section 150(c)(3)'s clear limitation of authorized performance measures to those that track the physical condition and efficiency of the interstate and national-highway systems.  If the people, through Congress, believe that the states should spend the time and money necessary to measure and report GHG emissions and set declining emission targets, they may do so by amending Section 150 or passing a new law.  But an agency cannot make this decision for the people.  An agency can only do what the people authorize it to do, and the plain language of Section 150(c)(3) and its related statutory provisions demonstrate the DOT was not authorized to enact the 2023 Rule.

Given this reality, the Court grants the plaintiffs' motion for summary judgment (Dkt. No. 18) and denies the defendants' cross-motion for summary judgment (Dkt. No. 24).  Further, in light of relevant Fifth Circuit precedent, the Court determines that remand with vacatur is the appropriate remedy.  Therefore, the Court sets aside and vacates the 2023 Rule.  The Court denies all other requested relief.  Judgment, including a seven-day administrative stay, will follow in a separate Order.

So ordered on March 27, 2024.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE